# DEBTOR-IN-POSSESSION LOAN AGREEMENT

This Debtor-In-Possession Loan Agreement (this "Agreement") dated as of August 29, 2009, is entered into by and between 7677 East Berry Avenue Associates, L.P., a Delaware limited partnership ("Borrower"), as debtor and debtor-in-possession in Bankruptcy Case No. _09-28000_ pending in the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Case"), and Carmel Landmark, LLC ("Lender"), a Colorado limited liability company.

## INTRODUCTORY STATEMENT

On the Petition Date (as defined herein), Borrower filed its voluntary petition for protection under Chapter 11 of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the District of Colorado (the "Petition"). Borrower has continued in possession of its assets and in the management of its business pursuant to Bankruptcy Code §§ 1107 and 1108.

Borrower has requested that Lender provide credit pursuant to the terms hereof in an aggregate principal amount not to exceed $15,000,000.00.

The proceeds of the Loans (as defined herein) will be used (a) to provide working capital for Borrower, and (b) to pay Chapter 11 costs of administration, subject to the terms of this Agreement and Orders of the Bankruptcy Court (as defined herein).

To provide security for and assure the repayment of the Loans and the payment of the other Obligations (as defined herein) of Borrower hereunder and under the other Loan Documents (as defined herein), Borrower agrees that Lender shall be entitled to the following, pursuant to this Agreement and the Final Order (as more fully described herein):

(a) an allowed administrative expense claim in the Bankruptcy Case for all sums due or to become due under this Agreement and the other Loan Documents, with superpriority over all administrative expenses specified in the Bankruptcy Code, including without limitation §§ 503(b), 507(b) or 546(c) of the Bankruptcy Code, pursuant to § 364(c)(1) of the Bankruptcy Code subject only to the Carve-Out (as defined herein);

(b) pursuant to Bankruptcy Code § 364(c)(2), Borrower shall grant to Lender a perfected first-priority Lien (as defined herein) on all present and after-acquired Property (as defined herein) of Borrower not subject to a Lien on the Petition Date; and

(c) pursuant to Bankruptcy Code § 364(d), Borrower shall grant to Lender a perfected first-priority Lien on all Property of Borrower subject to a Lien on the Petition Date held by a creditor other than Lender, excepting only the Lien of FirsTier Bank that encumbers that certain Sales Tax Rebate Agreement dated November 22, 2005 between the City of Greenwood Village, Colorado, a Colorado home rule municipal corporation, and Borrower.

Accordingly, the parties hereto hereby agree as follows:

**Exhibit 1**

SECTION 1.
DEFINITIONS

1.1    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>Accounts</u>" means all of accounts, instruments, documents, chattel paper and general intangibles of Borrower, whether secured or unsecured, whether now existing or hereafter created or arising, and whether or not specifically assigned to Lender, including, without limitation, all "accounts" as defined in Article 9 of the UCC.

"<u>Affiliate</u>" means, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 5% or more of the securities having ordinary voting power for the election of directors or managers of such Person, or (b) direct or cause the direction of the management and policies of such Person whether through the ownership of voting securities, by contract or otherwise.

"<u>Agreement</u>" means this Debtor-in-Possession Loan Agreement, as amended, supplemented or otherwise modified from time to time.

"<u>Bankruptcy Case</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the District of Colorado, or any other court having jurisdiction over the Bankruptcy Cases from time to time.

"<u>Borrower</u>" has the meaning set forth in the preamble to this Agreement.

"<u>Borrowing Certificate</u>" has the meaning set forth in Section 2.1(a).

"<u>Borrowing Date</u>" means any Business Day specified in a notice pursuant to Section 2.1 as a date on which Borrower requests a Loan hereunder.

"<u>Break-up Fee</u>" means the sum of Three Hundred Thousand Dollars ($300,000.00), payable as provided in Section 5.9.

"<u>Business Day</u>" means any day other than a Saturday, Sunday or other day on which banks in the State of Colorado are required or permitted to close.

"<u>Budget</u>" means the thirty-six (36) month budget of Borrower, that segregates operating and capital expense projections, submitted to the Bankruptcy Court in substantially the form attached as <u>Exhibit A</u> to this Agreement, any revisions thereto approved by the Bankruptcy Court, and any subsequent Budgets provided by Borrower and approved by Lender pursuant to this Agreement or the Final Order.

"Capital Expenditures" means, for any period, with respect to any Person, the aggregate of all expenditures by such Person for the acquisition or leasing (pursuant to a capital lease) of fixed or capital assets or additions to equipment (including replacements, capitalized repairs and improvement, during such period) which should be capitalized under GAAP on the balance sheet of such Person.

"Capital Lease Obligations" means as to any Person, the obligation, of such Person to pay rent or other amounts under a lease of (or other arrangement conveying the right to use) real or personal Property, tangible or intangible, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Carve-Out" shall have the meaning given in the Final Order.

"Cash Collateral" has the meaning set forth in Bankruptcy Code §363(a).

"Change of Control" means: (a) any change of more than ten percent (10%) in the equity ownership or voting interests of Borrower from those previously disclosed to the Lender; (b) Borrower consolidates or amalgamates with or merges into another entity or conveys, transfers or leases all or substantially all of its property and assets to another Person; (c) any entity consolidates or amalgamates with or merges into Borrower in a transaction pursuant to which the outstanding interests of Borrower is reclassified or changed into or exchanged for cash, securities or other property; (d) the appointment of a Trustee under Chapters 11 or 7 of the Bankruptcy Code; or (e) the death, disability, removal, resignation, or other unavailability or inability of either Zachary Davidson or Karl Hirschey to manage and operate the Project.

"Chattel Paper" means all "chattel paper" as defined in Article 9 of the UCC including, without limitation, "electronic chattel paper" or "tangible chattel paper", as each term is defined in Article 9 of the UCC.

"Closing Date" means the date on which the conditions precedent to the making of the Initial Loan set forth in Section 4.1 have been satisfied or waived by Lender.

"Closing Fee" shall mean the sum of Three Hundred Thousand Dollars ($300,000.00), payable as provided in Section 2.1(a).

"Collateral" has the meaning set forth in Section 2.8.

"Collateral Records" means books, designs, orders, records, ledger cards, files, correspondence, customer lists, blueprints, technical specifications, manuals, computer software, computer printouts, tapes, disks and related data processing software and similar items that at any time evidence or contain information relating to any of the Collateral or are otherwise necessary or helpful in the collection thereof or realization thereupon.

"Collateral Support" means all Property (real or personal) assigned, hypothecated or otherwise securing any Collateral and shall include any security agreement or other agreement granting a Lien on such real or personal Property.

"Confirmation Order" means an order of the Bankruptcy Court confirming a Reorganization Plan in the Bankruptcy Case.

"Contractual Obligation" means as to any Person, any provision of any security issued by such Person or of any agreement, contract, instrument or undertaking to which such Person is a party or by which it or any of the Property owned or leased by it is bound.

"Deed of Trust" means that Deed of Trust and Security Agreement granted by Borrower for the benefit of Lender to secure repayment of the Obligations and encumbering Borrower's real Property interests, in the form of Exhibit B or otherwise in form and substance satisfactory to Lender.

"Deposit Account" means all "deposit accounts" as defined in Article 9 of the UCC including, but not limited to, the deposit accounts listed on Exhibit C attached hereto and incorporated herein by reference.

"Documents" means all "documents" as defined in Article 9 of the UCC.

"Environmental Laws" means all present or future federal, state or local laws, statutes, common law duties, rules, regulations, ordinances and codes, together with all administrative or judicial orders, consent agreements, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case relating to any matter arising out of or relating to public health and safety, or pollution or protection of the environment or workplace, including any of the foregoing relating to the presence, use, production, generation, handling, transport, treatment, storage, disposal, distribution, discharge, emission, release, threatened release, control or cleanup of any Hazardous Substance.

"Escrow Account" means the account established pursuant to Section 2.15.

"Equipment" means (a) all "equipment" as defined in Article 9 of the UCC and (b) all accessions or additions thereto, all parts thereof, whether or not at any time of determination incorporated or installed therein or attached thereto, and all replacements therefor, wherever located, now or hereafter existing, including any fixtures.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, including (unless the context otherwise requires) any rules or regulations promulgated thereunder.

"ERISA Affiliate" means any Person who for purposes of Title IV of ERISA is a member of any Borrower's controlled group, or under common control with any Borrower, within the meaning of Section 414 of the IRC, the regulations promulgated pursuant thereto and the rulings issued thereunder.

"ERISA Event" means (a) the occurrence of a reportable event, within the meaning of Section 4043 of ERISA, unless the 30-day notice requirement with respect thereto has been waived by the PBGC; (b) the provision by the administrator of any ERISA Plan of a notice of intent to terminate such ERISA Plan, pursuant to Section 4041(a)(2) of ERISA (including any such notice with respect to a plan amendment referred to in Section 4041(e) of ERISA); (c) the

cessation of operations at a facility in the circumstances described in Section 4068(f) of ERISA; (d) the withdrawal by Borrower or any ERISA Affiliate from a Multiple Employer Plan (as defined in ERISA) during a plan year for which it was a substantial employer, as defined in 4001(a)(2) of ERISA; (e) the failure by Borrower or any ERISA Affiliate to make a material payment to an ERISA Plan required under Section 302(f)(1) of ERISA; (f) the adoption of an amendment to an ERISA Plan requiring the provision of initial or additional security to such ERISA Plan, pursuant to Section 307 of ERISA; or (g) the institution by the PBGC of proceedings to terminate an ERISA Plan, pursuant to Section 4042 of ERISA, or the occurrence of any event or condition which might constitute grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, an ERISA Plan.

"ERISA Plan" means any employee benefit or other plan established or maintained, or to which contributions have been made, by Borrower or any Subsidiary and covered by Title IV of ERISA or to which Section 412 of the IRC applies.

"Event of Default" has the meaning set forth in Section 7.

"Exclusivity Period" means a period of time commencing with the date of this Agreement and concluding at the end of the thirtieth (30th) day following the Petition Date, or as otherwise extended by Lender.

"Extension Fee" means the sum of $300,000.00, payable as provided in Section 2.10.

"Final Order" means an order or orders of the Bankruptcy Court entered in the Bankruptcy Case, after a final hearing under Bankruptcy Rule 4001(c)(2), granting final approval of the transactions contemplated by this Agreement and the other Loan Documents and granting the first priority priming Liens and the Superpriority Claim described herein in favor of Lender, in form and substance satisfactory to Lender in its sole and absolute discretion, for which the time to file an appeal has expired, and no appeal or motion for rehearing has been filed, or if an appeal or motion for rehearing has been filed, but no stay has been entered.  Lender may in its sole discretion elect to treat such order as a Final Order.

"GAAP" means generally accepted accounting principles in the United States of America applied on a consistent basis.

"General Intangibles" means all "general intangibles" as defined in Article 9 of the UCC, including "payment intangibles" also as defined in Article 9 of the UCC.

"Goods" means all "goods" as defined in Article 9 of the UCC.

"Governmental Authority" means any Federal, state, county, municipal or other governmental department, commission, board, bureau, agency or instrumentality or any court, in each case whether of the United States of America or a foreign country.

"Guaranty Obligation" means as to any Person, any obligation of such Person guaranteeing any Indebtedness, leases, dividends or other obligations (the "Primary Obligations") of any other person (the "Primary Obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent

(a) to purchase any such Primary Obligation or any Property constituting direct or indirect security therefor, (b) to advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency of the Primary Obligor, (c) to purchase Property, securities or services primarily for the purpose of assuring the owner of any such Primary Obligation of the ability of the Primary Obligor to make payment of such Primary Obligation, or (d) otherwise to assure or hold harmless the owner of any such Primary Obligation against loss in respect thereof, provided that notwithstanding the foregoing, the term Guaranty Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business.  The amount of any Guaranty Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Primary Obligation in respect of which such Guaranty Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by such Person in good faith.

"Hazardous Substances" means (a) any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, radon gas and mold; (b) any chemicals, materials, pollutant or substances defined as or included in the definition of "hazardous substances", "hazardous waste", "hazardous materials", "extremely hazardous substances", "restricted hazardous waste", "toxic substances", "toxic pollutants", "contaminants", "pollutants" or words of similar import, under any applicable Environmental Law; and (c) any other chemical, material or substance, the exposure to, or release of which is prohibited, limited or regulated by any governmental authority or for which any duty or standard of care is imposed pursuant to, any Environmental Law.

"Indebtedness" means at any time and with respect to any Person, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all indebtedness of such Person for the deferred purchase price of Property or services (other than Property, including Inventory, and services purchased, and trade payables, other expense accruals and deferred compensation items arising, in the ordinary course of business, including negotiated trade terms and Chapter 11 expense accruals), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the ordinary course of business), (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to Property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such Property), (e) all Capital Lease Obligations of such Person, (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities, (g) all Guaranty Obligations of such Person in respect of indebtedness of others referred to in clauses (a) through (f) above, and (h) all indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in Property owned by such Person, even though such Person has not assumed or become liable for the payment of such indebtedness.

