UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

| | |
|---|---|
| In re<br><br>7677 EAST BERRY AVENUE<br>ASSOCIATES, L.P., ET AL.<br><br>Debtors. | Case Nos. 09-27906, 09-27907, 09-28000<br><br>Jointly Administered under<br>Case No. 09-28000-MER<br><br>Chapter 11 |

## MOTION FOR APPROVAL OF FORBEARANCE AND
## MODIFICATION AGREEMENT FOR DEBTOR- IN-POSSESSION
## LOAN AND SECURITY AGREEMENT

7677 East Berry Avenue Associates, L.P. (the "Debtor") moves this Court for an order pursuant to sections 105, 362, and 364(c) and (d) of Title 11 of the United States Code (the "Bankruptcy Code"), Fed. R. Bankr. Pro. 4001(d), and L.B.R. 9013-1, approving a Forbearance and Modification Agreement (the "Forbearance Agreement," a copy of which is attached as Exhibit 1) with respect to a Debtor-In-Possession Loan and Security Agreement (the "DIP Agreement") dated as of November 20, 2009, between the Debtor and Hypo Real Estate Capital Corporation, as Agent ("Hypo"), and the lenders participating in such financing. In support of the Motion, the Debtor states as follows:

### Introduction

1. Despite its best efforts since filing for Chapter 11 protection, the Debtor has been unable to meet its first six-month benchmark that required $10 million in net sale proceeds from the sale of condominium units by May 20, 2010, as required by the DIP Agreement. As a result, an Event of Default has occurred under the DIP Agreement.

2. Rather than enforce all of its rights under the DIP Agreement, which includes the right to receive relief from the automatic stay to foreclose on the Debtor's property, Hypo has agreed with the Debtor to the terms of the Forbearance Agreement, described in greater detail below, which provides for appointment of a Chief Restructuring Officer ("CRO") selected by Hypo, a cooperative pursuit of a consensual plan confirmation process, transfer of the project to Hypo and its co-lenders in satisfaction of debt, with provisions for other creditors to be negotiated.

### Background

3. The Debtor is a Delaware limited partnership that develops and operates a luxury residential, retail, and entertainment development in Greenwood Village, Colorado (the "Project"). The Debtor's assets include, *inter alia,* two residential condominium towers, The Landmark and The Meridian, and retail and entertainment space called The Village Shops, which

10732\30\1404977.2                           1

contain approximately 185,000 square feet. There are 276 total residences (the "Condominium Units") at the Project, which range in size from 800 to 2,500 square feet. The Debtor broke ground on the Project in 2004 and opened The Landmark in 2006 and The Meridian in 2007.

4.      On October 29, 2009, the Court entered its Final Order Pursuant to 11 U.S.C. § 105, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying Automatic Stay (the "DIP Loan Order"), in which the Court approved a construction loan up to $30,000,000 from Hypo (the "DIP Loan") to provide capital for the Debtor to complete construction of the Project pursuant to a budget (the "DIP Budget") to sell its remaining Condominium Units, to lease its remaining retail space, and to otherwise operate the Project in contemplation of repayment of all of its secured and unsecured debt, a confirmed plan of reorganization, and an eventual return to its limited partner investors.

### The Debtor's Post-Petition Operations and Sales Efforts

5.      The Debtor's goal has been and continues to be to market and sell its unsold Condominium Units and lease its remaining retail space at the best possible prices based on current market conditions, enabling it to pay off its debts and to achieve profitability.

6.      Despite being unable to meet the May 20 sales benchmark, the Debtor has made substantial progress in this Chapter 11 case. The Debtor has requested seven draws on the DIP Loan for a total of $11,574,300.25. Pursuant to the approved budget under the DIP Loan Agreement, the Debtor has spent $13,229.539.67. The Debtor has remitted its total net sales proceeds of $5,757,792 to Hypo, which amounts have been applied against amounts outstanding under the DIP Loan Agreement. As a result, the Debtor currently owes $4,706,726.63 under the DIP Loan Agreement.

7.      The Debtor has achieved a number of goals in the six months since Hypo began providing draws under the DIP Loan, including:

   a.    The sale of nine Condominium Units, with total net sale proceeds of $5,757,792.

   b.    The Debtor has four additional Condominium Units under contract which are expected to generate $2,749,968 in net sale proceeds. The Debtor is in discussions with other potential buyers with estimated net sale proceeds of approximately $5,000,000.

   c.    The Debtor has entered into five new retail leases which generate $42,284 per month in rent. The Debtor has negotiated an additional two retail leases that await signature.

   d.    The Debtor has expended i) $313,931 on warranty construction work for current residents of Condominium Units and repairs to common areas in the two towers; ii) $404,354 in new construction work at the towers, including the completion of sold

10732\30\1404977.2                          2

units, fireplace repairs and completion of the elevators in both towers; and iii) $1,272,323 in retail construction costs consisting primarily of tenant improvement work and repairs to the retail property.

    e.    The Debtor has assumed five retail leases and settled with those tenants with respect to claims related to tenant improvements.

    f.    As required under the DIP Loan Order, the Debtor has objected to the mechanic's lien claims of Beck Residential, LLC and Milender White Construction Co., and has begun preliminary work on potential objections to a number of other mechanic's liens.