"Indemnified Party" means, respectively, each of the Lender and any parent entity, Affiliate or subsidiary of the Lender, and each of their respective members, managers, officers, directors, employees, attorneys and agents, and all of such parties and entities.

"Initial Loan" means a term loan in the principal amount of Ten Million Dollars ($10,000,000.00).

"Instruments" means all "instruments" as defined in Article 9 of the UCC.

"Insurance" means (a) all insurance policies covering any or all of the Collateral (regardless of whether Lender is the loss payee thereof), and (b) any key man life insurance policies.

"Intellectual Property" means the patents, trademarks, trade names, servicemarks, copyrights, technology, license fees, royalty payments, know-how and processes, and goodwill which are necessary for the conduct of Borrower's business as currently conducted.

"Interest Rate" means a fixed annual interest rate of twelve percent (12%), except during and throughout an Event of Default when the Interest Rate shall mean a fixed annual rate of eighteen percent (18%).

"Inventory" means all "inventory" as defined in Article 9 of the UCC.

"Investment" has the meaning set forth in Section 6.6.

"Investment Property" means all "investment property" as defined in Article 9 of the UCC.

"IRC" means the Internal Revenue Code of 1986, as amended from time to time.

"Lender" has the meaning set forth in the preamble to this Agreement.

"Lien" means with respect to any Property, any mortgage, deed of trust, lien (statutory or other), pledge, charge, hypothecation, assignment, deposit arrangement, security interest, encumbrance or other security agreement or preferential arrangement of any kind or nature in respect of such Property. For purposes of this Agreement and the other Loan Documents, a Person shall be deemed to own, subject to a Lien, any Property that it has acquired or holds subject to the interest of a vendor or lessor under any conditional sale agreement, capital lease or other title retention agreement (other than an operating tease) relating to such Property.

"Liquidity Events" has the meaning set forth in Section 2.15.

"Loans" means the Initial Loan and the Subsequent Loan.

"Loan Documents" means this Agreement, the Note, the Deed of Trust, each Borrowing Certificate, and any other instrument or agreement executed and delivered in connection herewith.

"Material Deviation" means, as of any determination date, an adverse deviation of more than the Permitted Deviation from the aggregate operating expense amount allocated for in the Budget.

"Material Adverse Effect" means a material adverse effect on (a) the Property, the Project, operations, prospects, and/or financial condition of Borrower taken as a whole, in each case, other than such effects as result solely from (i) the commencement of the Bankruptcy Case, (ii) the existence of pre-petition claims, or (iii) defaults under such pre-petition claims, (b) the validity or enforceability of the Final Order or any of the Loan Documents, (c) the rights and remedies of Lender under the Final Order and the Loan Documents, or (d) timely payment of the principal of or interest on the Loans or other amounts payable in connection therewith.

"Maturity Date" means January 31, 2011, unless extended as provided in Section 2.10.

"Maximum Lawful Rate of Interest" means a rate of interest equal to the highest rate of interest that may be charged under applicable laws or regulations in effect from time to time.

"Minimum Release Price Schedule" means Exhibit D, attached and incorporated into this Agreement.

"Money" means "money" as defined in the UCC.

"Note" means that Promissory Note made by Borrower payable to the order of Lender in the maximum principal amount of Fifteen Million Dollars ($15,000,000.00), in the form of Exhibit E or otherwise in form and substance satisfactory to Lender.

"Obligations" means (a) the principal of and interest on the Loans and the Note, (b) all other present and future, fixed or contingent, obligations and liabilities (monetary or otherwise) of the Borrower to Lender under the this Agreement and the other Loan Documents, including, without limitation, all costs and expenses payable pursuant to Section 9.5.

"PBGC" means the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Permitted Deviation" means ten percent (10%).

"Permitted Liens" means Liens permitted to exist under Section 6.2.

"Person" means any natural person, corporation, division of a corporation, partnership, trust, joint venture, association, limited liability company, other company or entity, estate, unincorporated organization or government or any agency or political subdivision thereof.

"Petition Date" means August 30, 2009.

"Proceeds" means (a) all "proceeds" as defined in Article 9 of the UCC, (b) payments or distributions made with respect to any Investment Property, and (c) whatever is receivable or received when Collateral or proceeds thereof are sold, exchanged, collected or otherwise disposed of whether such disposition is voluntary or involuntary.

"Property" means any right or interest in or to property of any kind whatsoever, whether real, personal or mixed and whether tangible or intangible.

"Project" means the land, improvements, fixtures and Equipment comprising that certain mixed use retail/residential condominium project located on the land described in Exhibit F and commonly known as Landmark.

"Receivables" means all rights to payment, whether or not earned by performance, for goods or other Property sold, leased, licensed, assigned or otherwise disposed of, or services rendered or to be rendered, including, without limitation, all such rights constituting or evidenced by any Account, Chattel Paper, Instrument, General Intangible or Investment Property, together with all of Borrower' rights, if any, in any Goods or other Property giving rise to such right to payment and all Collateral Support and Supporting Obligations related thereto and all books and records related thereto.

"Reorganization Plan" means a plan of reorganization in the Bankruptcy Cases.

"Requirements of Law" means as to any Person, the certificate of incorporation and by-laws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitration or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its Property or to which such Person or any of its Property is subject.

"Residential Unit Sales Target" means, at and as of the end of each calendar month prior to the Termination Date, the final sale(s) (after the date of this Agreement) in accordance with the terms of this Agreement, of not less than the number of Residential Units in the Project that is set forth for such month on Exhibit G.

"Subsequent Loan" means a term loan in the principal amount of Five Million Dollars ($5,000,000.00).

"Subsidiary" means with respect to any Person (herein referred to as the "Parent"), any corporation, partnership, limited liability company, association or other business entity (whether now existing or hereafter organized) of which at least a majority of the securities or other ownership interests having ordinary voting power for the election of directors or managers is, at the time as of which any determination is being made, owned or controlled by the Parent or one or more subsidiaries of the Parent or by the Parent and one or more subsidiaries of the Parent.

"Superpriority Claim" means an allowed administrative expense claim in all of the Bankruptcy Cases for all sums due or to become due under this Agreement and the other Loan Documents, with superpriority over all administrative expenses specified in the Bankruptcy Code, including without limitation §§ 503(b) or 507(b) of the Bankruptcy Code, pursuant to § 364(c)(1) of the Bankruptcy Code.

"Supporting Obligation" means all "supporting obligations" as defined in Article 9 of the UCC.

"Termination Date" means the earliest to occur of (a) the Maturity Date, (b) the date of indefeasible prepayment in full by Borrower of the Loans, (c) thirty (30) days following the Petition Date (or as otherwise extended by Lender) if the Final Order has not been entered by the Bankruptcy Court, (d) the date of the "substantial consummation" (as defined in Bankruptcy

Code §1101, but in any event no later than the effective date) of a Reorganization Plan confirmed by the Bankruptcy Court pursuant to the Confirmation Order in the Bankruptcy Case, (e) the date of the consummation of the sale of any portion of the Collateral for aggregate consideration greater than or equal to Forty Million Dollars ($40,000,000.00), outside the ordinary course of business pursuant to Bankruptcy Code § 363 whether sold to Lender or another purchaser making a higher and better bid, (f) the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or the appointment of a Chapter 11 trustee in the Bankruptcy Case, (g) dismissal of the Bankruptcy Case, (h) the occurrence of a Material Adverse Effect, (i) any Person is granted relief from the automatic stay under Section 362 of the Bankruptcy Code to pursue or foreclose on any of the Collateral having a value of $100,000.00 or more, (j) Borrower contests the validity, priority or enforceability of any Lien in favor of Lender or any provision of any Loan Document, (k) any Person other than Borrower contests the validity, priority or enforceability of any Lien in favor of Lender or any provision of any Loan Document and Borrower refuses or neglects to vigorously defend such contest, (l) Lender's acceleration of the Loans upon the occurrence of an Event of Default hereunder, or (m) Lender's Break-up Fee and expense reimbursement has not been approved by an order of the Bankruptcy Court entered within seven (7) days following the Petition Date.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of Colorado or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

1.2    Terms Generally.  The definitions in Section 1.1 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  All references herein to Sections and Exhibits shall be deemed references to Sections and subsections of, and Exhibits to, this Agreement unless the context shall otherwise require.  The use herein of the word "include" or "including" when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that are within the broadest possible scope of such general statement, term or matter.

1.3    Accounting Terms.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP as in effect from time to time.

1.4    Computation of Time.  In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including", the words "to" and "until" each mean "to but excluding" and the word "through" means "to and including".

SECTION 2.
AMOUNT AND TERMS OF LOANS

2.1    <u>Loans</u>.

(a)    <u>Initial Loan</u>.  Borrower shall deliver to Lender a fully executed Borrowing Certificate on or before the Closing Date substantially in the form of <u>Exhibit H</u> (the "Borrowing Certificate"), which certificate shall specify (i) the amount to be borrowed (which shall be equal to Ten Million Dollars ($10,000,000.00), and (ii) a Budget reflecting the items to be funded with the Initial Loan proceeds.  Upon Lender's approval of the use of the requested proceeds, which approval shall be in Lender's sole and absolute discretion, payment of the Closing Fee to Lender (which may be paid from the proceeds of the Initial Loan), and satisfaction of all conditions precedent specified in Section 4.1, Lender shall make the proceeds of the Initial Loan (the "Initial Loan") available to Borrower after entry of the Final Order by causing an amount of good and immediately available funds to be credited to Borrower in an account approved by Lender.

(b)    <u>Subsequent Loan</u>.  Borrower may request Lender to make the Subsequent Loan by delivering to Lender a Borrowing Certificate on or before March 1, 2010, which certificate shall specify (i) the amount to be borrowed (which shall be equal to Five Million Dollars ($5,000,000.00)), (ii) the requested Borrowing Date (which shall be not less than ten (10) nor more than thirty (30) days after delivery of the Borrowing Certificate), and (iii) a Budget reflecting the items funded with proceeds from the Initial Loan and the items to be funded with proceeds from the Subsequent Loan.  Upon Lender's approval of the use of the requested proceeds, which approval shall be in Lender's sole and absolute discretion, and satisfaction of all conditions precedent specified in Section 4.2, Lender shall make the proceeds of the requested Subsequent Loan available to Borrower on such Borrowing Date by causing an amount of good and immediately available funds to be credited to Borrower in an account approved by Lender.

2.2    <u>Use of Proceeds</u>.  Borrower agrees that it shall use the proceeds of the Loans solely (i) to provide working capital for Borrower, (ii) to pay Chapter 11 costs of administration, and (iii) in accordance with the Budget.  No portion of the Loans shall be used in any way to investigate any claims against Lender or to assert any claims or defenses of any kind or character against Lender whether such claims or defenses arise under the Loans or any other loan or lease or other transaction or occurrence.

2.3    <u>Repayment of Loans</u>.    Borrower hereby unconditionally promises to pay to Lender the then unpaid principal amount of the Loans, plus all accrued and unpaid interest, on the Termination Date.  Monthly installments of interest hereunder shall be paid monthly in arrears, on the first day of each calendar month during the term hereof, following the entry of the Final Order.

2.4    <u>Interest Rate and Payment Dates</u>.  Each Loan shall bear interest for each day at the Interest Rate.  If all or a portion of (i) any principal of any Loan, (ii) any interest payable thereon, or (iii) any other amount payable hereunder or under any of the other Loan Documents shall not be paid when due (whether at the stated maturity, by acceleration or otherwise), the principal of the Loans and any such overdue interest or other amount shall bear interest at the

lesser of the (A) the Maximum Lawful Rate of Interest or (B) the applicable Interest Rate, in each case from the date of such non-payment until such overdue principal, interest or other amount is paid in full.

2.5     Computation of Interest.  Interest shall be calculated on the basis of a 360-day year for the actual days elapsed.

2.6     Optional Prepayment.  Borrower may, at any time, prepay any Loans, in whole or in part, without premium or penalty.

2.7     Priority and Lien.  Borrower hereby covenants, represents and warrants that, upon entry of the Final Order, the Obligations and the Final Order, (i) pursuant to Bankruptcy Code §364(c)(1), shall at all times constitute allowed Superpriority Claims in the Bankruptcy Case, (ii) pursuant to Bankruptcy Code § 364(c)(2), shall be secured by a perfected first-priority Lien on all previously unencumbered Collateral, and (iii) pursuant to Bankruptcy Code § 364(d), shall be secured by a perfected first-priority Lien on all Property of Borrower subject to a Lien on the Petition Date held by a creditor other than Lender, excepting only the Lien of FirsTier Bank that encumbers that certain Sales Tax Rebate Agreement dated November 22, 2005 between the City of Greenwood Village, Colorado, a Colorado home rule municipal corporation, and Borrower.