### The Debtor's Default under the DIP Agreement

8.    Section 2.7.2 of the DIP Agreement required the Debtor to pay to Hypo at least $10 million of net sales proceeds from the sale of Condominium Units by May 20, 2010. The Debtor's inability to meet this sales benchmark constituted an Event of Default as defined in Section 10.1 of the DIP Agreement.

9.    On May 26, 2010, Hypo sent a notice of the Event of Default, as required by ¶ 23 of the DIP Loan Order, (see Exhibit 2, attached hereto) which provides, in relevant part, that Hypo may assert its rights and remedies under the DIP Agreement, including declaring the DIP Loan due and payable, terminating the right to use cash collateral, and allowing relief from stay to assert all of its rights and remedies against the Project after five business days, unless the Debtor or the Official Unsecured Creditors' Committee seeks an emergency hearing for the sole purpose of determining whether an Event of Default has occurred.

10.    The Debtor believes it has no grounds to contest Hypo's assertion of an Event of Default, and therefore it is in the best interests of the estate and parties-in-interest to enter into the Forbearance Agreement.

### The Debtor's Proposed Plan and Transfer to Hypo

11.    The Forbearance Agreement contemplates the immediate appointment of a CRO and a plan confirmation process that will lead to Hypo and its pre-petition co-lenders (collectively, the "Pre-Petition Lenders") becoming the owner of the Project through a conversion of some or all of their outstanding debt to equity. Rather than Hypo simply foreclosing on the Project or transferring the Project pursuant to a hasty sale under Bankruptcy Code § 363, a Chapter 11 plan will better manage the transition to Hypo and the Pre-Petition Lenders, maintain sales of Condominium Units and operational continuity, and address the unique needs of the residents. A plan will also reduce costs, remove the stigma of Chapter 11, protect Condominium Unit values, retail rents, and the value of the Landmark brand, and will mitigate the effect on unsecured creditors.

12.    A summary of the tentative plan that is the subject of negotiations with Hypo, in its capacity as DIP Lender, and the Pre-Petition Lenders, is as follows:

    a.    Hypo and the Pre-Petition Lenders will become owners of the Project by converting some or all of their outstanding indebtedness into equity in the Reorganized Debtor or Newco;

    b.    Indebtedness outstanding under the DIP Loan Agreement as of the effective date of the plan, will "roll" into an exit facility to be provided by Hypo and other lenders (yet to be determined);

    c.    Mechanic's lien claims and other secured claims would be addressed in accordance with the DIP Loan Order or as otherwise agreed between the Debtor, Hypo and the affected creditors;

    d.    Treatment of unsecured claims would be addressed pursuant to negotiation with the Official Unsecured Creditors' Committee;

    e.    Construction warranty claims of current Condominium Unit owners would be unimpaired, subject to review and approval of the CRO;

    f.    Existing equity interests in the Debtor would be cancelled;

13.    The Forbearance Agreement will facilitate implementation of this plan process and immediate appointment of the CRO to ensure a seamless transition throughout the process.

### Summary of the Forbearance Agreement's Material Provisions

14.    The terms of the Forbearance Agreement are the result of arms' length negotiations between the Debtor and Hypo. The following summarizes the material terms of the Forbearance Agreement:

- Provided that no further Default or Event of Default occurs under the DIP Agreement, the Debtor complies with the terms of the Forbearance Agreement, and the Debtor's representations in the Forbearance Agreement remain true, Hypo will refrain from exercising its rights under the DIP Agreement or any other related loan documents (each, a "Forbearance Default," as further described in Section 3.1 of the Forbearance Agreement). (Forbearance Agreement at § 3.1).

- Hypo will advance on the DIP Loan pursuant to an agreed budget, to be revised in consultation with the CRO within 30 days of appointment (Id. at § 3.4).

- On or before June 3, 2010, the Debtor will file a motion for authorization to (i) appoint a CRO, such CRO being selected by Hypo in its sole discretion, and (ii) enter into one or more agreements with such CRO, on terms and conditions acceptable to Hypo. The CRO will have full authority to manage the affairs and day-to-day operation of the Debtor and the Project, including managing employees and professionals, sales, construction, and leasing. (Id. at § 5.3). Further detail concerning the appointment of the CRO will be provided in the motion to appoint the CRO.

- On or before June 21, 2010, the Debtor shall file a plan of reorganization (the "Plan") and disclosure statement (the "Disclosure Statement") which shall be acceptable in form and substance to Hypo in its sole discretion. (Id. at § 5.4).

- On or before July 21, 2010, the Court shall have entered an order, in form and substance acceptable to Hypo in its sole discretion approving the Disclosure Statement. (Id. at § 5.5).

- On or before August 30, 2010, the Court shall have entered an order, in form and substance acceptable to Hypo in its sole discretion confirming the Plan. (Id. at § 5.6).

- On or before September 15, 2010, all conditions to the effectiveness of the Plan shall have been satisfied and the Plan shall have become effective. (Id. at § 5.7).

- Hypo and the Debtor agree to a new DIP Budget, which is attached to the Forbearance Agreement as Exhibit IV. Other provisions relating to the DIP Budget are set forth in Sections 6.2 and 6.3 of the Forbearance Agreement.

- The Debtor and Zack Davidson will forever release any and all claims against Hypo, any of their respective subsidiaries and affiliates, and their successors, assigns, officers, directors, employees, agents, shareholders, stockholders, agents, members, attorneys and other representatives, based in whole or in part on facts, whether or not known, existing on or prior to the date of this Agreement, including, without limitation, any claims or causes of action arising out of the actions or omissions of any CRO or its employees, agents, attorneys or other representatives with respect to the Property. (Id. at Art. 7).