2.8     Security Interest.  To secure the Obligations, Borrower hereby grants to Lender a Lien on and security interest in all of Borrower's right, title and interest in all assets of Borrower including, without limitation, the following, in each case whether now owned or existing or hereafter acquired or arising and wherever located (all of which being herein collectively referred to as the "Collateral"): (i) Accounts; (ii) Chattel Paper; (iii) Documents; (iv) General Intangibles; (v) Goods, including Equipment and Inventory; (vi) Instruments; (vii) Intellectual Property; (viii) Investment Property; (ix) Insurance, (x) Money; (xi) Receivables; (xii) Deposit Accounts and the Escrow Account; (xiii) real Property the title to which is held by Borrower, or the possession of which is held by Borrower in the form of a leasehold interest; (xiv) to the extent not otherwise included above, all Collateral Records, Collateral Support and Supporting Obligations relating to any of the foregoing; and (xv) to the extent not otherwise included above, all Proceeds, products, accessions, rents and profits of or in respect of any of the foregoing.

Borrower acknowledges that, pursuant to the Final Order, the Liens granted in favor of Lender in all of the Collateral shall be perfected without the recordation of any UCC financing statements, notices of Lien, deeds of trust, or other instruments of mortgage or assignment. Notwithstanding the foregoing, Borrower shall authorize and/or execute such financing statements, deeds of trust, instruments and notices as may be requested by Lender.  Borrower further agrees that (i) Lender shall have the rights and remedies set forth in Section 8 in respect of the Collateral, and (ii) if requested by Lender, Borrower shall execute and/or deliver to Lender any additional assignments, control agreements, leasehold mortgages, mortgages on real Property, deeds of trust, security agreements, pledge agreements, control agreements, UCC Financing Statements, and other security instruments which Lender may request or deem necessary or advisable to perfect its interests in the Collateral, including such instruments as may be recorded in the public records.

2.9    Payment of Obligations.  Upon the Termination Date (whether by acceleration or otherwise) of any of the Obligations under this Agreement or any of the other Loan Documents, Lender shall be entitled to immediate payment of all Obligations without further application to or order of the Bankruptcy Court.

2.10    Extension of Maturity Date.    Provided that there is no Event of Default in existence or continuing at the time Borrower delivers the notice and payment described below, Borrower shall have the right to extend the Maturity Date to January 31, 2012, upon notice to such effect delivered to Lender on or before December 1, 2010, and payment to Lender of the Extension Fee contemporaneously with the delivery of such notice.

2.11    Carve-Out.  Notwithstanding any other provision of this Agreement, including but not limited to Sections 2.7 and 2.8, the Superpriority Claim and any Liens in favor of Lender on Borrower's Property, shall be subject to the Carve-Out.

2.12    Method of Payment.   All payments hereunder, including without limitation all payments of principal of and interest on the Loans, shall be made to Lender pursuant to the wire transfer instructions provided by Lender to Borrower after execution of this Agreement, or as otherwise agreed between Borrower and Lender.   Whenever any payment hereunder becomes due on a day other than a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the interest due. Any payment made to Lender shall be applied in the following order:  first, to the payment of any expense owing to Lender; second, to the payment of interest on the Loan; third, to the payment of the principal amount of the Loan outstanding; and fourth, to any other amounts owing to Lender hereunder.

2.13    Full Payment Required.  Any Confirmation Order shall not discharge or otherwise affect in any way any of the Obligations of Borrower to the Lender or the performance of this Agreement, other than through the payment in full in cash to the Lender of all Obligations and the full performance of this Agreement on or before the effective date of the Plan of Reorganization.

2.14    Partial Release.   Lender shall from time to time release one or more of the residential units and/or the retail units in the Project from the Lien of the Loan Documents securing the Loan and deliver in escrow a duly executed partial release of the Deed of Trust in recordable form and other such documents as may be reasonably required for release.   Any partial release pursuant to this Section 2.14 is conditional upon satisfaction of each of the following conditions:

(a)    Lender shall have received a copy of an executed sales contract with respect to such residential or retail unit, as the case may be;

(b)    Borrower shall have given to Lender a written request for the release accompanied by all evidence, information and other items required by Lender in its reasonable discretion not less than five (5) Business Days prior to the desired release date;

(c)     Borrower shall have delivered to Lender a copy of the closing statement for the sale of the residential or retail unit, as the case may be, certified by Borrower as true and correct not less than one (1) Business Day prior to the desired release date;

(d)     Neither the release from the Lien nor the conveyance to the purchaser of such residential or retail unit will violate any applicable Requirements of Law (including zoning and subdivision requirements) and the residential or retail unit being sold, the remaining portion of the property, and the conveyance shall be in compliance with all applicable Requirements of Law (including zoning and subdivision requirements);

(e)     With respect to a release of a residential or retail unit, Lender shall concurrently and timely receive by wire transfer of immediately available funds all net proceeds of the transaction and such funds shall be deposited into the Escrow Account defined in Section 2.15 below.  The minimum release prices paid to Lender for each applicable unit shall be in accordance with the Minimum Release Price Schedule; provided, however, that such minimum release prices may vary from the prices set forth on the Minimum Release Price Schedule so long as on a cumulative basis, the aggregate amount of minimum release prices paid to Lender is equal to or greater than the aggregate amount of minimum release prices set forth on the Minimum Release Price Schedule for the applicable units that have then been sold; and

(f)     Borrower shall have delivered to Lender a certified copy of the Bankruptcy Court's order approving the sale, which order shall be final and non-appealable.

2.15   <u>Mandatory Escrow</u>.  The Borrower will be required until the Termination Date to fund the net proceeds of the following "Liquidity Events" into an escrow account (the "Escrow Account") established as a separate Borrower Deposit Account, with respect to which Borrower and Lender shall have joint signature authority, and no funds shall be disbursed therefrom without both signatures, which signatures, if required by this Agreement, shall be provided within five (5) days following request thereof:

(a)     100% of insurance proceeds applicable to any of the Collateral, unless such proceeds are, within 90 days following such casualty event, expended on replacement of like-kind collateral which is subject to the Lender's Lien, (in which case the Loans shall be repaid in an amount equal to the insurance proceeds less replacement capital expenditures);

(b)     100% of all net proceeds after deduction of transaction costs but not debt repayment from asset sales subject to release prices set forth in the Minimum Release Price Schedule; and

(c)     100% of all net proceeds from any debt or equity issuance related to the Project.

2.16   <u>Segregation and Application of Escrow Account</u>.  Proceeds from Liquidity Events placed in the Escrow Account shall remain property of Borrower's bankruptcy estate and subject to Lender's Lien and the provisions of this Agreement.  Escrow Account funds will be accounted for and used as follows:

(a)     First:  A working capital reserve will be established and funded up to a maximum amount of Five Million Dollars ($5,000,000.00);

(b)     Second:  After the working capital reserve, a loan repayment reserve will be established and funded up to a maximum amount equal to 110% of the Loans then outstanding;

(c)     Third:  Excess funds will be released to the Borrower.

After Borrower has utilized all of the proceeds of the Loans consistent with the terms of this Agreement, it may request use of funds from the working capital reserve held in the Escrow Account to pay items set forth in the Budget by providing Lender with a written request to that effect.  Provided that there is no Event of Default then in existence or continuing, Lender shall honor such requests on a monthly basis until the working capital reserve portion of the Escrow Account is depleted.  Borrower acknowledges and agrees that the working capital reserve, once drawn upon, will not be replenished from the proceeds of subsequent Liquidity Events, and that after a total of Five Million Dollars ($5,000,000.00) has been placed in the Escrow Account, proceeds of subsequent Liquidity Events shall be earmarked to the Loan repayment reserve until that reserve is fully funded.

## SECTION 3.
## REPRESENTATIONS

In order to induce Lender to make Loans hereunder, Borrower hereby represents as follows:

3.1     <u>Organization and Authority</u>.  Borrower (a) is duly organized and validly existing under the laws of the jurisdiction of its incorporation or formation, as the case may be, and is duly qualified as a foreign corporation and either is in good standing or will be in good standing within thirty days of the date of this Agreement in each jurisdiction in which the failure to so qualify could reasonably be expected to have a Material Adverse Effect; (b) subject to the entry by the Bankruptcy Court of the Final Order, has the requisite corporate power and authority to effect the transactions contemplated hereby and by the other Loan Documents, and (c) subject to the entry by the Bankruptcy Court of the Final Order, has all requisite corporate power and authority and the legal right to own, pledge, mortgage and operate its Properties, to lease the Properties it operates as lessee and to conduct its business as now or currently proposed to be conducted.

3.2     <u>Due Execution; Binding Obligation</u>.  Upon entry by the Bankruptcy Court of the Final Order, the execution, delivery and performance by Borrower of each of the other Loan Documents to which it is a party, and the commencement of the Bankruptcy Case are within the power of Borrower and have been duly authorized by all necessary corporate action.  Upon entry by the Bankruptcy Court of the Final Order, this Agreement has been duly executed and delivered by Borrower.  This Agreement is, and each of the other Loan Documents to which Borrower is or will be a party, when delivered hereunder or thereunder, will be, a legal, valid and binding obligation of Borrower, enforceable against Borrower in accordance with its terms and the Final Order, except to the extent that the enforceability thereof may be limited by applicable

bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

3.3     Financial Statements.   Any financial statements delivered pursuant to this Agreement or the other Loan Documents, taken as a whole and in light of the circumstance in which made, contain no untrue statement of a material fact and do not omit to state a material fact necessary to make such statements not misleading.

3.4     Title to Assets.   Borrower owns and has on the date hereof good and marketable fee or leasehold title to, or a right or license to use, the Properties (subject only to Permitted Liens that are necessary for the operation and conduct of the Project).   There are no Liens of any nature whatsoever on any assets of Borrower other than: (i) Liens granted pursuant to the Final Order and this Agreement, and (ii) the other Permitted Liens.

3.5     Final Order.   As of the date of the making of the Initial Loan hereunder, the Final Order must have been entered and must not have been stayed, amended, vacated, reversed, rescinded or otherwise modified in any respect.   As of the date of the making of the Subsequent Loan hereunder, the Final Order must have been entered and must not have been stayed, amended (except in accordance with the terms hereof or as consented to by Lender), reversed, vacated, rescinded or otherwise modified (except in accordance with the terms hereof or as consented to by Lender) in any respect.

3.6     Insurance.   All policies of insurance of any kind or nature owned by or issued to Borrower, including, without limitation, policies of life, fire, theft, product liability, public liability, property damage, other casualty, employee fidelity, workers' compensation, employee health and welfare, title, property and liability insurance, are in full force and effect and are of a nature and provide such coverage as in the reasonable opinion of Borrower, is sufficient and as is customarily carried by companies of the size and character of Borrower.

3.7     Licenses, etc.   Subject to Bankruptcy Code § 365, Borrower shall have obtained and shall hold in full force and effect, either directly or through an Affiliate, all franchises, licenses, permits, certificates, authorizations, qualifications, accreditations, easements, rights of way and other rights, consents and approvals which are necessary for the ownership and operation of the Project, except where the failure to so obtain the foregoing could not, individually or in the aggregate, have a Material Adverse Effect.

3.8     Litigation.   Except for the Bankruptcy Case and as disclosed on Schedule 3.8 to be delivered to Lender on or before five (5) business days prior to the Closing Date, (i) there is no litigation, arbitration, legal or administrative proceeding, tax audit, investigation, or other action or proceeding of any nature pending against Borrower or any of its Properties, and (ii) to the best of Borrower's knowledge, information, and belief, there is no litigation, arbitration, legal or administrative proceeding, tax audit, investigation, or other action or proceeding of any nature threatened against Borrower.   Borrower is not subject to any outstanding court, arbitration, or administrative order, writ, or injunction.

3.9     ERISA.   Borrower is in compliance in all material respects with all applicable provisions of ERISA.  No ERISA Event has occurred with respect to any ERISA Plan or is reasonably expected to occur with respect to any ERISA Plan.

3.10     Intellectual Property.   Borrower owns or possesses adequate licenses or other rights to use all patents, trademarks, trade names, service names, service marks, copyrights, licenses, permits, franchises, registrations, formulas, trade secrets, or other intangible property rights and know-how necessary to entitle it to own, develop, and operate the Project, and the use thereof by Borrower does not infringe upon the rights of any other Person, except for any such infringements that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

3.11     Significant Contracts.   On or before five (5) business days prior to the Closing Date, Borrower shall deliver to Lender Schedule 3.11 which shall be a complete and correct list of all contracts, agreements, and other documents pursuant to which Borrower receives revenues in excess of Ten Thousand and No/100ths Dollars ($10,000.00) per fiscal year or has committed to make expenditures in excess of Ten Thousand and No/100ths Dollars ($10,000.00) per fiscal year.