### The Forbearance Agreement Is in the Best Interests of the Estate

15. The Debtor's decision to enter into the Forbearance Agreement represents an exercise of its sound business judgment in the continued operation of its business, the completion of construction of the Project, the sale of Condominium Units, and the process of confirming a reorganization plan. The Forbearance Agreement is the mechanism most likely to allow the Debtor to continue operate efficiently in bankruptcy, maintain the value of its assets, continue to sell Condominium Units and to lease retail space, and reorganize in approximately three months. See In re C & S Grain Co., 47 F.3d 233, 238 (7th Cir. 1995) ("Among the permissible justifications for modifying the stay is whether such action will benefit the debtor."); In re Simasko Prod. Co., 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (debtor used its sound business judgment in obtaining secured financing pursuant to § 364(d)).

16. The Forbearance Agreement provides that, despite the Event of Default, the Debtor will continue to operate its business, with new management chosen and overseen by Hypo, as it has the greatest stake in completing the Project. Despite Hypo's increased oversight of the Project, however, the rights of creditors and other parties-in-interest will remain unchanged. Parties will retain all of the rights accorded them in the DIP Loan Order and the Bankruptcy Code, including their rights in the plan confirmation process. The Secured Creditors remain adequately protected because the economics of the DIP Loan have not changed and the

10732\30\1404977.2         5

interests protected by the DIP Loan are not affected. Moreover, the retention of the CRO will provide further protection to the Secured Creditors with renewed oversight over the Project and day-to-day decisions related thereto. The payment provisions bargained for by mechanic's lien and other secured creditors remain in place, including the "Liquidation Waterfall" and other provisions set forth in ¶ 24 of the DIP Loan Order. The liens granted by the DIP Loan Order also remain in place. Accordingly, the Secured Creditors' bargained-for rights remain secure and adequately protected. See MBank Dallas, N.A. v. O'Connor (In re O'Connor), 808 F.2d 1393, 1397 (10th Cir. 1987).

17. Further, the lock up provision that requires the Debtor to propose a plan of reorganization agreeable to Hypo is reasonable in the circumstances and does not unduly prejudice the Debtor or detrimentally affect the estate or other parties. While the Debtor has committed itself to proposing a plan of reorganization that is agreeable to Hypo, , the Forbearance Agreement cannot trump the Debtor's obligation to satisfy the requirements of Bankruptcy Code § 1129 in proposing a plan and to act as a fiduciary to its creditors, both in operating its business and in proposing a plan. See In re Bush Indus., Inc., 315 B.R. 292, 304 (Bankr. W.D.N.Y. 2004) ("Although a debtor may in good faith negotiate a lock up agreement, the particular terms of any resulting plan must themselves be proposed in good faith and not by any means forbidden by law.").

18. The Debtor believes that the general release of Hypo is standard for a forbearance agreement and has no detrimental effect on the Debtor or its estate. Given the Debtor's status and the status of the Project, and the Debtor's belief that it likely has no claims against Hypo, the Debtor's sound business judgment justifies such a release. See In re Simasko Prod. Co., 47 B.R. at 449.

**WHEREFORE**, the Debtor requests that the Court enter an Order approving the Forbearance Agreement and granting such other relief as is just and proper.

Dated this 28th day of May, 2010.

                                     **BROWNSTEIN HYATT FARBER SCHRECK, LLP**

                                     s/Daniel J. Garfield
                                     Michael J. Pankow, #21212
                                     Daniel J. Garfield, #26054
                                     410 17th Street, Suite 2200
                                     Denver, Colorado 80202
                                     Telephone: (303) 223-1100
                                     Facsimile: (303) 223-1111
                                     mpankow@bhfs.com
                                     dgarfield@bhfs.com

                                     Attorneys for the Debtor

### FORBEARANCE AND MODIFICATION AGREEMENT

THIS FORBEARANCE AND MODIFICATION AGREEMENT (this "Agreement") is dated as of May 28, 2010, and is entered into by and among 7677 EAST BERRY AVENUE ASSOCIATES, L.P., a Delaware limited partnership ("Borrower"), HYPO REAL ESTATE CAPITAL CORPORATION, a Delaware corporation, as agent on behalf of the Lenders ("Agent") and the banks, financial institutions and other institutional lenders parties to the DIP Loan Agreement (as hereinafter defined), as the lenders (and together with their permitted successors and assigns, the "Lenders").

### RECITALS:

WHEREAS, on August 30, 2009, Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States District Court for the District of Colorado (the "Court"), case no. 09-28000-MER (the "Chapter 11 Case");

WHEREAS, in accordance with the DIP Order (as defined below), Lenders provided a senior secured, superpriority credit facility (the "Loan") to Borrower to fund, inter alia, the working capital requirements of Borrower and the project costs necessary to complete construction of the Improvements, and for other purposes permitted under that certain Debtor-in-Possession Loan and Security Agreement dated as of November 20, 2009 (the "DIP Loan Agreement") during the pendency of the Chapter 11 Case;

WHEREAS, on February 1, 2010, Zachary M. Davidson ("Davidson"), guarantor under the Loan, filed with the Court a voluntary petition for relief under Chapter 7 of the Bankruptcy Code and nothing in this Agreement is intended to modify or in any way impact Davidson's personal discharge under Chapter 7;