3.12     Environmental Laws and Hazardous Substances.    The Borrower has not generated, used, stored, treated, transported, manufactured, handled, produced or disposed of any Hazardous Substances, on or off any of the Project in any manner which at any time violates any Environmental Law or any license, permit, certificate, approval or similar authorization thereunder.  The Borrower will comply in all material respects with all Environmental Laws and will obtain all licenses, permits certificates, approvals and similar authorizations thereunder. There has been no investigation, proceeding, complaint, order, directive, claim, citation or notice by any governmental authority or any other Person, nor is any pending or, to the best of the Borrower's knowledge, threatened, and the Borrower shall immediately notify the Lender upon becoming aware of any such investigation, proceeding, complaint, order, directive, claim, citation or notice, and shall take prompt and appropriate actions to respond thereto, with respect to any non-compliance with, or violation of, the requirements of any Environmental Law by the Borrower or the release, spill or discharge, threatened or actual, of any Hazardous Substances or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Substances or any other environmental, health or safety matter, which affects the Borrower or its business, operations or assets or any properties at which the Borrower has transported, stored or disposed of any Hazardous Substances.  The Borrower has no material liability, contingent or otherwise, in connection with a release, spill or discharge, threatened or actual, of any Hazardous Substances or the generation, use, storage, treatment, transportation, manufacture, handling, production or disposal of any Hazardous Substances.  The Borrower further agrees to allow the Lender or its agent access to the Project to confirm compliance with all Environmental Laws, and the Borrower shall, following determination by the Lender that there is non-compliance, or any condition which requires any action by or on behalf of the Borrower in order to avoid any non-compliance, with any Environmental Law, at the Borrower's sole expense, cause an independent environmental engineer acceptable to the Lender to conduct such tests of the relevant site as are appropriate, and prepare and deliver a report setting forth the result of such tests, a proposed plan for remediation and an estimate of the costs thereof.

3.13   <u>Office of Foreign Asset Control</u>.   Neither Borrower nor any of its respective Affiliates is a Prohibited Person and Borrower and all of its respective Affiliates are in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control of the U.S. Department of the Treasury.   At all times throughout the term of the Loans, Borrower and all of its respective Affiliates shall: (i) not be a Prohibited Person (defined below); and (ii) be in full compliance with all applicable orders, rules, regulations and recommendations of The Office of Foreign Assets Control ("OFAC") of the U.S. Department of the Treasury.

    (a)    The term "Prohibited Person" shall mean any person or entity:

        (i)    listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (the "Executive Order");

        (ii)    that is owned or controlled by, or acting for or on behalf of, any person or entity that is listed to the Annex to, or is otherwise subject to the provisions of, the Executive Order;

        (iii)    with whom Lender is prohibited from dealing or otherwise engaging in any transaction by any terrorism or money laundering law, including the Executive Order;

        (iv)    who commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order;

        (v)    that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website, www.ustreas.gov/offices/enforcement/ofac, or at any replacement website or other replacement official publication of such list; or

        (vi)    who is an Affiliate of or affiliated with a person or entity listed above; or

        (vii)    who is a "disregarded entity" as defined in IRS Regulation 1.14452(b)(2)(iii).

The term "Affiliate," as used in this <u>Section 3.13</u>, shall mean as to any person or entity, any other person or entity that, directly or indirectly, is in control of, is controlled by or is under common control with such person or entity or is a director or officer of such person or entity or of an Affiliate of such person or entity.   As used herein, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a person or entity, whether through ownership of voting securities, by contract or otherwise.

SECTION 4.
CONDITIONS PRECEDENT

4.1    Conditions to Initial Borrowing.   The obligation of Lender to make the Initial Loan is subject to the satisfaction, immediately prior to or currently with the making of such Loan, of the following conditions precedent, unless Lender has previously waived any such condition precedent in writing:

(a)    Loan Documents.  Lender shall have received (i) this Agreement, executed and delivered by a duly authorized officer of Borrower, (ii) a Note and Deed of Trust conforming to the requirements hereof and executed by a duly authorized officer of Borrower, and (iii) such other documents, including, without limitation, deeds of trust, security agreements, pledge agreements and other related collateral documents, that are customary in such transactions, in form and substance satisfactory to Lender.

(b)    Final Order.  Before the time of the making of the Initial Loan, and in any event no later than thirty (30) days after the Petition Date, Lender shall have received a copy of the Final Order approving this Agreement and the other Loan Documents and granting the Superpriority Claim status and Liens described herein and finding that Lender is extending credit to Borrower in good faith within the meaning of Bankruptcy Code § 364(e), which Final Order (i) shall be in form and substance satisfactory to Lender in its sole and absolute discretion, including providing Lender with immediate relief from the automatic stay upon the occurrence of an Event of Default, (ii) shall have been entered upon an application of Borrower in form and substance satisfactory to Lender, (iii) shall be in full force and effect, and (iv) shall not have been stayed, reversed, vacated, rescinded, modified or amended in any respect, and, if the Final Order is the subject of a pending appeal in any respect, none of the making of such Loan, the granting of Liens and Superpriority Claims herein or the performance by Borrower of any of its obligations hereunder or under the other Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(c)    No Material Adverse Change.  Since the Petition Date, no event, act or condition shall have occurred in the Project, assets, operations, prospects, or Properties of Borrower which, in the reasonable judgment of Lender, has had or would have a Material Adverse Effect.

(d)    No Injunction.  Since the Petition Date, no law or regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which in the judgment of Lender would enjoin, prohibit or restrain, or impose or result in the imposition of any material adverse condition upon, the making or repayment of the Loans.

(e)    Budget.  Lender shall have received and approved (in its sole and absolute discretion) the Budget.

(f)    Additional Matter.  All corporate and other proceedings, and all documents, instruments and other legal matters in connection with the transactions contemplated by this Agreement and the other Loan Documents, shall be in form and substance satisfactory to

Lender, and Lender shall have received such other documents in respect of any aspect or consequence of the transactions contemplated hereby or thereby as it shall reasonably request.

(g)     Representations.   All representations contained in or pursuant to this Agreement and the other Loan Documents, or otherwise made in writing in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of each Loan hereunder with the same effect as if made on and as of such date (unless stated to relate to a specific earlier date, in which case, such representations shall be true and correct in all material respects as of such earlier date).

(h)     Title Insurance.   Borrower, at its expense, has provided Lender with a Mortgagee's Title Insurance Policy for the maximum amount of the Loans and insuring Lender's first-priority Lien on Borrower's real Property, in form and substance satisfactory to Lender in its sole and absolute discretion.

(i)     Break-up Fee.   Lender's Break-up Fee and expense reimbursement shall have been approved by an order of the Bankruptcy Court entered within seven (7) days following the Petition Date, and such order shall not have been stayed, reversed, vacated, rescinded, or, without the consent of Lender, modified or amended in any respect.

(j)     Legal Opinions.   Such opinions of counsel as Lender may require with respect to the matters represented in Section 3.1 and the first two sentences of Section 3.2.

(k)     Cash Collateral.   Borrower shall have obtained an order from the Bankruptcy Court authorizing its use of Cash Collateral of all parties other than Lender.

4.2     Conditions to Subsequent Borrowing.   The obligation of Lender to make the Subsequent Loan is subject to the following conditions precedent, unless Lender has previously waived any such condition precedent in writing:

(a)     Notice; Borrowing Certificate.   Lender shall have received a Borrowing Certificate as provided in Section 2.1(b), executed by an authorized officer of Borrower. Borrower agrees that the delivery of any such Borrowing Certificate shall constitute a certification by Borrower that (i) the requested Loan and the intended use thereof are consistent with the terms of this Agreement and is necessary for Borrower to satisfy its obligations in the ordinary course of business or as otherwise permitted under this Agreement, (ii) the proceeds of all prior Loans have been applied in conformity with the requirements of this Agreement, (iii) all of the representations contained in Section 3 are true and correct as required by Section 4.2(b), (iv) Borrower has observed and performed in all material respects all applicable covenants and agreements contained herein and in the other Loan Documents and the Final Order, and satisfied each condition to such Loan contained herein or in the other Loan Documents or in the Final Order, to be observed, performed or satisfied by Borrower, (v) the making of the requested Loan is in compliance with all provisions of this Agreement and the other Loan Documents, and (vi) such authorized officer has no knowledge of any Event of Default.

(b)     Representations.   All representations contained in or pursuant to this Agreement and the other Loan Documents, or otherwise made in writing in connection herewith or therewith, shall be true and correct in all material respects on and as of the date of each Loan

hereunder with the same effect as if made on and as of such date (unless stated to relate to a specific earlier date, in which case, such representations shall be true and correct in all material respects as of such earlier date).

(c)     <u>No Event of Default</u>.   No Event of Default shall have occurred and be continuing on such Borrowing Date or after giving effect to such Loan on such Borrowing Date.

(d)     <u>Material Adverse Effect</u>.   Since the Petition Date there shall not have been any Material Adverse Effect.

(e)     <u>Bankruptcy Court Approval</u>.   The Final Order shall be in full force and effect and shall not have been stayed, reversed, vacated, rescinded, or, without the consent of Lender, modified or amended in any respect, if the Final Order is the subject of a pending appeal in any respect, none of the making of such Loan, the grant of Liens and Superpriority Claims pursuant hereto or the performance by Borrower of any of its obligations hereunder or under the other Loan Documents or under any other instrument or agreement referred to herein or therein shall be the subject of a then effective stay pending appeal.

(f)     <u>Budget</u>.   Lender shall have received and approved (in its sole and absolute discretion) any necessary subsequent Budget.

(g)     <u>Pleadings</u>.   No pleading shall have been filed in the Bankruptcy Court by any party which is not withdrawn, dismissed or denied within thirty (30) days after such filing seeking (i) to dismiss or convert the Bankruptcy Case to a Chapter 7 case, (ii) the appointment of a Chapter 11 trustee in the Bankruptcy Case, (iii) the appointment of an examiner having enlarged powers relating to the operation of the business of Borrower (beyond those set forth under Bankruptcy Code § 1106(b) or §§ 1106(a)(3) and (4), (iv) the allowance of a Superpriority Claim or a Lien <u>pari passu</u> or senior to that of Lender granted hereunder pursuant to Bankruptcy Code § 364(c)(3) , (v) to stay, reverse, vacate or otherwise modify the Final Order without the prior written consent of Lender, or (vi) relief from the automatic stay so as to allow a third party to proceed against any Property or asset of Borrower with a value equal to or greater than $100,000.00 (except with respect to a third party proceeding against Property or assets of Borrower in which such third party has a perfected first-priority Permitted Lien).

(h)     <u>Cash Collateral</u>.   Borrower shall have obtained an order from the Bankruptcy Court authorizing its use of Cash Collateral of all parties other than Lender.

<div align="center">SECTION 5.<br>AFFIRMATIVE COVENANTS</div>

Borrower hereby agrees that, so long as any Loan remains outstanding and unpaid or any other amount is owing to Lender hereunder or under any other Loan Document, Borrower shall:

5.1     <u>Financial Statements, Etc</u>.  Until the Termination Date, deliver to Lender: (i) not later than twenty (20) days following every calendar month end unaudited financial statements for the calendar month which shall be presented in a form consistent with generally accepted accounting principals, consistently applied, or in a form otherwise acceptable to Lender, and (ii) as soon as available, the monthly operating report required to be provided to the United States

Trustee.  All such financial statements delivered pursuant to this Section 5.1 shall be complete and correct in all material respects and shall be prepared in reasonable detail and in accordance with GAAP (other than the inclusion of footnotes and year-end adjustments) applied consistently throughout the periods reflected therein.

    5.2    <u>Other Information</u>.  Furnish to Lender:

    (a)    promptly following the delivery thereof to Borrower or to the Board of Directors or management of Borrower, a copy of any management letter or report by independent public accountants with respect to the financial condition, operations, business or prospects of Borrower;

    (b)    promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of Borrower with the Bankruptcy Court or the United States Trustee in the Bankruptcy Cases, or distributed by or on behalf of Borrower to any official committee appointed in the Bankruptcy Case; and

    (c)    concurrently with the delivery to Lender of the above monthly financial statements and reports, Borrower shall provide Lender with monthly variance reports, in form satisfactory to Lender, which reports shall include a detailed accounting of any variance between the actual monthly operating results versus the projected results in each category described in the Budget.

    5.3    <u>Maintenance of Property; Insurance</u>.  Keep all of its respective Property in good working order and condition, subject to ordinary wear and tear and damage by casualty or governmental taking or action in lieu thereof, except where the failure to do so could not reasonably be expected to have a Material Adverse Effect; maintain pre-Petition Date insurance policies on its Property, which policies shall name Lender as an additional insured and the loss payee for the proceeds of any such policy; and furnish to Lender, upon written request, certificates evidencing such insurance in form and substance acceptable to Lender.

    5.4    <u>Inspection of Property Books and Records; Discussions</u>.  Keep proper books of records and accounts in which full, true and correct entries in conformity with GAAP and all Requirements of Law shall be made of all dealings and transactions in relation to their respective businesses and activities; and permit representatives of Lender, upon reasonable advance notice to Borrower, to visit and inspect the Project and examine and make abstracts from its books and records at any reasonable time or times and to discuss the business, operations, Properties and financial and other condition of Borrower with officers and employees of Borrower and with its accountants.

    5.5    <u>Notices</u>.  Promptly, and in any event within three Business Days after Borrower acquires knowledge thereof, give notice to Lender of:  (a) the occurrence of any Default or Event of Default, (b) the occurrence of any default or event of default under any post-Petition Date Contractual Obligation of Borrower, (c) litigation, investigation or proceeding which may exist at any time between Borrower and any Governmental Authority, which in either case, if not cured or if adversely determined, as the case may be, could reasonably be expected to have a

Material Adverse Effect, (d) any post-Petition Date litigation or proceeding affecting Borrower an adverse determination in which could reasonably be expected to have a Material Adverse Effect or in which injunctive or similar relief is sought; and (e) any development or event which has had or would reasonably be expected to have a Material Adverse Effect. Upon Lender's request, each notice pursuant to this Section 5.5 shall be accompanied by a statement of an authorized officer setting forth details of the occurrence referred to therein and stating what action the Borrower has taken or proposes to take with respect thereto.