WHEREAS, an Event of Default has occurred under Section 10.1(a) of the DIP Loan Agreement due to Borrower's failure to make the mandatory prepayment required on May 20, 2010 in accordance with Section 2.7.2(c) of the DIP Loan Agreement (such Event of Default, the "Existing Default"); and

WHEREAS, Agent and the Lenders are willing to forbear from enforcing their rights that arise because of the Existing Default for a limited period of time, provided that Borrower complies with the terms of this Agreement.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE 1
### DEFINITIONS

Section 1.1. All capitalized terms used herein (including in the introductory paragraph and recitals set forth above) and not otherwise defined shall have the meanings assigned to such terms in the DIP Loan Agreement. For the avoidance of doubt, all references herein to the Lenders shall only include lenders under the DIP Loan Agreement.

Section 1.2. The following terms used in this Agreement shall have the meanings set forth below:

"DIP Order" means the Final Order Pursuant To 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use Of Cash Collateral, (3) Granting Liens And Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, And (5) Modifying Automatic Stay entered by the Court in the Chapter 11 Case on October 29, 2009.

"Forbearance Default" means (a) the occurrence of any uncured Default or Event of Default other than the Existing Default or any budget variances disclosed by Borrower to Lenders prior to the date of this

10732\30\1407573.2

**EXHIBIT 1**

Agreement, including without limitation, the property tax reallocation request outlined in that certain memo from Borrower to Lenders dated May 25, 2010, subject, however, to the approval rights of Agent and Lenders with respect to the property tax reallocation request which is not waived herein; (b) the failure of Borrower to comply with any term, condition or covenant set forth in this Agreement, including without limitation, the failure of any of the events referred to in Sections 5.3 through 5.7 to occur (regardless of whether the failure of such events to occur was within the control of Borrower and regardless of the efforts expended by Borrower to cause the same to occur) or (c) any representation made by Borrower under or in connection with this Agreement shall prove to be false or misleading, in any material respect, as of the date when made.

"Obligations" mean, the obligations of Borrower as more particularly set forth in the Loan Documents.

"Termination Date" means the date upon which a Forbearance Default occurs.

## ARTICLE 2
### CONFIRMATION BY BORROWERS OF OBLIGATIONS

Borrower acknowledges and agrees that as of the date hereof, Borrower has no right of offset, defense, or counterclaim with respect to the Obligations.

## ARTICLE 3
### AGREEMENT TO FORBEAR; SUBORDINATION AGREEMENT; OTHER AGREEMENTS

Section 3.1. Provided that no Forbearance Default occurs, Agent and the Lenders hereby agree to refrain through the Termination Date from exercising any of their rights and remedies under the DIP Loan Agreement or any of the other Loan Documents that may exist by virtue of the Existing Default including imposition of the Default Rate with respect to any of the Obligations.

Section 3.2. Nothing in this Agreement shall be construed as a waiver of or acquiescence to the Existing Default which shall continue in existence, subject only to the agreement of Agent and the Lenders, as set forth herein, not to enforce their remedies for a limited period of time. Except as expressly provided herein, the execution and delivery of this Agreement shall not (a) constitute an extension, modification, or waiver of any aspect of the DIP Loan Agreement or the other Loan Documents; (b) constitute a waiver or acquiescence to any other Event of Default or Default under the Loan Documents which may exist as of the date of this Agreement; (c) extend the terms of the DIP Loan Agreement or the due date of any of the Obligations; (d) give rise to any obligation on the part of Agent or the Lenders to extend, modify or waive any term or condition of the DIP Loan Agreement or any of the other Loan Documents; (e) give rise to any defenses or counterclaims to the right of Agent and the Lenders to compel payment of the Obligations or to otherwise enforce their rights and remedies under the DIP Loan Agreement and the other Loan Documents; or (f) establish a custom or course of dealing between or among Borrower, Agent and/or the Lenders, or any of them. Except as expressly limited herein, Agent and the Lenders hereby expressly reserve all of their rights and remedies under the DIP Loan Agreement, the other Loan Documents and applicable law with respect to the Existing Default.

Section 3.3. From and after the Termination Date, Agent and the Lenders shall be entitled to enforce the DIP Loan Agreement and other Loan Documents according to the original terms thereof, and to exercise any and all rights available to them as secured lenders under applicable law. In addition, and without limitation of any of the rights granted to Agent and the Lenders in the immediately preceding sentence, Borrower hereby authorizes Agent on and after the Termination Date, pursuant to 11 U.S.C. § 363, to cause the sale of any or all of the Collateral, acting in the name of Borrower, and in connection with any such sale, (i) to file with the Court, on Borrower's behalf, one or more motions: (a) for approval of bidding procedures acceptable to Agent, (b) for approval of the designation of one or more "stalking horse" bidders and the authorization for payment to such bidders (by Borrower) of a break-up fee, expense reimbursement or other similar bid protection, (c) for approval of

2

the sale of all or any portion of the Collateral, upon terms and conditions acceptable to Agent, and Borrower hereby agrees that it shall not oppose any of the foregoing motions, and (ii) to take such other actions, whether in the name of Borrower or otherwise, to cause the sale or transfer of all or any portion of the Collateral at such times and on such terms as Agent shall determine in its sole and absolute discretion.