5.6     Further Assurances.  At the cost and expense of Borrower, execute and file all such further documents and instruments, and perform such other acts, as Lender may reasonably determine are necessary or advisable to maintain the Liens granted to Lender in connection with this Agreement, the other Loan Documents and the Final Order and to maintain the priority of such Liens purported to be granted pursuant to this Agreement and the Final Order. Without limiting the generality of the foregoing, Borrower shall assist Lender in the preparation and filing of any UCC financing statements required by Lender.

5.7     Approval of Agreement.  Use Borrower's best efforts to obtain approval from the Bankruptcy Court of this Agreement and Borrower shall comply in all respects with the Final Order.

5.8     Deposit Accounts.  Borrower represents and warrants that Exhibit C attached hereto contains a complete and accurate list of all Deposit Accounts maintained by Borrower. Further, Borrower agrees that, without Lender's prior written consent, it shall not close any of the Accounts or open or maintain any deposit accounts other than the Deposit Accounts.

5.9     Exclusivity Period; Break-up Fee.   Borrower agrees during the Exclusivity Period not to solicit, entertain, or otherwise discuss any other offers or financing in conjunction with the reorganization of the Borrower in its Bankruptcy Case with any party other than the Lender; provided, however, that Borrower may, consistent with its fiduciary duties, consider any non-solicited financing proposals that are presented to it during the Exclusivity Period. Borrower agrees to pay Lender the Break-up Fee and expense reimbursement if the Bankruptcy Court approves any other form of financing, including but not limited to financing from existing creditors.

5.10    Environmental Matters.  If any release or threatened release or other disposal of Hazardous Substances shall occur or shall have occurred on any real Property or any other Property of the Borrower pertaining to the Project, the Borrower shall cause the prompt containment and removal of such Hazardous Substances and the remediation of such real Property or other Property as necessary to comply with all Environmental Laws and to preserve the value of such real Property or other Property. Without limiting the generality of the foregoing, the Borrower shall comply with any Federal or state judicial or administrative order requiring the performance at any real Property of the Borrower of activities in response to the release or threatened release of a Hazardous Substance. To the extent that the transportation of Hazardous Substances is permitted by this Agreement, the Borrower shall dispose of such Hazardous Substances, or of any other wastes, only at licensed disposal facilities operating in compliance with Environmental Laws.

5.11   <u>Maintenance of Collateral; Administrative Expenses</u>.  Borrower shall maintain the Collateral in good condition and repair, consistent with reasonable industry practice, and not permit or commit waste of any material portion thereof, and shall pay all post-Petition Date obligations set forth in the Budget in the ordinary course of business.

<div align="center">

SECTION 6.
NEGATIVE COVENANTS

</div>

Borrower hereby agrees that from the date of this Agreement through the Termination Date the Borrower shall not, directly or indirectly, without the written consent of Lender:

6.1   <u>Limitation on Indebtedness</u>.  Create, incur, increase, assume or suffer to exist any Indebtedness, except:

(a)   Indebtedness in favor of Lender under this Agreement and the other Loan Documents;

(b)   Indebtedness outstanding on the Petition Date; and

(c)   Indebtedness first incurred after the Petition Date in respect of Liens permitted under <u>Section 6.2</u>.

6.2   <u>Limitation on Liens</u>.  Create, incur, assume or suffer to exist any Lien upon any of its Properties, whether now owned or hereafter acquired, except for

(a)   Liens existing on the Petition Date which are junior in priority to the Lender's Lien by virtue of the Final Order, and the lien of FirsTier Bank described in <u>Section 2.7</u>;

(b)   carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlords' or other similar Liens arising in the ordinary course of business which are not overdue or which are being contested in good faith by appropriate proceedings;

(c)   pledges or deposits in connection with workers' compensation, general liability insurance and/or claims or unemployment insurance;

(d)   Liens imposed by any Governmental Authority for taxes, assessments or charges not yet due or that are being contested in good faith and by appropriate proceedings if, unless the amount thereof is not material with respect to its financial condition, adequate reserves with respect thereto are maintained on the books of Borrower in accordance with GAAP;

(e)   Liens created pursuant to this Agreement and the Final Order; and

(f)   Any extension, renewal or replacement of any of the foregoing, <u>provided</u> that the Liens permitted by this paragraph shall not extend to or cover any additional Indebtedness or Property (other than substitution of like Property).

6.3     <u>Limitation on Guaranty Obligations</u>.   Create, incur or assume any post-Petition Date Guaranty Obligation.

6.4     <u>Prohibition on Fundamental Changes</u>.   Enter into any acquisition, merger, consolidation or amalgamation, or liquidate, wind up or dissolve (or suffer any liquidation or dissolution), or make any material change in its present methods of conducting business or create or acquire any new Subsidiaries.

6.5     <u>Limitation on Sale of Assets</u>.   Except as agreed by Lender or permitted pursuant to the Minimum Release Price Schedule, convey, sell, lease, assign, transfer or otherwise dispose of any of its respective Properties or businesses, whether now owned or hereafter acquired, outside of the ordinary course of business.

6.6     <u>Limitation on Investments, Loans and Advances</u>.   Make any advance, loan, extension of credit or capital contribution to, or purchase any stock, bonds, notes, debentures or other securities of or any assets constituting a business unit of or make any other investment (each, an "Investment") in, any Person, except:

        (a)     Investments in cash equivalents;

        (b)     Investments existing on the Petition Date;

        (c)     extensions of trade credit and prepaid expenses made in the ordinary course of business; and

        (d)     Investments received in connection with the creation and collection of Accounts in the ordinary course of business.

6.7     <u>Transactions with Affiliates</u>.   Sell or transfer any Property or assets to, or otherwise engage in any other transactions with, any of its Affiliates, except that Borrower may engage in any such transaction which is otherwise permitted under this Agreement, is consistent with past practices, or otherwise in the ordinary course of business at prices and on terms and conditions not less favorable than could be obtained in a comparable arm's-length transaction from unrelated third parties.

6.8     <u>Lines of Business</u>.   Engage to any substantial extent in any line or lines of business activity other than businesses of the same general type as those in which Borrower is engaged on the date of this Agreement or which are related thereto.

6.9     <u>Chapter 11 Claims; Payment of Pre-Petition Date Claims</u>.   Incur, create, assume, suffer to exist or permit any other Superpriority Claim or Lien which is <u>pari passu</u> with or senior to the claims of Lender granted pursuant to this Agreement and the Final Order, or make any payments of pre-Petition Date obligations other than (a) as permitted under the Final Order, (b) as permitted by the Bankruptcy Court under the "first-day" orders including pre-Petition Date wages and benefits and other employee-related claims, and (c) as otherwise permitted or required under this Agreement.

6.10  Capital Expenditures.  Make or commit to make any Capital Expenditure that is not approved by the Lender or not within the Budget.

6.11  Use of Proceeds.  Use the proceeds of the Loans, the Collateral, or any Cash Collateral to commence or prosecute any investigation, action or objection with respect to the Superpriority Claims or Liens granted to Lender pursuant to this Agreement and the Orders or any other claims of any kind against Lender.

6.12  Final Order.  Seek any revision, modification or nullification of the Final Order without Lender's written consent.

6.13  Place of Business; Name.  The Borrower will not transfer its chief executive office or principal place of business, or move, relocate, close or sell any business location.  The Borrower will not permit any tangible Collateral or any records pertaining to the Collateral to be located in any state or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Lien of Lender as provided in this Agreement.  The Borrower will not change its name or jurisdiction of organization.

6.14  Public Statements.  Make any public statements regarding Ron Zeff or Lender or any of Lender's Affiliates, without first obtaining Lender's written consent.

SECTION 7.
EVENTS OF DEFAULT

7.1  Event of Default.  If one or more of the following events (each an "Event of Default") shall occur and be continuing:

(a)  Borrower shall fail to (i) pay any principal under the Note or under this Agreement when due in accordance with the terms thereof or hereof, or (ii) pay any interest under the Note or under this Agreement, or any other amount payable hereunder or under any other Loan Document, within three (3) Business Days after any such interest or other amount becomes due in accordance with the terms thereof or hereof; or

(b)  any representation made or deemed made by Borrower herein or in any other Loan Document or which is contained in any certificate, document or financial or other statement furnished at any time under or in connection with this Agreement shall prove to have been incorrect in any material respect on or as of the date made or deemed made; or

(c)  Borrower shall default in the observance or performance of any covenant or other agreement contained in this Agreement (other than as provided in subsections (a) and (b) of this Section), and such default shall continue unremedied for a period of ten (10) days after Lender provides written notice of such default to Borrower or such longer period agreed to by Lender in writing; or

(d)  The Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code, or a trustee or other responsible officer under Chapter 11 of the Bankruptcy Code shall be appointed in the Bankruptcy Case, or a Change of Control occurs; or

(e)     An order of the Bankruptcy Court shall be entered granting another Superpriority Claim or Lien pari passu with or senior to that granted to Lender pursuant to this Agreement and the Final Order, or an order of a court of competent jurisdiction shall be entered reversing, staying, vacating or rescinding the Final Order, or an order of a court of competent jurisdiction shall be entered amending, supplementing or otherwise modifying the Final Order without the consent of Lender; or

(f)     An order of the Bankruptcy Court shall be entered under Bankruptcy Code § 1106(b) in any of the Bankruptcy Cases appointing an examiner having enlarged powers relating to the operation of the business of Borrower (i.e., powers beyond those set forth under Bankruptcy Code §§ 1106(a)(3) and (4)); or

(g)     Borrower shall make any payments relating to pre-Petition Date obligations other than (i) as permitted under the Final Order or the "first-day" orders, (ii) as permitted under the Budget or otherwise under this Agreement or approved by Lender in writing, or (iii) as required by an order of the Bankruptcy Court, or

(h)     The entry of an order granting relief from the automatic stay so as to allow a third party to proceed against Borrower's assets having a value equal to or greater than $100,000.00, or an order under Section 506(c) of the Bankruptcy Code awarding recovery of any costs and expenses of the Collateral; or

(i)     Borrower or any other party in interest files a motion without the consent of Lender to use Cash Collateral or to approve financing pursuant to Section 364 of the Bankruptcy Code that would grant an additional security interest or lien on any of the Collateral;

(j)     An order is entered over the objection of the Lender permitting the use of Cash Collateral or granting an administrative claim in any Case that is equal or superior to the administrative claim granted to the Lender pursuant to the Final Order; or

(k)     The filing of any pleading by Borrower seeking, or otherwise consenting to, any of the matters set forth in subsections (e), (f), (g), (h), (i) and (j) of this Section 7; or

(l)     The occurrence of any event, including, without limitation, any change in the financial condition of Borrower, after the Petition Date which results in, or could reasonably be expected to have, a Material Adverse Effect or Material Deviation; or

(m)     The entry of the Final Order shall not have occurred within thirty (30) days after the Petition Date; or

(n)     The commencement of any proceeding seeking, or otherwise consenting to, (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations, or (ii) any relief under Bankruptcy Code § 506(c) with respect to any Collateral; or (iii) if any action or proceeding is commenced against Lender arising out of or in connection with its pre-Petition Date loans and liens or seeking a monetary judgment against Lender.