Section 3.4. Notwithstanding any provision in any Loan Document to the contrary, Lenders shall Advance all amounts allocated to any line item in the Approved DIP Budget once the Agent and the chief restructuring officer ("CRO") collectively consent, within thirty (30) days following the date of this Agreement, to a revised Approved DIP Budget.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES

In consideration of the limited agreement of Agent and the Lenders to forbear from the exercise of their rights and remedies as set forth above, Borrower hereby represents and warrants to Agent and the Lenders as of the date hereof as follows:

Section 4.1. Borrower has made full disclosure to Agent and the Lenders of all existing Defaults and Events of Default under the DIP Loan Agreement.

Section 4.2. The execution, delivery and performance of this Agreement by Borrower is within Borrower's partnership power and has been duly authorized by all necessary partnership action.

Section 4.3. This Agreement constitutes a valid and legally binding Agreement enforceable against Borrower in accordance with its terms subject to the effects of bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights generally and to general equitable principles.

Section 4.4. All Loan Documents, including without limitation the DIP Loan Agreement, constitute valid and legally binding obligations of Borrower, enforceable against Borrower in accordance with the terms thereof subject to the effects of bankruptcy, insolvency, fraudulent conveyance and other laws affecting creditors' rights generally and to general equitable principles.

## ARTICLE 5
### COVENANTS

In order to induce Agent and the Lenders to forbear from the exercise of their rights and remedies as set forth above, Borrower hereby covenants and agrees with Agent and the Lenders as follows:

Section 5.1. Borrower shall continue to perform and observe all terms and conditions contained in the DIP Loan Agreement and the other Loan Documents.

Section 5.2. Borrower shall reimburse Agent and the Lenders for all costs and expenses incurred by such Persons in connection with the negotiation, preparation and enforcement of this Agreement (including, without limitation, reasonable attorneys' fees and legal expenses, which may consist of fees and legal expenses of outside counsel retained by Agent and the Lenders.

Section 5.3. On or before June 3, 2010, subject to extension upon consent of the Agent, in its sole discretion, Borrower shall file with the Court a motion for authorization to (i) appoint a CRO of Borrower, such CRO being selected by Agent in its sole discretion, and (ii) to enter into one or more agreements with such CRO, on terms and conditions acceptable to Agent. Borrower hereby delegates to such CRO, and agrees that such CRO shall have, full and complete right, power and authority to manage the affairs and day-to-day operation of Borrower and the Property, including, without limitation, the right, power and authority to administer, manage, operate, execute, direct and make decisions with respect to each of the following matters (each of the following, collectively, "Project

Decisions"): (a) the scope of employment of existing employees whose compensation is part of the Approved DIP Budget, (b) the performance of all management companies previously retained by Borrower, including, without limitation, any management companies retained pursuant to the Retail Management Agreement and the Residential Management Agreement, (c) any Construction Documents, Material Agreements or other contracts or agreements to which Borrower is a party or otherwise relating to the Property, (d) all Bona Fide Sales Contracts, (e) all Leases, (f) any condominium association with respect to the Property (to the extent that Borrower has rights to control, direct and/or have representation with respect to the same), (g) all brokerage, leasing and similar agreements relating to the Property, (h) all Licenses and Permits, (i) the design of the Property, any alterations thereto, and any plans and specifications relating thereto, (j) the Approved DIP Budget and any other budgets or financial projections pertaining to the Property, and (k) the settlement, waiver, compromise, adjudication or prosecution of any claims (at law, in equity or otherwise and before any governmental, quasi-governmental, administrative, arbitration or mediation tribunal) against or in favor of Borrower or with respect to the Property. Borrower shall execute such agreements, instruction letters and other instruments as Agent may determine are necessary in order to effectuate the foregoing. From the date hereof until and including the Termination Date, Borrower and Davidson (for the duration of his employment) shall (i) give such assistance and cooperation to CRO as Agent or CRO may request, including, without limitation, providing CRO with (A) access to the Property, (B) access to all books and records relating to the Property whether located on or off the Property, (C) the right to maintain an office at the Property, and monitor and administer the Property on a daily basis; and (D) any other information or reasonable assistance requested by Agent, CRO or their respective employees, officers, consultants, accountants, attorneys or advisors (all such Persons, collectively, "Lender Parties"). Borrower and Davidson hereby agrees that, from and after the appointment of a CRO until and including the Termination Date, Borrower and Davidson shall, and shall cause each other Borrower to: (w) immediately cease making Project Decisions, (x) defer to CRO with respect to all Project Decisions, (y) not interfere with any Project Decisions made by CRO, and (z) upon request, instruct in writing any third parties (including all employees of the Project, contractors, Tenants and Purchasers) to act upon the instructions of CRO as if CRO were the owner of the Property.

Section 5.4. On or before June 21, 2010, Borrower shall file with the Court a motion for approval of a disclosure statement (the "Disclosure Statement") in connection with a plan of reorganization of Borrower (the "Plan"), which Disclosure Statement, Plan and motion shall be acceptable in form and substance to Agent in its sole and absolute discretion.

Section 5.5. On or before July 21, 2010, the Court shall have entered an order, in form and substance acceptable to Agent in its sole and absolute discretion, approving the Disclosure Statement.

Section 5.6. On or before August 30, 2010, the Court shall have entered an order, in form and substance acceptable to Agent in its sole and absolute discretion, confirming the Plan.