(o)     Subject to Bankruptcy Code § 365, Borrower shall fail to obtain, maintain or comply in all material respects with any order, consent, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority and such failure could reasonably be expected to have a Material Adverse Effect; or

(p)     This Agreement, the other Loan Documents and the Final Order shall, for any reason, cease to create a valid Lien on any of the Collateral purported to be covered thereby or such Lien shall cease to be a perfected Lien having the priority provided herein pursuant to Bankruptcy Code § 364 against Borrower, or Borrower shall so allege in any pleading filed in any court, or any material provision of any Loan Document shall, for any reason, cease to be valid and binding on Borrower or Borrower shall so state; or

(q)     Borrower, without the prior consent of Lender, shall (i) determine to suspend the operation of its business in the ordinary course or liquidate all or substantially all of its assets, or (ii) file a motion or other application in the Bankruptcy Case seeking authority to do any of the foregoing; or

(r)     The Final Order is modified without Lender's consent or is vacated, stayed or is for any reason not binding on Borrower; or

(s)     Borrower or any other party in interest files a Reorganization Plan that purports to affect the Lender's claims, to which plan the Lender has not consented in writing; or

(t)     Borrower or any other party in interest files a motion to approve a sale of Borrower or any Collateral (other than the sale of Inventory pursuant to the Minimum Release Price Schedule in the ordinary course of business) on terms to which Lender has not given its prior written consent; or

(u)     An order is entered for the sale of Borrower or any Collateral (other than the sale of Inventory pursuant to the Minimum Release Price Schedule in the ordinary course of business) to which the Lender objects; or

(v)     Borrower, at the end of any calendar month prior to the Termination Date has failed to meet the Residential Unit Sales Target for such month as set forth on Exhibit G; or

(w)     A negative variance exists between the actual capital expenses incurred by Borrower during any calendar month versus the projected capital expenses for such month in the Budget, provided that it shall not be an Event of Default if Borrower accelerates payment of cumulative capital expense, provided that such amounts are utilized for (1) leasing commissions and tenant improvement costs in an amount not to exceed $85.00/sq. ft. in connection with a newly executed retail lease, a copy of which shall be provided to Lender, and/or (2) costs for completion of residential unit improvements in an amount not to exceed $75,000/unit in connection with any unit residential sale, a copy of which sales contract(s) shall be provided to Lender; or

(x)     A negative variance in excess of the Permitted Deviation exists between the actual operating expenses incurred by Borrower during any calendar month (excluding expenses subject to the Carve-Out) and the projected operating expenses (excluding expenses

subject to the Carve-Out) for such month in the Budget; provided, however, that savings in any category in the Budget may be reallocated to another category within the Budget so long as the overall Budget with respect to operating expenses remains unchanged,

then, and in every such event and at any time thereafter during the continuance of such Event of Default, Lender may take one or more of the following actions, at the same or different times: (i) declare the Loans then outstanding to be forthwith due and payable, whereupon the principal of the Loans together with accrued interest thereon and all other Obligations of Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; (ii) set off amounts in any accounts of Borrower and apply such amounts to the Obligations; and (iii) exercise any and all remedies under this Agreement, the other Loan Documents, the Orders and applicable law available to Lender.  Borrower agrees and acknowledges that, as provided in the Final Order, Lender shall be permitted to exercise its remedies upon an Event of Default without seeking further relief or orders from the Bankruptcy Court, including without limitation relief from the automatic stay.

<div align="center">

SECTION 8.
ADDITIONAL REMEDIES; APPLICATION OF PROCEEDS

</div>

8.1     Remedies; Obtaining the Collateral Upon Default.  Upon the occurrence and during the continuance of an Event of Default, Lender shall have all rights as provided by law and this Agreement to enforce all of its rights and remedies.

8.2     Remedies; Disposition of the Collateral.  Upon the occurrence and during the continuance of an Event of Default, any Collateral (that constitutes security under the UCC) may be sold, assigned, leased or otherwise disposed of under one or more contracts or as an entirety, and without the necessity of gathering at the place of sale the Property to be sold, and in general in such manner, at such time or times, at such place or places and on such terms as Lender may do so in compliance with any applicable Requirements of Law.

8.3     Application of Proceeds.  Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, any payment by Borrower on account of principal of and interest on the Loans and any Proceeds arising out of any realization (including after foreclosure) upon the Collateral shall be applied as follows: first, to the payment in full of all costs and expenses (including without limitation, reasonable attorney fees and disbursements) paid or incurred by Lender in connection with any such realization upon the Collateral, and second, to the payment in full of the Loans (including any accrued and unpaid interest thereon, and any fees and other Obligations in respect thereto).  It is understood that Borrower shall remain liable to the extent of any deficiency between the amount of the Proceeds of the Collateral and the amount of the Obligations.

8.4     WAIVER OF CLAIMS.  BORROWER HEREBY WAIVES ANY RIGHTS TO PROCEED AGAINST OR RECOVER FROM LENDER OR THE COLLATERAL PURSUANT TO SECTION 506(c) OF THE BANKRUPTCY CODE.

8.5     <u>Remedies Cumulative</u>.   Each and every right, power and remedy hereby specifically given to Lender shall be in addition to every other right power and remedy specifically given under this Agreement, the other Loan Documents, the Final Order or now or hereafter existing at law or in equity, or by statute and each and every right, power and remedy whether specifically herein given or otherwise existing may be exercised from time to time or simultaneously and as often and in such order as may be deemed expedient by Lender.  All such rights, powers and remedies shall be cumulative and the exercise or the beginning of exercise of one shall not be deemed a waiver of the right to exercise of any other or others.  No delay or omission of Lender in the exercise of any such right, power or remedy and no renewal or extension of any of the Obligations shall impair any such right, power or remedy or shall be construed to be a waiver of any Default or Event of Default or an acquiescence therein.  In the event that Lender shall bring any suit to enforce any of its rights hereunder and shall be entitled to judgment, then in such suit Lender may recover reasonable expenses, including attorney fees, and the amounts thereof shall be included in such judgment.

8.6     <u>Discontinuance of Proceedings</u>.   In case Lender shall have instituted any proceeding to enforce any right, power or remedy under this Agreement by foreclosure, sale, entry or otherwise, and such proceeding shall have been discontinued or abandoned for any reason or shall have been determined adversely to Lender, then and in every such case Borrower, Lender and each holder of any of the Obligations shall be restored to their former positions and rights hereunder with respect to the Collateral subject to the Liens granted under this Agreement and the Orders, and all rights, remedies and powers of Lender shall continue as if no such proceeding had been instituted.

<div align="center">

SECTION 9.
MISCELLANEOUS
</div>

9.1     <u>Amendments, Modifications and Waivers</u>.   Neither this Agreement, any other Loan Document to which Borrower is a party nor any terms hereof or thereof may be amended, supplemented, modified or waived except in accordance with this Section.  Lender and Borrower may, from time to time, enter into written amendments, supplements, modifications or waivers for the purpose of adding, deleting, changing or waiving any provisions to this Agreement or the other Loan Documents.  Any such amendment, supplement, modification or waiver shall apply to and shall be binding upon Borrower, Lender and all future holders of the Note.  In the case of any waiver, Borrower and Lender shall be restored to their former positions and rights hereunder and under the other Loan Documents, and any Event of Default waived shall be deemed to be cured and not continuing, but no such waiver shall extend to any subsequent or other Event of Default, or impair any right consequent thereon.

9.2     <u>Notices</u>.   All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission, email or similar writing) and shall be given to such party at its address, facsimile number or email address set forth below or at such other address, facsimile number or email address as such party may specify from time to time for this purpose by notice to Lender and Borrower.

<blockquote>

If to Lender:          Carmel Landmark, LLC
                       1000 Sansome Street, Suite 180
</blockquote>

San Francisco, California  94111
Attn: Ron Zeff
Facsimile: (415) 273-2901
Email:  rzeff@carmelpartners.net

With a copy to:    Craig A. Christensen
Lindquist & Vennum P.L.L.P.
600 17th Street, Suite 1800 South
Denver, Colorado  80202
Facsimile: (303) 573-1956
Email:  cchristensen@lindquist.com

If to Borrower:    7677 East Berry Avenue Associates, L.P.
5500 Greenwood Plaza Boulevard, Suite 230
Greenwood Village, Colorado  80111
Facsimile:  (303) 221-2835
Email:  zdavidson@everestdc.com

With a copy to:    Michael Pankow and LeaAnn T. Fowler
Brownstein Hyatt Farber Schreck LLP
410 17th Street, Suite 2200
Denver, Colorado  80202-4437
Facsimile: (303) 223-1111
Email:  mpankow@bhfs.com
Email:  lfowler@bhfs.com

Each such notice, request or other communication shall be effective (a) if given by facsimile or email, when such transmission to the number specified above and confirmation of transmission is received, (b) if given by mail, 72 hours after such communication is deposited in the U.S. Mail with first class postage prepaid, addressed as aforesaid, or (c) if given by any other means, when delivered at the address specified above.

9.3    <u>No Waiver; Remedies Cumulative</u>.  No failure or delay on the part of Lender or any holder of a Note in exercising any right, power or privilege hereunder or under any other Loan Document and no course of dealing between Borrower and Lender or the holder of any Note shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Loan Document preclude any other or further exercise thereof of the exercise of any other right, power or privilege hereunder or thereunder.  The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which Lender or the holder of any Note would otherwise have.  No notice to or demand on Borrower in any case shall entitle Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of Lender or the holder of any Note to any other or further action in any circumstances without notice or demand.

9.4    <u>Survival of Representations</u>.  All representations and warranties made herein and in any document, certificate or statement delivered pursuant hereto or in connection herewith

shall survive the execution and delivery of this Agreement, the Note and any other Loan Documents.

9.5    Payment of Expenses and Taxes.   Borrower agrees (a) to pay or reimburse Lender, within ten (10) days of receipt of an invoice, for all its out-of-pocket costs and expenses reasonably incurred in connection with the development, preparation and execution of, this Agreement and any amendment, supplement or modification to, and the enforcement or preservation of any rights under, this Agreement, the Note, the Deed of Trust, the other Loan Documents, the Final Order and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including, without limitation the reasonable fees and disbursements of counsel to Lender and other professionals engaged by Lender, (b) to pay or reimburse Lender for all its costs and expenses reasonably incurred in connection with the enforcement or preservation of any rights under this Agreement, the Note, the other Loan Documents, the Final Order and any such other documents following the occurrence and during the continuance of an Event of Default, including, without limitation, the reasonable fees and disbursements of counsel to Lender and other professionals engaged by Lender, (c) to pay, and indemnify and hold harmless Lender from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, which may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the Note, the other Loan Documents, the Final Order and any such other documents, (d) to pay, and indemnify and hold harmless Lender (and its members, managers, directors, officers, employees and agents) from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance, preservation of rights and administration of this Agreement, the Note, the other Loan Documents, the Final Order or the use of the proceeds of the Loans (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided that Borrower shall have no obligation hereunder to Lender with respect to Indemnified Liabilities determined by the final judgment of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of Lender or its directors, officers, employees or agents.   The agreements in this Section shall survive repayment of the Loans and all other Obligations payable hereunder.

9.6    Successors and Assigns; Participations.   This Agreement shall be binding upon and inure to the benefit of Borrower, Lender, all future holders of the Note and their respective successors and assigns, except that Borrower may not assign or transfer any of their rights or obligations under this Agreement without the prior written consent of Lender.  Lender may, from time to time, sell participations in any Loan or assign its interest in the Loans and this Agreement, the Note and the other Loan Documents to any Persons without notice to or approval of Borrower.  Further, Lender may from time to time disclose to any participant, purchaser or prospective participant or purchaser such information as Lender may have regarding the financial condition, operations, and prospects of Borrower.

9.7    Right of Set-off.   Subject to the giving of the notice as described in Section 7, notwithstanding the provisions of Bankruptcy Code § 362 and any other rights and remedies of

Lender now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to Borrower or to any other Person, any such notice being hereby expressly waived, to set-off any other indebtedness or other obligation at any time held or owing by Lender to or for the credit or the account of any Borrower against and on account of the Obligations of Borrower to Lender under this Agreement or under any of the other Loan Documents, and all other claims of any nature or description arising out of or connected with this Agreement or any other Loan Document, irrespective of whether or not Lender shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

9.8     Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

9.9     **GOVERNING LAW.   THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF COLORADO AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

9.10    **SUBMISSION TO JURISDICTION; WAIVER OF JURY TRIAL.**

**(A)     EACH PARTY TO THIS AGREEMENT HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE BANKRUPTCY COURT.**

**(B)     EACH PARTY UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO IN CLAUSE (A) ABOVE AND ANY COUNTERCLAIM THEREIN.**

9.11    Effectiveness.   This Agreement shall become effective once (i) Lender and Borrower shall have each signed (email and/or facsimile signatures permitted) a counterpart hereof and Borrower shall have delivered (by email, facsimile or otherwise) the same to Lender and (ii) the Bankruptcy Court shall have entered the Final Order.

9.12    Headings Descriptive.   The headings of the several Sections and subsection, of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

9.13    Marshalling Recapture.   Lender shall be under no obligation to marshal any assets in favor of Borrower or any other party or against or in payment of any or all of the Obligations. To the extent Lender receives any payment by or on behalf of Borrower, which payment or any

part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to Borrower or its estate, trustee, receiver, custodian or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then to the extent of such payment or repayment, the obligation or part thereof which has been paid, reduced or satisfied by the amount so repaid shall be reinstated by the amount so repaid and shall be included within the liabilities of Borrower to Lender as of the date such initial payment, reduction or satisfaction occurred.

9.14    Severability.  In case any provision in or obligation under this Agreement, the Note or the other Loan Documents shall be invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or of such provision or obligation in any other jurisdiction, shall not in any way be affected or impaired thereby.

9.15    Limitation of Liability.  No claim may be made by Borrower or any other Person against Lender or any of its Affiliates, lenders, investors, managers, members, directors, officers, employees, attorneys or agents for any special, indirect, consequential or punitive damages in respect of any claim for breach of contract or any other theory of liability arising out of or related to the transactions contemplated by this Agreement or any act, omission or event occurring in connection herewith; and Borrower hereby waives, releases and agrees not to sue upon any claim for any such damages, whether or not accrued and whether or not known or suspected to exist in its favor.