Section 5.7. On or before September 15, 2010, all conditions to the effectiveness of the Plan shall have been satisfied and the Plan shall have become effective.

## ARTICLE 6
### MODIFICATIONS

Section 6.1. Exhibit IV to the DIP Loan Agreement is hereby deleted in its entirety and Exhibit IV to be agreed to as set forth in Section 3.4 hereof is substituted in place thereof.

Section 6.2. Section 8.1.3 of the DIP Loan Agreement is hereby deleted in its entirety, and replaced with the following new Section 8.1.3: "If Borrower becomes aware of any change in project costs which will increase a category or line item of the Approved DIP Budget, Borrower shall within five (5) Business Days thereafter notify Agent in writing and promptly submit to Agent for its approval a proposed Approved DIP Budget for such items for Agent's review and approval. The Lenders shall have no obligation to make any further Advances unless and until any proposed revised budget so submitted by Borrower, as applicable, is approved by Agent."

4

Section 6.3. Section 8.1.5 of the DIP Loan Agreement is hereby amended by deleting the first paragraph thereof in its entirety, and by deleting clause (v) in the first sentence of the second paragraph thereof.

## ARTICLE 7
### GENERAL RELEASE

In consideration of, among other things, the forbearance provided for herein, and any other financial accommodations which Agent and the Lenders elect to extend to Borrower, Borrower and Davidson for themselves and their affiliates, predecessors, successors, assigns, officers, directors, members, shareholders, stockholders, agents, attorneys, employees, and anyone claiming through or under any of them (but not Davidson's bankruptcy estate), forever waives, releases and discharges any and all claims (including, without limitation, cross-claims, counterclaims, rights of setoff and recoupment), causes of action, demands, suits, costs, expenses and damages that it now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity that arise under or relate to any of the Loan Documents or this Agreement or Borrower's rights or obligations thereunder (collectively, "Claims"), against Agent, the Lenders, any of their respective subsidiaries and affiliates, and their successors, assigns, officers, directors, employees, agents, shareholders, stockholders, agents, members, attorneys and other representatives, based in whole or in part on facts, whether or not known, existing on or prior to the date of this Agreement, including, without limitation, any claims or causes of action arising out of the actions or omissions of any CRO or its employees, agents, attorneys or other representatives to the Property. The provisions of this section shall survive the termination of the DIP Loan Agreement and payment in full of the Obligations.

## ARTICLE 8
### MISCELLANEOUS

Section 8.1. Headings. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 8.2. Governing Law. THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES WHICH WOULD REQUIRE THE APPLICATION OF NON-NEW YORK LAW.

Section 8.3. Counterparts. This Agreement may be executed in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

Section 8.4. Continued Effectiveness. Except as expressly set forth in this Agreement, the terms of the DIP Loan Agreement and each of the other Loan Documents remain unchanged, and all such Loan Documents shall remain in full force and effect and are hereby confirmed and ratified.

Section 8.5. No Novation. This Agreement shall not be deemed or construed to be a satisfaction, reinstatement, novation or release of the DIP Loan Agreement or of any of the other Loan Documents or, except as expressly provided herein, a waiver by Agent or the Lenders of any of their rights and remedies under the DIP Loan Agreement or any of the other Loan Documents, or at law or in equity.

Section 8.6. Reaffirmation. Borrower hereby reaffirms each and every covenant, condition, obligation and provision set forth in the Loan Documents, as modified hereby.

Section 8.7. Construction. Borrower acknowledges that it has been represented by its own legal counsel in connection with its execution of this Agreement and the Loan Documents, that it has exercised independent judgment with respect to this Agreement and the Loan Documents, and that it has not relied on Agent

10732\30\1407573.2

or the Lenders or Agent's or the Lenders' counsel for any advice with respect to this Agreement or the Loan Documents.

Section 8.8. Integration; Waivers. This Agreement, the Loan Documents and the other written agreements, instruments and documents entered into in connection therewith (collectively, the "Borrower/Lender Documents") set forth in full the terms of agreement between the parties with respect to the subject matter thereof and are intended as the full, complete and exclusive contract governing the relationship between the parties with respect thereto, superseding all other discussions, promises, representations, warranties, agreements and understandings between the parties with respect thereto. There are no oral agreements between the parties. No amendment, waiver or other modification of any provision of this Agreement shall be effective without the written agreement of Agent. Any waiver of any condition in, or breach of, any of the foregoing in a particular instance shall not operate as a waiver of other or subsequent conditions or breaches of the same or a different kind. Agent's and the Lenders' exercise or failure to exercise any rights under any of the foregoing in a particular instance shall not operate as a waiver of its right to exercise the same or different rights in other instances. Except as expressly provided to the contrary in this Agreement, all the terms, conditions and provisions of the Borrower/Lender Documents shall continue in full force and effect.

Section 8.9. CONSENT TO JURISDICTION. ANY JUDICIAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER BORROWER/LENDER DOCUMENT, OR ANY OBLIGATIONS HEREUNDER OR THEREUNDER, MUST BE BROUGHT IN THE COURT, WHICH SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR SUCH MATTERS, AND BORROWER HEREBY WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF THE COURT IN ANY SUCH SUIT, ACTION OR PROCEEDING; PROVIDED, THAT BORROWER HEREBY ACKNOWLEDGES THAT ANY APPEALS FROM THE COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE COURT; AND PROVIDED, FURTHER, THAT, SUBJECT TO RECEIVING PRIOR APPROVAL FROM THE COURT AUTHORIZING SUCH ACTION, NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE AGENT AND EACH LENDER FROM BRINGING SUIT OR TAKING OTHER LEGAL ACTION IN ANY OTHER JURISDICTION TO REALIZE ON THE COLLATERAL OR ANY OTHER SECURITY FOR THE OBLIGATIONS HEREUNDER, OR TO ENFORCE A JUDGMENT OR OTHER COURT ORDER.