9.16    Maximum Lawful Rate.  Notwithstanding any provision of this Agreement, the Note or the other Loan Documents to the contrary, it is the intent of Lender and Borrower, that neither Lender nor any subsequent holder of the Note shall be entitled to receive, collect, reserve or apply, as interest, any amount in excess of the amount determined by application of the Maximum Lawful Rate of Interest.  In the event this Agreement, the Note or the other Loan Documents calls for an interest payment that exceeds the amount determined by application of the Maximum Lawful Rate of Interest, such interest shall not be received, collected, charged or reserved until such time as that interest together with all other interest then payable, falls within the amount determined by application of the Maximum Lawful Rate of Interest.  In the event Lender, or any subsequent holder of the Note, receives any such interest in excess of the amount determined by the application of the Maximum Lawful Rate of Interest, such amount which would be excessive interest shall be deemed a partial prepayment of principal and treated hereunder as such, or, if the principal indebtedness evidenced by the Note is paid in full, any remaining excess funds shall immediately be paid to Borrower.  In determining whether or not the interest paid or payable, under any specific contingency, exceeds the amount determined by application of the Maximum Lawful Rate of Interest, Borrower and Lender shall, to the greatest extent permitted under applicable law, (i) exclude voluntary prepayments and the effects thereof, and (ii) amortize, prorate, allocate, and spread, in equal parts, the total amount of interest throughout the entire term of the indebtedness, provided, however, that if the indebtedness is paid in full then to the end of the full contemplated term hereof; and if the interest received for the actual period of existence hereof exceeds the amount determined by application of the applicable Maximum Lawful Rate of Interest, the holder of this Note shall refund to Borrower the amount of such excess or credit the amount of such excess against the principal portion of the indebtedness as of the date it was received, and, in such event, Lender shall not be subject to any

penalties provided by any laws for contracting for, charging, reserving, collecting or receiving interest in excess of the amount determined by the application of the applicable Maximum Lawful Rate of Interest.

9.17   WAIVER OF DEFENSES.  THE BORROWER WAIVES EVERY PRESENT AND FUTURE DEFENSE, CAUSE OF ACTION, COUNTERCLAIM OR SETOFF WHICH THE BORROWER MAY NOW HAVE OR HEREAFTER MAY HAVE TO ANY ACTION BY THE LENDER IN ENFORCING THIS AGREEMENT.  PROVIDED THE LENDER ACTS IN GOOD FAITH, THE BORROWER RATIFIES AND CONFIRMS WHATEVER THE LENDER MAY DO PURSUANT TO THE TERMS OF THIS AGREEMENT.   THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE LENDER GRANTING ANY FINANCIAL ACCOMMODATION TO THE BORROWER.

9.18   Survival of Borrower Representations. All covenants, agreements, representations and warranties made by the Borrower herein shall, notwithstanding any investigation by the Lender, be deemed material and relied upon by the Lender and shall survive the making and execution of this Agreement and the Loan Documents and the issuance of the Note, and shall be deemed to be continuing representations and warranties until such time as the Borrower has fulfilled all of its Obligations to the Lender, and the Lender has been indefeasibly paid in full in cash. The Lender, in extending financial accommodations to the Borrower, is expressly acting and relying on the aforesaid representations and warranties.

9.19   Release of Claims Against Lender.  In consideration of the Lender making the Loans, the Borrower hereby releases and discharges the Lender and any of its Affiliates, lenders, investors, managers, members, directors, officers, employees, attorneys and agents of and from any and all claims, harm, injury, and damage of any and every kind, known or unknown, legal or equitable, which the Borrower may have against the Lender from the date of their respective first contact with the Lender until the date of this Agreement, including any claim arising from any reports (environmental reports, surveys, appraisals, etc.) prepared by any parties hired or recommended by the Lender. The Borrower confirms to Lender that it has reviewed the effect of this release with competent legal counsel of their choice, or have been afforded the opportunity to do so, prior to execution of this Agreement and the Loan Documents and do each acknowledge and agree that the Lender is relying upon this release in extending the Loans to the Borrower.

9.20   Indemnification.  The Borrower agrees to defend (with counsel satisfactory to the Lender), protect, indemnify, exonerate and hold harmless each Indemnified Party from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs, expenses and distributions of any kind or nature (including the disbursements and the reasonable fees of counsel for each Indemnified Party thereto, which shall also include, without limitation, reasonable attorneys' fees and time charges of attorneys who may be employees of any Indemnified Party), which may be imposed on, incurred by, or asserted against, any Indemnified Party (whether direct, indirect or consequential and whether based on any federal, state or local laws or regulations, including securities laws, Environmental Laws, commercial laws and regulations, under common law or in equity, or based on contract or otherwise) in any manner relating to or arising out of this Agreement or any of the Loan Documents, or any act, event or transaction related or attendant thereto, the preparation,

execution and delivery of this Agreement and the Loan Documents, including the making or issuance and management of the Loans, the use or intended use of the proceeds of the Loans, the enforcement of the Lender's rights and remedies under this Agreement, the Loan Documents, the Note, any other instruments and documents delivered hereunder, or under any other agreement between the Borrower and the Lender; provided, however, that the Borrower shall not have any obligations hereunder to any Indemnified Party with respect to matters determined by a court of competent jurisdiction by final and non-appealable judgment to have been caused by or resulting from the willful misconduct or gross negligence of such Indemnified Party. To the extent that the undertaking to indemnify set forth in the preceding sentence may be unenforceable because it violates any law or public policy, the Borrower shall satisfy such undertaking to the maximum extent permitted by applicable law.   Any liability, obligation, loss, damage, penalty, cost or expense covered by this indemnity shall be paid to each Indemnified Party on demand, and failing prompt payment, together with interest thereon at the Default Rate from the date incurred by each Indemnified Party until paid by the Borrower, shall be added to the Obligations of the Borrower and be secured by the Collateral.   The provisions of this Section shall survive the satisfaction and payment of the other Obligations and the termination of this Agreement.

9.21   <u>Customer Identification – USA Patriot Act Notice</u>.   The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56, signed into law October 26, 2001) (the "Act"), and each Lender's policies and practices, the Lender is required to obtain, verify and record certain information and documentation that identifies the Borrower, which information includes the name and address of the Borrower and such other information that will allow the Lender to identify the Borrower in accordance with the Act.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and the year first written.

**LENDER:**

**CARMEL LANDMARK, LLC,**
a Colorado limited liability company

By:  CP Investment III REIT,
        a Maryland real estate investment trust,
        its Managing Member

By: _____
        Ron Zeff, President

**BORROWER:**

**7677 EAST BERRY AVENUE ASSOCIATES, L.P.**

By: _____
Title: _____

[Signature Page to Debtor In Possession Loan Agreement]

Doc# 3060549\2

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and the year first written.

**LENDER**:


**CARMEL LANDMARK, LLC,**
a Colorado limited liability company

By:   CP Investment III REIT,
      a Maryland real estate investment trust,
      its Managing Member



By:_____
         Ron Zeff, President

**BORROWER**:

**7677 EAST BERRY AVENUE ASSOCIATES, L.P.,**
a Delaware limited partnership

By:   EDC Denver I, LLC,
      a Delaware limited liability company,
      its General Partner

By:_____
      Name: Zachary M. Davidson
      Title:   Manager


[Signature Page to Debtor In Possession Loan Agreement]

# EXHIBIT A

## <u>Budget</u>

(SEE ATTACHED)

[Exhibit to Debtor In Possession Loan Agreement]

**Project Southern Cross**
**36 MONTH OPERATING BUDGET**

| | | | Sep-09 Month 1 | Oct-09 Month 2 | Nov-09 Month 3 | Dec-09 Month 4 | Jan-10 Month 5 | Feb-10 Month 6 | Mar-10 Month 7 | Apr-10 Month 8 | May-10 Month 9 | Jun-10 Month 10 | Jul-10 Month 11 | Aug-10 Month 12 | Sep-10 Month 13 | Oct-10 Month 14 | Nov-10 Month 15 | Dec-10 Month 16 | Jan-11 Month 17 | Feb-11 Month 18 | Mar-11 Month 19 | Apr-11 Month 20 | May-11 Month 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Residentail Tower Sales** | | | | | | | | | | | | | | | | | | | | | | | |
| Tower 1 Sales | Plan 1 | | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 |
| Tower 2 Sales | Plan 1 | | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 2 | 2 | 2 | 2 | 2 | 5 | 5 | 5 | 5 |
| Tower 1 | Total Units | # sold | | | | | | | | | | | | | | | | | | | | | |
| # of Sold units closed | 4 | 4 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 1 | | | | | | | | | |
| # units to sell | 18 | 18 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 2 | 2 | 2 |
| Cummulative Units Sold | 135 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 117 | 118 | 119 | 120 | 121 | 122 | 123 | 125 | 127 | 129 |
| Total $ - Sold Units Closed (net 6 | 4 | 491,103 | - | - | - | - | - | 491,103 | - | 491,103 | - | 491,103 | - | 491,103 | - | - | - | - | - | - | - | - | - |
| Total $ - Units to Sell (net 6%) | 18 | 577,745 | - | - | - | - | - | - | - | - | - | - | - | - | 577,745 | 577,745 | 577,745 | 577,745 | 577,745 | 577,745 | 1,155,490 | 1,155,490 | [illegible]55,490 |
| Tower 2 | | | | | | | | | | | | | | | | | | | | | | | |
| # of Sold units closed | 22 | 22 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 0 | 1 | 0 | 2 | 2 | 2 | 2 | 2 | 5 | 4 | | |
| # units to sell | 97 | 97 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 5 | 5 |
| Cummulative Units Sold | 143 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 46 | 47 | 52 | 57 |
| Total $ - Sold Units Closed (net 6 | 22 | 967,435 | - | - | - | - | - | - | 967,435 | - | 967,435 | - | 967,435 | - | 1,934,870 | 1,934,870 | 1,934,870 | 1,934,870 | 1,934,870 | 4,837,176 | 3,869,741 | - | - |
| Total $ - Units to Sell (net 6%) | 97 | 859,823 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 859,823 | 4,299,114 | [illegible]299,114 |
| % of Units Remaining | | | | | | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.4% | 41.0% | 40.6% | 40.3% | 39.9% | 39.6% | 39.2% | 38.1% | 35.6% | 33.1% |
| | Total Units | $ per Unit | | | | | | | | | | | | | | | | | | | | | |
| Net Value of Storage Units/Parkir | [redacted] | 3,633 | - | - | - | - | - | 3,633 | 3,633 | 3,633 | 3,633 | 3,633 | 3,633 | 3,633 | 10,900 | 10,900 | 10,900 | 10,900 | 10,900 | 21,800 | 25,433 | 25,433 | 25,433 |
| Net Revenue on upgrades for uns | | 13,160 | - | - | - | - | - | 13,160 | 13,160 | 13,160 | 13,160 | 13,160 | 13,160 | 13,160 | 39,480 | 39,480 | 39,480 | 39,480 | 39,480 | 78,960 | 92,120 | 92,120 | 92,120 |
| Total Residentail Revenue | | | - | - | - | - | - | 507,896 | 984,229 | 507,896 | 984,229 | 507,896 | 984,229 | 507,896 | 2,562,995 | 2,562,995 | 2,562,995 | 2,562,995 | 2,562,995 | 5,515,681 | 6,002,607 | 5,572,157 | 5,872,157 |
| **Retail Revenue** | | | | | | | | | | | | | | | | | | | | | | | |
| Projected Monthly Retail NOI | | | 80,000 | 120,000 | 130,000 | 130,000 | 150,000 | 170,000 | 170,000 | 190,000 | 190,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 210,000 | 240,000 | 240,000 | 270,000 | 270,000 | 300,000 |
| Cap Retail - Exit | | | | | | | | | | | | | | | | - | | | | | | | |
| **Other Revenue** | | | | | | | | | | | | | | | | | | | | | | | |
| Tiff Revenue | | | - | 60,000 | - | - | 60,000 | - | - | 60,000 | - | - | 60,000 | - | - | 60,000 | - | - | 60,000 | - | - | 60,000 | - |
| Estimated E&O Claims | | | - | - | - | - | - | - | - | - | - | - | - | 400,000 | - | - | - | - | - | 600,000 | - | - | - |
| Total Other Revenue | | | - | 60,000 | - | - | 60,000 | - | - | 60,000 | - | - | 60,000 | 400,000 | - | 60,000 | - | - | 60,000 | 600,000 | - | 60,000 | - |
| Total Revenue | | | 80,000 | 180,000 | 130,000 | 130,000 | 210,000 | 677,896 | 1,154,229 | 757,896 | 1,174,229 | 717,896 | 1,254,229 | 1,117,896 | 2,772,995 | 2,832,995 | 2,772,995 | 2,772,995 | 2,862,995 | 6,355,681 | 6,272,607 | 5,902,157 | 5,872,157 |

Project Southern Cross
36 MONTH OPERATING BUDGET

**Project Southern Cross**
**36-MONTH OPERATING BUDGET**

| | Sep-09 Month 1 | Oct-09 Month 2 | Nov-09 Month 3 | Dec-09 Month 4 | Jan-10 Month 5 | Feb-10 Month 6 | Mar-10 Month 7 | Apr-10 Month 8 | May-10 Month 9 | Jun-10 Month 10 | Jul-10 Month 11 | Aug-10 Month 12 | Sep-10 Month 13 | Oct-10 Month 14 | Nov-10 Month 15 | Dec-10 Month 16 | Jan-11 Month 17 | Feb-11 Month 18 | Mar-11 Month 19 | Apr-11 Month 20 | May-11 Month 21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