Section 8.10. Reaffirmation. Borrower has executed and delivered one or more of the other Loan Documents as debtor, grantor, pledgor, guarantor, assignor, or in other similar capacities in which such Person has granted liens or security interests in their respective properties or otherwise acted as an accommodation party or guarantor, as the case may be. Borrower hereby ratifies and reaffirms all of its respective payment and performance obligations, contingent or otherwise, under the Loan Documents to which it is a party and, to the extent Borrower has granted liens on or security interests in any of their respective properties pursuant to any Loan Documents as security for or otherwise guaranteed the Obligations under or with respect to the Agreement or any other Loan Documents, hereby ratifies and reaffirms such payment and performance obligations, guarantee and grant of security interests and liens and confirms and agrees that such security interests and liens hereafter secure all of the Obligations. Borrower agrees that each of the Loan Documents remains in full force and effect and is hereby ratified and reaffirmed, and agrees that this Agreement shall not (i) operate as a waiver of any right, power or remedy of Agent or the Lenders under the Loan Documents or (ii) constitute a waiver of any provision of any of the Loan Documents or serve to effect a novation of the Obligations.

Section 8.11. Additional Representations. Borrower hereby acknowledges, agrees, represents and warrants as follows: (a) it is a sophisticated party, acting without any duress, coercion or undue influence by any party, and is acting upon the advice of its own independent counsel (which has advised Borrower that their respective undertakings with respect to the terms, covenants, provisions and conditions of this Agreement are enforceable), and (b) this Agreement was executed after an arms-length negotiation as the free and voluntary act of Borrower.

10732\30\1407573.2

Section 8.12. No Joint Venture/Partnership. Nothing contained in this Agreement or any prior actions by the parties, whether pursuant to this Agreement or otherwise, shall be deemed to contemplate or constitute a joint venture or partnership agreement of any kind between Lender and/or any of the Lenders, on one hand, and any of the Borrower Parties, on the other hand, or otherwise create the relationship of joint venturers or partners between Lender and/or any of the Lenders, on one hand, and any of the Borrower Parties, on the other hand, or characterize Lender or any Lender as a "mortgagee-in-possession".

Section 8.13. No Brokers. Borrower hereby represents to Agent and Lenders that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement. Borrower agrees to indemnify and hold Agent and Lenders and their respective affiliates, directors, officers, employees, shareholders and agents harmless from and against any and all loss, claims, liabilities, costs and expenses arising by reason of a breach of the representation in the preceding sentence.

Section 8.14. Successors & Assigns. This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective heirs, personal representatives, successors and assigns, subject, however, to the terms of the Loan Documents.

Section 8.15. No Third Party Beneficiaries. Nothing herein, express or implied is intended to or shall confer on any Person other than the parties named herein, any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 8.16. Loan Document. This Agreement shall comprise a Loan Document.

Section 8.17. TRIAL BY JURY WAIVER. LENDER AND BORROWER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THIS AGREEMENT OR ANY DOCUMENT EXECUTED AND DELIVERED PURSUANT TO THIS AGREEMENT, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION HEREWITH OR THEREWITH.

[Remainder of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first set forth above, by their respective duly authorized officers.

BORROWER:

7677 EAST BERRY AVENUE ASSOCIATES, L.P., a Delaware limited partnership

By: EDC Denver 1, LLC,
a Delaware limited liability company,
its General Partner

By: _____
Name: Zachary M. Davidson
Title: Manager

AGENT:

HYPO REAL ESTATE CAPITAL CORPORATION, a Delaware corporation

By: _____
Name:
Title:

By: _____
Name:
Title:

LENDER:

HYPO REAL ESTATE CAPITAL CORPORATION, a Delaware corporation

By: _____
Name:
Title:

By: _____
Name:
Title:

[Signature Page Continues]

ACKNOWLEDGED AND AGREED AS TO SECTION 5.3
AND SECTION 7 OF THE AGREEMENT:

ZACHARY M. DAVIDSON, an individual

By: _____
Name: Zachary M. Davidson
Title: Guarantor

[End of Signature Pages]

Hypo Real Estate Capital Corporation<br>
622 Third Avenue<br>
31st Floor<br>
New York, New York 10017

**VIA FEDERAL EXPRESS AND FACSIMILE**

May 26, 2010

7677 East Berry Avenue Associates, L.P.
7677 East Berry Avenue
Greenwood Village, Colorado 80111
Attention: Zachary M. Davidson
Fax: (303) 770-6566

**RE: Notice of Event of Default Under Section 2.7.2 of the DIP Loan Agreement**
   **Client-Matter No. 279447-203**

Gentlemen:

    Reference is made to (i) the Debtor-in-Possession Loan and Security Agreement dated as of November 20, 2009 by and between 7677 East Berry Avenue Associates, L.P., as borrower ("Borrower") and Hypo Real Estate Capital Corporation, as agent ("Agent") for itself and the other lenders signatory thereto (collectively, together with such other co-lenders as may exist from time to time, "Lenders") (the "DIP Loan Agreement"), and (ii) the Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing, (2) Authorizing Use of Cash Collateral, (3) Granting Liens and Providing Superpriority Administrative Expense Status, (4) Granting Adequate Protection, and (5) Modifying Automatic Stay entered on October 29, 2009 by the United States Bankruptcy Court for the District of Colorado (the "Bankruptcy Court") [Docket No. 232] (the "Final DIP Order"). Capitalized terms used herein and not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Loan Agreement.