**Project Southern Cross**
**36-MONTH OPERATING BUDGET**

| | # sold | $ per unit | Jun-11 Month 22 | Jul-11 Month 23 | Aug-11 Month 24 | Sep-11 Month 25 | Oct-11 Month 26 | Nov-11 Month 27 | Dec-11 Month 28 | Jan-12 Month 29 | Feb-12 Month 30 | Mar-12 Month 31 | Apr-12 Month 32 | May-12 Month 33 | Jun-12 Month 34 | Jul-12 Month 35 | Aug-12 Month 36 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Residential Tower Sales** | | | | | | | | | | | | | | | | | | |
| Tower 1 Sales | Plan 1 | | 2 | 2 | 2 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 22 |
| Tower 2 Sales | Plan 1 | | 5 | 5 | 5 | 5 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 119 |
| | | | | | | | | | | | | | | | | | | |
| **Tower 1** | Total Units 4 | 4 | | | | | | | | | | | | | | | | 4 |
| # of Sold units closed | 18 | 18 | | | | | | | | | | | | | | | | 18 |
| # units to sell | 135 | 117 | | | | | | | | | | | | | | | | 135 |
| Cumulative Units Sold | | | 2 | 133 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 | 135 |
| Total $ - Sold Units Closed (net 6 | 491,103 | | 1,155,490 | 1,155,490 | 1,155,490 | | | | | | | | | | | | | 1,954,412 |
| Total $ - Units to Sell (net 6%) | 577,745 | | | | | | | | | | | | | | | | | 10,399,608 |
| | | | | | | | | | | | | | | | | | | |
| **Tower 2** | 22 | 22 | | | | | | | | | | | | | | | | 22 |
| # of Sold units closed | 97 | 97 | | | | | | | | | | | | | | | | 97 |
| # units to sell | 143 | 46 | | | | | | | | | | | | | | | | 143 |
| Cumulative Units Sold | | | 62 | 67 | 72 | 77 | 83 | 89 | 95 | 101 | 107 | 113 | 119 | 125 | 131 | 137 | 143 | 143 |
| Total $ - Sold Units Closed (net 6 | 967,435 | | 4,299,114 | 4,299,114 | 4,299,114 | 4,299,114 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 21,283,574 |
| Total $ - Units to Sell (net 6%) | 859,823 | | 4,299,114 | 4,299,114 | 4,299,114 | 4,299,114 | | | | | | | | | | | | 83,402,616 |
| | | | | | | | | | | | | | | | | | | |
| % of Units Remaining | Total Units | | 30.6% | 28.1% | 25.5% | 23.7% | 21.6% | 19.4% | 17.3% | 15.1% | 12.9% | 10.8% | 8.6% | 6.5% | 4.3% | 2.2% | 0.0% | |
| Net # of Storage Units/Parking | 3,533 | | 25,433 | 25,433 | 25,433 | 18,167 | | | | | | | | | | | | 512,200 |
| Net Revenue on upgrades for uni | 13,160 | | 92,120 | 92,120 | 92,120 | 65,800 | | | | | | | | | | | | 1,855,560 |
| | | | | | | | | | | | | | | | | | | |
| **Total Residential Revenue** | | | 5,572,157 | 5,572,157 | 5,572,157 | 4,383,081 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 119,418,070 |
| | | | | | | | | | | | | | | | | | | |
| **Retail Revenue** | | | | | | | | | | | | | | | | | | |
| Projected Monthly Retail ROI | | | 350,000 | 340,000 | 340,000 | | | | | | | | | | | | | 5,100,000 |
| | | | | | | | | | | | | | | | | | | |
| Cap Rate? - Exit | | | | | 54,262,787 | | | | | | | | | | | | | 54,262,787 |
| | | | | | | | | | | | | | | | | | | |
| **Other Revenue** | | | | | | | | | | | | | | | | | | |
| Tiff Revenue | | | | | | | | | | | | | | | | 1,960,000 | | 2,500,000 |
| Estimated Mgr's Claims | | | 66,000 | 66,000 | | 60,000 | | | | | | | | | | | | 1,000,000 |
| Total Other Revenue | | | 66,000 | 66,000 | | 60,000 | | | | | | | | | | 1,960,000 | | 3,500,000 |
| | | | | | | | | | | | | | | | | | | |
| **Total Revenue** | | | 5,872,157 | 5,572,157 | 60,274,944 | 4,383,081 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 5,158,937 | 7,118,937 | 5,158,937 | 182,280,857 |

DISCLOSURE ONLY - FOR DISCUSSION PURPOSES ONLY

Project Southern Cross
24 MONTH OPERATING BUDGET

**Project Southern Cross**
**36-MONTH OPERATING BUDGET**

| | | Jun-11 Month 22 | Jul-11 Month 23 | Aug-11 Month 24 | Sep-11 Month 25 | Oct-11 Month 26 | Nov-11 Month 27 | Dec-11 Month 28 | Jan-12 Month 29 | Feb-12 Month 30 | Mar-12 Month 31 | Apr-12 Month 32 | May-12 Month 33 | Jun-12 Month 34 | Jul-12 Month 35 | Aug-12 Month 36 | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Advance from WC Bucket | | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | |
| Net in WC Bucket | | | | | | | | | | | | | | | | | |
| **ISP Reserve Budget** | 110.0% | 16,500,000 | | | | | | | | | | | | | | | |
| Beginning Amount | | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | |
| Net Proceeds from Asset Sales | | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | 16,500,000 | |
| Max ISP Reserve | | | | | | | | | | | | | | | | | |
| **Excess to Borrower** | | | | | | | | | | | | | | | | | |
| Beginning Amount | | 18,961,849 | 24,534,007 | 30,106,164 | 35,678,321 | 40,061,402 | 45,321,099 | 50,580,796 | 55,840,493 | 61,100,190 | 66,359,888 | 71,619,585 | 76,879,282 | 82,138,979 | 87,398,676 | 92,658,373 | |
| Net Proceeds from Asset Sales | | 5,572,157 | 5,572,157 | 5,572,157 | 4,383,081 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | |
| Net to Borrower | | 24,534,007 | 30,106,164 | 35,678,321 | 40,061,402 | 45,321,099 | 50,580,796 | 55,840,493 | 61,100,190 | 66,359,888 | 71,619,585 | 76,879,282 | 82,138,979 | 87,398,676 | 92,658,373 | 97,918,070 | |
| Advance to Cash | | 5,572,157 | 5,572,157 | 5,572,157 | 4,383,081 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | 5,259,697 | |
| Net Excess | | | | | | | | | | | | | | | | | |

**EXHIBIT B**

**Form of Deed of Trust**

(TO BE PROVIDED)

[Exhibit to Debtor In Possession Loan Agreement]

**7677 EAST BERRY AVENUE ASSOCIATES, L.P.,**
**a Delaware limited partnership, as trustor**

(Borrower)

to

**THE PUBLIC TRUSTEE OF ARAPAHOE COUNTY,**
as trustee

(Trustee)

for the benefit of

**CARMEL LANDMARK, LLC,**
a Colorado LLC

(Beneficiary)

---

## DEED OF TRUST AND SECURITY AGREEMENT

---

| | |
|---|---|
| Dated: | As of September ___, 2009 |
| Location: | 7677 East Berry Avenue<br>Greenwood Village, Colorado |
| County: | Arapahoe |

PREPARED BY AND UPON
RECORDATION RETURN TO:

Lindquist & Vennum P.L.L.P.
600 17th Street, Suite 1800 South
Denver, Colorado 80202
Attention:  Harold G. Morris, Jr., Esq.

Doc# 3060428\2

# TABLE OF CONTENTS

ARTICLE 1 GRANTS OF SECURITY ...................................................................................2

    Section 1.1    **Property Conveyed.** ..................................................................2
    Section 1.2    **Assignment of Rents.** ..............................................................5
    Section 1.3    **Security Agreement.** ...............................................................6
    Section 1.4    **Fixture Filing.** ..........................................................................6
    Section 1.5    **Pledges of Monies Held.** ........................................................7

ARTICLE 2 WARRANTY ..................................................................................................7

    Section 2.1    **Title.** ...........................................................................................7
    Section 2.2    **All Property.** ............................................................................7
    Section 2.3    **Enforceability of Security Instrument.** ..............................8

ARTICLE 3 DEBT AND OBLIGATIONS SECURED ......................................................8

    Section 3.1    **Debt.** ...........................................................................................8
    Section 3.2    **Other Obligations.** .................................................................8
    Section 3.3    **Debt and Other Obligations.** ...............................................8

ARTICLE 4 BORROWER COVENANTS ..........................................................................8

    Section 4.1    **Payment of Debt.** ...................................................................8
    Section 4.2    **Incorporation by Reference.** ...............................................8
    Section 4.3    **Insurance.** ................................................................................9
    Section 4.4    **Maintenance of Property.** .....................................................9
    Section 4.5    **Waste.** .......................................................................................9
    Section 4.6    **Payment for Labor and Materials.** .....................................9
    Section 4.7    **Performance of Other Agreements.** .....................................9

ARTICLE 5 OBLIGATIONS AND RELIANCES ............................................................10

    Section 5.1    **Relationship of Borrower, Beneficiary and each Lender.** ...........10
    Section 5.2    **No Reliance on Beneficiary or any Lender.** .....................10
    Section 5.3    **No Beneficiary or Lender Obligations.** ............................10
    Section 5.4    **Reliance.** .................................................................................10

ARTICLE 6 FURTHER ASSURANCES ..........................................................................11

    Section 6.1    **Recording of Security Instrument, etc.** ...........................11
    Section 6.2    **Further Acts, etc.** ..................................................................11
    Section 6.3    **Chances in Tax, Debt, Credit and Documentary Stamp Laws.** ...........12
    Section 6.4    **Splitting of Security Instrument.** ......................................12
    Section 6.5    **Replacement Documents.** ....................................................12

i

ARTICLE 7 DUE ON SALE/ENCUMBRANCE ........................................................................13

    Section 7.1    **Beneficiary Reliance.** ......................................................................13
    Section 7.2    **No Transfer.** ....................................................................................13

ARTICLE 8 RIGHTS AND REMEDIES UPON DEFAULT ....................................................13

    Section 8.1    **Remedies.** ........................................................................................13
    Section 8.2    **Application of Proceeds.** ................................................................15
    Section 8.3    **Actions and Proceedings.** ..............................................................15
    Section 8.4    **Recovery of Sums Required To be Paid.** ......................................15
    Section 8.5    **Beneficiary's Right to Perform.** ...................................................16
    Section 8.6    **Specific Performance.** ....................................................................16
    Section 8.7    **Sale of Property.** ............................................................................16
    Section 8.8    **Other Rights. Etc.** .........................................................................17
    Section 8.9    **Right to Release Any Portion of the Property.** ............................17
    Section 8.10    **Choice of Remedies.** ..................................................................18

ARTICLE 9 NOTICES ...........................................................................................................18

ARTICLE 10 APPLICABLE LAW; WAIVER OF JURY TRIAL ...........................................18

    Section 10.1    **GOVERNING LAW.** ..................................................................18
    Section 10.2    **Provisions Subject to Applicable Law** ......................................19
    Section 10.3    **TRIAL BY JURY** .......................................................................19

ARTICLE 11 DEFINITIONS; CONSTRUCTION .................................................................20

ARTICLE 12 MISCELLANEOUS PROVISIONS ..................................................................21

    Section 12.1    **Conflict of Terms.** .....................................................................21
    Section 12.2    **No Oral Change.** ........................................................................21
    Section 12.3    **Successors and Assigns.** .............................................................21
    Section 12.4    **Entire Agreement.** .....................................................................21
    Section 12.5    **Delay Not a Waiver.** ..................................................................22
    Section 12.6    **No Joint Venture or Partnership; No Third Party Beneficiaries.** .......22
    Section 12.7    **Limitation on Beneficiary's Responsibility.** ............................23
    Section 12.8    **Subrogation.** ..............................................................................23
    Section 12.9    **Joint and Several Liability.** .......................................................23
    Section 12.10    **Time of the Essence.** ................................................................23

ARTICLE 13 ..........................................................................................................................23

ARTICLE 14 STATE-SPECIFIC PROVISIONS ....................................................................23

    Section 14.1    **Principles Of Construction.** ......................................................23
    Section 14.2    **Maturity Date.** ...........................................................................24
    Section 14.3    **Fixture Filing.** ............................................................................24

**Section 14.4**      **Foreclosure.** ...................................................................................24
**Section 14.5**      **Additional Waivers.** ......................................................................26
**Section 14.6**      **Waiver Of Homestead And Other Exemptions**...................................26
**Section 14.7**      **Partial Releases.** ...........................................................................26

## EXHIBITS

EXHIBIT A    Legal Description
EXHIBIT B    Definitions of Leases and Rents

Doc# 3060428\2