    This letter serves as written notice to Borrower that an Event of Default has occurred pursuant to the terms of the DIP Loan Agreement as a result of Borrower's failure to pay outstanding Unit Required Release Payments at the time and in the amount required pursuant to Section 2.7.2(c)(i) of the DIP Loan Agreement (the "Relevant Event of Default").

    Please be aware that the Loan Documents provide that Borrower is obligated to pay all expenses, including attorneys' fees and disbursements, incurred by the Lenders in connection with the Relevant Event of Default. In addition, Section 2.6.4 of the DIP Loan Agreement further provides that upon the occurrence of an Event of Default, the outstanding principal balance of the Loan shall accrue interest at the Default Rate, calculated from the date the Event of Default occurred. Finally, please note that pursuant to Section 2.1.4(d) of the DIP Loan Agreement, Agent and the Lenders have no obligation to make any Advances to Borrower if an Event of Default exists. Therefore, please be advised that, without limiting any of the other rights and

**EXHIBIT 2**

**May 26, 2010**
Page Two

remedies of Agent and the Lenders pursuant to the DIP Loan Agreement and the other Loan Documents, for so long as the Relevant Event of Default exists, Agent and the Lenders may elect to make, or not to make, Advances from time to time, in their sole discretion, but shall in no event be obligated to make any such Advances.

Subject to the Borrower's and the Statutory Committee's right to seek an emergency hearing with the Bankruptcy Court pursuant to the terms of Paragraph 23 of the Final DIP Order, the automatic stay shall terminate five business days after the date hereof and the Agent shall be entitled to exercise all rights and remedies against the Collateral as permitted by the terms of the DIP Loan Agreement and the Final DIP Order, including the initiation of state court foreclosure proceedings.

This letter is not intended to contain an exhaustive or complete listing of all defaults or Events of Default that currently or may exist with respect to the DIP Loan Agreement, other Loan Documents, or Final DIP Order. Nothing contained in this letter or in any discussions, either before or after the date of this letter, with Borrower or Guarantor or any of their respective members, partners or representatives, is intended to limit, nor shall it be deemed to limit or in any way affect, any of Lenders' rights or remedies under the Loan Documents or the Final DIP Order with respect to any past, present or future default or Event of Default under the Loan Documents or Final DIP Order, including, without limitation, the Relevant Event of Default, or constitute an amendment, waiver, forbearance or modification of any of the terms of the Loan Documents. Nothing contained herein, nor any failure by Lenders to exercise any of its rights or remedies under the Loan Documents or Final DIP Order with respect to any past, present or future default or Event of Default under the Loan Documents or Final DIP Order, including, without limitation, the Relevant Event of Default, shall be deemed to constitute a waiver of any default or Event of Default under the Loan Documents or Final DIP Order. As provided in the Loan Documents, the Loan Documents may only be modified by a written agreement executed by both Borrower and Lenders.

Lenders hereby expressly reserve all rights and remedies available to Lenders under any of the Loan Documents and the Final DIP Order, at law and/or in equity with respect to any past, present or future default or Event of Default under the Loan Documents or Final DIP Order, including, without limitation, the Relevant Event of Default, and expressly reserves the right at any time and from time to time to take any action available to it under any of the foregoing which it deems appropriate under the circumstances.

[signature page follows]

**May 26, 2010**
Page Three

    Any questions regarding this notice should be directed to our counsel, Cooley LLP, 1114 Avenue of the Americas, New York, New York 10036, Attention: Jeffrey L. Cohen, Telephone: (212) 479-6218.

HYPO REAL ESTATE CAPITAL CORPORATION

By: _____
Name:
Title:   PAMELA L. GHEYSEN
      MANAGING DIRECTOR

By: _____
Name:
Title:   **David L. Katz**
      **Managing** Director


cc:   Brownstein Hyatt Farber Schreck, P.C.
      410 Seventeenth Street, Suite 2200
      Denver, Colorado 80202
      Attn: LeaAnn T. Fowler, Esq.
      Fax: (303) 223-0982
      (via FedEx and Fax)

      Daniel Garfield, Esq., Brownstein Hyatt Farber Schreck, P.C. (via FedEx)
      Jeffrey L. Cohen, Esq., Cooley LLP (via Email)
      Thomas D. O'Connor, Esq., Cooley LLP (via Email)
      The Honorable Michael E. Romero, U.S. Bankruptcy Judge (via FedEx)
      Alan K. Motes, Esq., U.S. Trustee (via Email)
      Lee M. Kutner, Esq., Kutner Miller Brinen, P.C. (via Email)
      Thomas C. Bell, Esq., Davis Graham & Stubbs LLP (via Email)
      Peter A. Cal, Esq., Sherman & Howard L.L.C. (via Email)
      Daniel C. Wennogle, Esq., Balcomb & Green, P.C. (via Email)

1635857 v3/NY