## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

|  |  |
|---|---|
| ------------------------------------------ )<br><br>In re:                                      )<br>                                            )<br>7677 EAST BERRY AVENUE        )<br>ASSOCIATES, L.P., *et al.*          )<br>                                            )<br>                          Debtors.    )<br>                                            )<br>                                            )<br>                                            )<br>                                            )<br>------------------------------------------ ) | Case Nos. 09-27906, 09-27907,<br>09-28000-MER<br><br>Jointly Administered under Case No.<br>09-28000-MER<br><br>*Chapter 11* |

## CORRECTED DEBTORS' JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE[1]

Dated: July 9, 2010
      Denver, Colorado

BROWNSTEIN HYATT FARBER
SCHRECK, LLP
Michael J. Pankow (CO Bar No.21212)
Daniel J. Garfield (CO Bar No. 26054)
410 Seventeenth Street, Suite 2200
Denver, CO 80202-4432
Telephone: (303) 223-1106
Facsimile: (303) 223-0906

*Counsel for Debtors and Debtors in
Possession*

---

[1] The Debtors are 7677 East Berry Avenue Associates, L.P., EDC Denver I, LLC and Everest Holdings, LLC.

**Table of Contents**

**Page**

ARTICLE I         DEFINITIONS AND CONSTRUCTION OF TERMS ................................. 1

ARTICLE II       TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND DIP ADVANCE CLAIMS ..................... 16

2.01.    Administrative Expense Claims ................................................................ 16

2.02.    Professional Compensation and Reimbursement Claims ..................... 16

2.03.    Priority Tax Claims ................................................................................ 17

2.04.    DIP Claims .............................................................................................. 17

ARTICLE III      CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS ................ 18

ARTICLE IV      TREATMENT OF CLAIMS AND EQUITY INTERESTS ........................ 18

4.01.    CLASS 1 - OTHER PRIORITY CLAIMS ............................................. 18

      (a)      Impairment and Voting .......................................................... 18

      (b)      Distributions ........................................................................... 18

4.02.    CLASS 2 – SECURED TAX CLAIMS ................................................. 18

      (a)      Impairment and Voting .......................................................... 18

      (b)      Distributions ........................................................................... 19

4.03.    CLASS 3 - OTHER SECURED CLAIMS ............................................. 19

      (a)      Impairment and Voting .......................................................... 19

      (b)      Distributions/Reinstatement of Claims ................................... 19

4.04.    CLASS 4 - PREPETITION FACILITY CLAIMS ................................. 19

      (a)      Impairment and Voting .......................................................... 19

      (b)      Distributions ........................................................................... 19

4.05.    CLASS 5 – HOA CLAIMS .................................................................. 19

      (a)      Impairment and Voting .......................................................... 19

      (b)      Distributions ........................................................................... 19

4.06.    CLASS 6 - GENERAL UNSECURED CLAIMS ................................. 20

      (a)      Impairment and Voting .......................................................... 20

      (b)      Transfer of Retained Causes of Action ................................... 20

      (c)      Distributions ........................................................................... 20

4.07.    CLASS 7 – SUBORDINATED CLAIMS ............................................. 20

      (a)      Impairment and Voting .......................................................... 20

      (b)      Distributions ........................................................................... 20

4.08.    CLASS 8 –EQUITY INTERESTS ....................................................... 20

**Table of Contents**
(continued)

**Page**

|  |  |  |  |
|---|---|---|---|
| | (a) | Impairment and Voting | 20 |
| | (b) | Distributions | 21 |
| 4.09. | | CLASS 9 – WARRANTY CLAIMS | 21 |
| | (a) | Impairment and Voting | 21 |
| | (b) | Treatment | 21 |
| 4.10. | | CLASS 10 – PREPETITION MECHANICS' LIEN CLAIMS | 21 |
| | (a) | Impairment and Voting | 21 |
| | (b) | Treatment | 21 |
| | (c) | Additional Provisions Related to Prepetition Mechanics' Lien Claims | 21 |
| | (d) | Application of Liquidation Waterfall | 22 |
| | (e) | Failure of Effective Date to Occur by Critical Date | 22 |
| 4.11. | | CLASS 11 – FirsTier Bank Claims | 23 |
| | (a) | Impairment and Voting | 23 |
| | (b) | Treatment | 23 |
| 4.12. | | CLASS 12 – MEZZANINE CLAIMS | 23 |
| | (a) | Impairment and Voting | 23 |
| | (b) | Treatment | 23 |
| ARTICLE V | | IMPLEMENTATION OF THE PLAN | 23 |
| 5.01. | | Funding of GUC Amount and Approval of Plan Administration Budget | 23 |
| 5.02. | | Reorganization Transaction | 24 |
| 5.03. | | Plan Distributions | 24 |
| 5.04. | | Intercompany Claims | 24 |
| 5.05. | | Title to Accounts | 24 |
| 5.06. | | Cancellation of Existing Equity Interests | 24 |
| 5.07. | | Plan Administrator | 24 |
| | (a) | Plan Implementation | 24 |
| | (b) | Role of the Plan Administrator | 25 |
| | (c) | Indemnification of Plan Administrator | 26 |
| | (d) | Plan Administration Budget | 26 |

-ii-

**Table of Contents**
(continued)

Page

|   |   |   |   |   |
|---|---|---|---|---|
| | (e) | Taxes | | 26 |
| | (f) | Resignation, Death, or Removal of Plan Administrator | | 27 |
| | (g) | Termination of Duties of Plan Administrator | | 27 |
| 5.08. | Powers of Officers; Resignations | | | 27 |
| 5.09. | Retention of Counsel | | | 27 |
| 5.10. | GUC Litigation Trust | | | 27 |
| ARTICLE VI | REORGANIZATION TRANSACTION | | | 29 |
| 6.01. | Exit Facility | | | 29 |
| | (a) | Parties | | 29 |
| | (b) | Exit Facility Term A Loans | | 30 |
| | (c) | Exit Facility Term B Loans | | 30 |
| | (d) | Security | | 30 |
| | (e) | Loan and Security Priority | | 30 |
| | (f) | Terms of Exit Facility Loans | | 30 |
| 6.02. | Formation and Operation of NewCo | | | 30 |
| 6.03. | Vesting of Transferred Assets in NewCo | | | 31 |
| | (a) | Transfer of Assets | | 31 |
| | (b) | Assumed Agreements | | 31 |
| | (c) | Condominiums | | 31 |
| | (d) | TIF Agreements/FirsTier Financing | | 31 |
| | (e) | Assets Transferred Free and Clear of Liens and Claims | | 31 |
| | (f) | Causes of Action | | 32 |
| 6.04. | Condominium and Property Matters | | | 32 |
| | (a) | Funding of Reserves | | 32 |
| | (b) | European Village Sharing Agreement/Metro Bonds | | 32 |
| 6.05. | Discharge of Prepetition Facility Claims | | | 32 |
| 6.06. | Corporate Action | | | 32 |
| 6.07. | Operation of NewCo | | | 33 |
| | (a) | Operating Agreement of NewCo | | 33 |
| | (b) | Indemnification of NewCo Manager | | 33 |

-iii-

## Table of Contents
(continued)

**Page**

|  |  |  |
|---|---|---|
| | (c) | Davidson Consulting Agreement ................................................................. 33 |
| 6.08. | Securities Law Matters ........................................................................................ 33 |
| 6.09. | Books and Records ............................................................................................... 33 |
| 6.10. | Effective Date and Closing of Reorganization Transaction ............................... 33 |
| ARTICLE VII | PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN ........................................................................................ 33 |
| 7.01. | Voting of Claims .................................................................................................. 33 |
| 7.02. | Nonconsensual Confirmation ............................................................................... 34 |
| 7.03. | Distributions ........................................................................................................ 34 |
| 7.04. | Distributions of Cash .......................................................................................... 34 |
| 7.05. | Timing of Distributions ........................................................................................ 34 |
| 7.06. | Delivery of Distributions ..................................................................................... 34 |
| 7.07. | Minimum Distributions ........................................................................................ 34 |
| 7.08. | Distributions to Holders as of the Record Date .................................................. 34 |
| 7.09. | Unclaimed Distributions ..................................................................................... 35 |
| 7.10. | Cancellation and Surrender of Existing Securities and Agreements .................. 35 |
| 7.11. | Setoffs ................................................................................................................. 35 |
| 7.12. | Votes Solicited in Good Faith .............................................................................. 35 |
| 7.13. | Tax Matters Concerning Distributions ................................................................. 35 |
| ARTICLE VIII | PROCEDURES FOR TREATING DISPUTED CLAIMS .......................... 36 |
| 8.01. | Objections to Claims ............................................................................................ 36 |
| 8.02. | No Distributions Pending Allowance ................................................................... 36 |
| 8.03. | Tort Claims .......................................................................................................... 36 |
| 8.04. | Distributions Relating to Allowed Insured Claims .............................................. 36 |
| 8.05. | Resolution of Claims ............................................................................................ 37 |
| 8.06. | Estimation ............................................................................................................ 37 |
| 8.07. | No Interest or Penalties ....................................................................................... 37 |
| ARTICLE IX | EXECUTORY CONTRACTS AND UNEXPIRED LEASES .................... 37 |
| 9.01. | Assumption or Rejection of Executory Contracts and Unexpired Leases ........... 37 |
| 9.02. | Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases .................................................................................................. 38 |

-iv-

**Table of Contents**
(continued)

| | | Page |
|---|---|---|
| 9.03. | Inclusiveness | 38 |
| 9.04. | Cure of Defaults | 38 |
| 9.05. | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 38 |
| ARTICLE X | EFFECT OF CONFIRMATION | 38 |
| 10.01. | Survival of Corporate Reimbursement Obligations | 38 |
| 10.02. | Discharge of Claims | 39 |
| 10.03. | Discharge of Debtors | 39 |
| 10.04. | Releases of Claims | 39 |
| | (a) Mutual Releases of Debtors and Lenders | 39 |
| | (b) Mutual Releases of Lenders | 40 |
| | (c) Releases of Released Parties | 40 |
| | (d) Injunction Related to Releases | 41 |
| 10.05. | Injunction | 41 |
| 10.06. | Term of Injunctions or Stays | 41 |
| 10.07. | Exculpation | 41 |
| 10.08. | Retained Causes of Action | 42 |
| 10.09. | Reservation of Rights | 42 |
| 10.10. | Substantive Consolidation | 43 |
| ARTICLE XI | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | 43 |
| 11.01. | Effectiveness | 43 |
| 11.02. | Failure of Conditions | 44 |
| 11.03. | Waiver of Conditions | 44 |
| ARTICLE XII | RETENTION OF JURISDICTION | 44 |
| ARTICLE XIII | MISCELLANEOUS PROVISIONS | 46 |
| 13.01. | Settlement and Compromise | 46 |
| 13.02. | Effectuating Documents and Further Transactions | 46 |
| 13.03. | Withholding and Reporting Requirements | 46 |
| 13.04. | Exemption from Transfer Taxes | 46 |
| 13.05. | Payment of Statutory Fees | 47 |

**Table of Contents**
(continued)

**Page**

13.06. Post-Effective Date Professional Fees and Expenses ........................................... 47

13.07. Dissolution of the Creditors' Committee ........................................................... 47

13.08. Disposition of Remaining Funds ....................................................................... 47

13.09. Plan Supplement .............................................................................................. 47

13.10. Amendment or Modification of the Plan ........................................................... 48

13.11. Revocation or Withdrawal of the Plan ............................................................. 48

13.12. Vacatur of Confirmation Order ........................................................................ 48

13.13. Severability ...................................................................................................... 48

13.14. Expedited Tax Determination ........................................................................... 49

13.15. Governing Law ................................................................................................ 49

13.16. Binding Effect .................................................................................................. 49

13.17. Exhibits/Schedules ........................................................................................... 49

13.18. Waiver of Federal Rule of Civil Procedure 62(a) and Bankruptcy Rule 6004(h) ............................................................................................................. 49

13.19. Notice of Confirmation of Plan and Effective Date .......................................... 49

13.20. Notices ............................................................................................................. 49

13.21. Consent of Debtors .......................................................................................... 50

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

------------------------------------------

In re:

7677 EAST BERRY AVENUE
ASSOCIATES, L.P., *ET AL.*

                              Debtors.

------------------------------------------

)
)
)
)
)
)
)
)
)
)
)
)

Case Nos. 09-27906, 09-27907, 09-28000-MER

Jointly Administered under Case No. 09-28000-MER

*Chapter 11*

## CORRECTED DEBTORS' JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE[2]

    7677 East Berry Avenue Associates, L.P., EDC Denver I, LLC and Everest Holdings, LLC, as debtors and debtors in possession, jointly propose the following plan of reorganization under section 1121(a) of title 11 of the United States Code. [The Creditors' Committee supports the Plan and the releases provided for herein.]

## ARTICLE I

DEFINITIONS AND CONSTRUCTION OF TERMS

    Definitions.  As used herein, the following terms have the respective meanings specified below:

    1.01.  Administrative Expense Claim means any right to payment (other than DIP Claims, and, for the avoidance of doubt, Cure Claims) constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(1) of the Bankruptcy Code, including, without limitation, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code.  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code shall be excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Section 13.05.

    1.02.  Affiliate means, with respect to any Person, any other Person controlling, controlled by, or under common control with, such Person.

    1.03.  Agent means, collectively, DIP Agent and Prepetition Agent.

---

[2] The Debtors are 7677 East Berry Avenue Associates, L.P., EDC Denver I, LLC and Everest Holdings, LLC.

1.04.   Allowed means, with reference to any Claim against any Debtor, (i) any Claim that has been listed by such Debtor in its Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (ii) any Claim allowed under the Plan, (iii) any Claim that is compromised, settled, or otherwise resolved by the Debtors or the Plan Administrator pursuant to a Final Order of the Bankruptcy Court or under Section 8.05 of the Plan, or (iv) any Claim that, if Disputed, has been (A) Allowed by Final Order or (B) in the case of Tort Claims, deemed Allowed pursuant to Section 8.03; *provided, however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Claim" shall not, for any purpose under the Plan, include interest, penalty or premium on such Claim from and after the Petition Date.  In the event that a Claim is resolved as provided in subsection (iii) or (iv) of this Section 1.04, it shall be an "Allowed Claim" for purposes of the Plan in the amount agreed to by the parties or ordered by the Bankruptcy Court (or, in the case of Tort Claims, an administrative or judicial tribunal of appropriate jurisdiction).  In the event no objection, complaint or request for estimation is timely filed during the applicable period specified in Section 8.01 on account of a Claim or a request for payment of Administrative Expense Claim that is Disputed solely by virtue of Subsection (b)(ii) of the definition of "Disputed", and is not otherwise Disputed as provided for in the Plan, then such Claim or request for payment of Administrative Expense Claim shall be deemed Allowed as of the date such period expires.

1.05.   Approved Project Cost Budget means the budget detailing permitted expenditures by NewCo from the proceeds of the Exit Facility, which budget shall be annexed to, and made part of, the Exit Facility Credit Agreement.

1.06.   Assumed Agreements has the meaning ascribed to such term in Section 9.01.

1.07.   Ballot means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan on which such holder shall indicate acceptance or rejection of the Plan.

1.08.   Bankruptcy Code means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.09.   Bankruptcy Court means the United States Bankruptcy Court for the District of Colorado having jurisdiction over the Chapter 11 Cases.

1.10.   Bankruptcy Rules means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

1.11.   Bar Date means (i) January 11, 2010, the bar date established in the Bar Date Order for the filing of proofs of Claim, (ii) June 30, 2010, the bar date established in the Bankruptcy Court's order (the "Extension Order") entered March 31, 2010 [Docket No. 523] or such later date established by further order of the Bankruptcy Court for the filing of proofs of

Claim by: First American Title Company; The Landmark Towers Condominium Association; and the Policy Holders (as defined in the Extension Order), as applicable, and (iii) in the case of requests for payment of Administrative Expense Claims, thirty days after notice of the Effective Date has been filed.

1.12.   Bar Date Order means the Order of the Bankruptcy Court entered on November 24, 2009, Docket No. 278 establishing the bar date for the filing of proofs of Claim.

1.13.   Borrower means Debtor 7677 East Berry Avenue Associates, L.P.

1.14.   Business Day means any day other than a Saturday, Sunday, or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.15.   Cash means legal tender of the United States of America.

1.16.   Catch-Up Distribution means, as of any Distribution Date, a distribution in an amount equal to the aggregate amount that the holder of a previously Disputed Claim that has become an Allowed Claim would have received on one or more previous Distribution Dates if such holder's Claim had been Allowed as of each such Distribution Date.

1.17.   Causes of Action means any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Petition Date or during the course of the Chapter 11 Cases, through and including the Effective Date.

1.18.   Chapter 11 Cases means the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors, styled (i) In re 7677 East Berry Avenue Associates, L.P., Chapter 11 Case No. 09-28000-MER, (ii) In re EDC Denver, LLC, Chapter 11 Case No. 09-27906 and (iii) In re Everest Holdings, LLC, Chapter 11 Case No. 09-27907, which are jointly administered under Case No. 09-2800-MER and are currently pending before the Bankruptcy Court.

1.19.   Charter Documents means the articles of incorporation, by-laws, limited liability company agreement, by-laws or other applicable corporate or limited liability company formation and governance documents of the Reorganized Debtors, as the same may be adopted, amended, restated, supplemented or otherwise modified from time to time in accordance with the Plan.

1.20.   Claim shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

1.21.   Class means a category of holders of Claims as set forth in Article III.

1.22.   Collateral means any property or interest in property of any Debtor subject to a Lien to secure the payment or performance of a Claim, which Lien is not subject to avoidance or otherwise invalid under the Bankruptcy Code or applicable state law.

3

1.23.    Condominiums means The Landmark Village Center Master Community, the Landmark Towers Condominiums and the Landmark Lot 2 Retail Condominiums, each located in the City of Greenwood Village, Colorado.

1.24.    Condominium Act means the Colorado Common Interest Ownership Act, codified as amended at C.R.S. § 38-33-101 et seq, as amended, modified or supplemented from time to time and all rules and regulations promulgated thereunder.

1.25.    Condominium Associations means the condominium associations for the Condominiums formed pursuant to the Condominium Documents.

1.26.    Condominium Declaration means collectively, (i) that certain Amended and Restated Declaration of Covenants, Conditions, and Restrictions of The Landmark Village Center Master Community with respect to The Landmark Village Center Master Community [Recorded March 26, 2008, Reception No. B8035117], as amended by the Supplemental Declaration recorded May 5, 2008 at Reception No. B8051571 and Supplemental Declaration recorded December 26, 2008 B8139381; (ii) that certain Landmark Towers Condominium Declaration with respect to the Landmark Towers Condominiums (as defined therein) [Recorded May 5, 2008, Reception No. B8051569], as amended by the First Amendment recorded August 18, 2008 at Reception No. B8093226; the Second Amendment and Supplemental Declaration recorded December 26, 2008, at Reception No. B8139383; the Third Amendment recorded November 9, 2009 at Reception No. B9122571; the Fourth Amendment recorded on December 17, 2009 at Reception No. B9135958; and the Fifth Amendment recorded March 1, 2010 at Reception No. D0019253; and (iii) that certain Condominium Declaration of Landmark Lot 2 Retail Condominium with respect to the Landmark Lot 2 Retail Condominiums (defined therein) [Recorded April 29, 2008, Reception No. B8049374], each of which is recorded in the County of Arapahoe, State of Colorado, and as otherwise amended, restated, supplemented or otherwise modified from time to time.

1.27.    Condominium Documents means all documents (and all amendments and supplements thereto), as required by the Condominium Act and otherwise relating to the submission of the Property and Units to the provisions of the Condominium Act or to the regulations, operation, administration or sale thereof after such submission, including, without limitation, the Condominium Declaration, articles of incorporation, by-laws and rules and regulations of the Condominium Associations, offering circulars, plats and contracts of sale and deed forms to be used in connection with the sale of Units, as applicable.

1.28.    Confirmation Date means the date that the Confirmation Order is entered.

1.29.    Confirmation Hearing means the hearing held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

1.30.    Confirmation Order means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

1.31.    Critical Date shall have the meaning ascribed to such term in Section 4.10(d).

4

1.32.   Creditors' Committee means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases on September 17, 2009, pursuant to section 1102 of the Bankruptcy Code.

1.33.   CRO means, collectively, Andrew S. Miller and Miller Frishman Group, LLC, in their capacity as restructuring professionals of the Debtors pursuant to that certain retention agreement approved by the Bankruptcy Court on July __, 2010 [Docket No. __].

1.34.   Cure Claim means any Claim arising as a result of any default under any executory contract or unexpired lease to be assumed or assumed and assigned by the Debtors during the Chapter 11 Cases in accordance with section 365 of the Bankruptcy Code.

1.35.   Davidson means Zachary M. Davidson, a natural person.

1.36.   Davidson Consulting Agreement means a consulting agreement, in form and substance acceptable to Agent in its sole discretion, between NewCo and Davidson.

1.37.   Debtors in Possession means the Debtors in their capacity as debtors in possession in the Chapter 11 Cases pursuant to sections 1101, 1107(a), and 1108 of the Bankruptcy Code.

1.38.   Debtors means Borrower, General Partner and Everest.

1.39.   DIP Agent means Hypo, as agent under the DIP Credit Agreement and any successor agent appointed in accordance with the terms thereof.

1.40.   DIP Claims means all Claims under the DIP Financing Orders and DIP Credit Agreement, including without limitation, all Claims for payment of principal, interest, fees, expenses, reimbursement, indemnification and other amounts with respect thereto.

1.41.   DIP Credit Agreement means that certain Debtor-in-Possession Loan and Security Agreement, dated as of November 20, 2009, and as amended, restated, supplemented or otherwise modified from time to time, by and among Borrower, Agent, and the DIP Lenders.

1.42.   DIP Lenders means, collectively, Hypo, as lender, and the other banks and financial institutions that are from time to time lender parties to the DIP Credit Agreement and their respective successors and assigns.

1.43.   DIP Financing Orders means, collectively, (i) the interim orders entered by the Court on September 4, 2009 and October 2, 2009 authorizing, *inter alia*, the Debtors' use of cash collateral on an interim basis [Docket Nos. 48 and 155] and (ii) the final order (the "Final DIP Financing Order") entered by the Court on October 29, 2009 authorizing, *inter alia*, post-petition financing on a final basis for the benefit of the Debtor [Docket No. 232], and any amendments, modifications or supplements to any of the foregoing.

1.44.   Disbursing Agent means the Plan Administrator, or its designee, in its capacity as Disbursing Agent pursuant to the Plan.

5

1.45.   Disclosure Statement means the disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.46.   Disputed means, with respect to any Claim:

(a)     if no proof of Claim or request for payment of Administrative Expense Claim has been filed by the applicable Bar Date or has otherwise been deemed timely filed under applicable law, (i) a Claim that is listed on the Debtors' Schedules as disputed, contingent or unliquidated or (ii) a Claim that is not listed on the Debtors' Schedules;

(b)     if a proof of Claim or request for payment of Administrative Expense Claim has been filed by the applicable Bar Date, or has otherwise been deemed timely filed under applicable law, (i) a Claim for which an objection, complaint or request for estimation has been filed by the Debtors or Plan Administrator, and such objection, complaint or request has not been withdrawn or denied in its entirety by a Final Order, or (ii) a Claim that the Plan Administrator's time to file an objection, complaint or request for estimation pursuant to Section 8.01 has not expired;

(c)     a Claim for which a proof of Claim or request for payment of Administrative Expense Claim is required to be filed under the Plan and no such proof of Claim or request for payment of Administrative Expense Claim is timely filed; or

(d)     a Tort Claim.

1.47.   Distribution Date means any date on which a distribution is made to holders of Allowed Claims by the Disbursing Agent.

1.48.   Effective Date means the first (1st) Business Day on which the conditions specified in Section 11.01 of the Plan have been satisfied or waived.

1.49.   Equity Interests means any and all partnership, membership or equity interests, shares of common or preferred stock or any other instrument evidencing an equity or other ownership interest in any Debtor, whether or not transferable, and any option, warrant, or right, contractual or otherwise, to acquire any such interest, in each case solely to the extent existing prior to the Effective Date.  For the avoidance of doubt, the term "Equity Interest" shall include any direct or indirect membership or partnership interest of any Debtor in any other Debtor.

1.50.   Escrow Account shall have the meaning ascribed to such term in Section 4.10.

1.51.   Estates means the respective estates created for the Debtors in the Chapter 11 Cases pursuant to section 541 of the Bankruptcy Code.

1.52.   European Village Sharing Agreement means the Declaration of Covenants, Reciprocal Easements, Amenities Use and Cost Sharing Agreement, recorded May 19, 2008 at Reception No. B8057756.

1.53.   Everest means Debtor Everest Holdings, LLC.

6

1.54.  Excess Disposition shall have the meaning ascribed to such term in Section 4.10(d).

1.55.  Excluded Assets means (i) the Retained Causes of Actions (but not, for the avoidance of doubt, the right of NewCo to receive a portion of the Net Proceeds of the Retained Causes of Action as provided for in the Plan), (ii) the GUC Account and the Plan Administration Account, and (iii) the Debtors' rights under section 549 of the Bankruptcy Code relative to any transfers occurring prior to the Effective Date (but not the proceeds thereof, which shall be Transferred Assets).

1.56.  Exit Facility has the meaning ascribed to such term in section 6.01(a).

1.57.  Exit Facility Agent means Hypo, or an Affiliate of Hypo designated by Hypo, as agent under the Exit Facility and any successor agent appointed pursuant to the terms of the Exit Facility Credit Agreement.

1.58.  Exit Facility Borrower means NewCo, as borrower under the Exit Facility.

1.59.  Exit Facility Credit Agreement means the credit agreement setting forth the terms of the Exit Facility to be filed by the Debtors with the Plan Supplement, as the foregoing may be amended, restated, supplemented or otherwise modified from time to time.

1.60.  Exit Facility Documents means, collectively, the Exit Facility Credit Agreement together with a Note, Security Instrument, Assignment of Leases, Assignment of Contracts, Assignment of Sales Contracts, Environmental Indemnity, Consent of Manager, Loan Fee Letter, Guaranty of Recourse Obligations, Depository Agreement, Lender Interest Rate Protection Agreement, Counterparty Consent, Assignment of Interest Rate Protection Agreement, in each case in form and substance acceptable to Exit Facility Agent in its sole discretion, as well as all other documents, instruments, certificates or other agreements now or hereafter executed and/or delivered in connection with or pursuant to the Exit Facility Loans.

1.61.  Exit Facility Lenders means Hypo and any other lenders from time to time party to the Exit Facility Credit Agreement and their respective successors and assigns.

1.62.  Exit Facility Loans means (i) the Exit Facility Term A Loans and (ii) the Exit Facility Term B Loans.

1.63.  Exit Facility Term A Loans means the loans to be made pursuant to Section 6.01(b).

1.64.  Exit Facility Term B Loans means the loans to be made pursuant to Section 6.01(c).

1.65.  Final Order means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance

7

satisfactory to the Plan Administrator or, in the event that any of the foregoing has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided, however,* that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order shall not cause such order not to be a Final Order.

     1.66.   FirsTier Bank Claims means all prepetition claims arising under the FirsTier Financing.

     1.67.   FirsTier Financing means that certain loan in the original principal amount of $7,000,000 made to Borrower by FirsTier Bank on March 14, 2008, which FirsTier Financing is secured by a first priority security interest in the TIF Agreements.

     1.68.   Forbearance Agreement means that certain Forbearance and Modification Agreement, dated as of June 8, 2010, by and among Borrower, Agent and the DIP Lenders approved by the Bankruptcy Court on June 15, 2010.

     1.69.   General Partner means Debtor EDC Denver I, LLC.

     1.70.   General Unsecured Claim means any Claim (including, for the avoidance of doubt, all Rejection Claims and Tort Claims) other than Administrative Expense Claims, Priority Tax Claims, DIP Claims, Other Priority Claims, Secured Tax Claims, Prepetition Facility Secured Claims, Other Secured Claims, Subordinated Claims, HOA Claims, Warranty Claims, Prepetition Mechanics' Lien Claims, FirsTier Bank Claims and Mezzanine Claims.

     1.71.   Governmental Authority means any court, tribunal, arbitrator, authority, agency, commission, official or instrumentality of the United States of America, the European Union, any foreign country or any domestic or foreign state, province, county, city, town, township or village or other political subdivision.

     1.72.   Guarantor means Zachary M. Davidson, a natural person, in his capacity as Guarantor under the Guaranty.

     1.73.   Guaranty means, collectively, that certain Guaranty of Recourse Carveouts, and that certain Completion Guaranty, both dated as of November 20, 2009, executed in connection with the DIP Credit Agreement.

     1.74.   GUC Account means an account with a nationally recognized financial institution reasonably acceptable to Agent to be established by the Debtors prior to the Effective Date to hold the GUC Amount and proceeds of Retained Causes of Action until such funds are distributed as provided for in the Plan.

     1.75.   GUC Amount means an amount equal to $[_____].

1.76.   GUC Litigation Trust means a trust, to be established under the laws of the State of Colorado as of the Effective Date, to own and prosecute the Retained Causes of Action.

1.77.   GUC Litigation Trust Agreement means an agreement, acceptable in form and substance to Agent, to govern the affairs of the GUC Litigation Trust and memorialize the rights and obligations of the GUC Litigation Trustee, substantially in the form of such agreement filed with the Plan Supplement.

1.78.   GUC Litigation Trust Assets means the GUC Amount, the GUC Account, and the Retained Causes of Action and the proceeds thereof.

1.79.   GUC Litigation Trustee means a Person designated by the Creditors' Committee, and reasonably acceptable to Agent, to serve as the trustee of the GUC Litigation Trust pursuant to the GUC Litigation Trust Agreement.

1.80.   GUC Net Proceeds means an amount equal to (i) [100]% of the Net Proceeds of Non-Insider Actions and (ii) [___]% of the Net Proceeds of all other Retained Causes of Action.

1.81.   Highland Claims means all Claims arising under the Highland Loan Documents, including without limitation, any and all claims for interest, principal, fees, expenses, reimbursement or indemnification and other amounts with respect thereto.

1.82.   Highland Lenders means Highland Capital Real Estate Fund, L.P., and the other lenders from time to time parties to the Highland Loan Agreement and their respective successors and assigns.

1.83.   Highland Loan Agreement means that certain Subordinated Loan Agreement, dated as of March 6, 2008, as amended, restated, supplemented or otherwise modified from time to time, between Borrower, NexBank, SSB, as agent, and the Highland Lenders whereunder Highland Lenders advanced a loan to Borrower in the original principal amount of $8.0 million.

1.84.   Highland Loan Documents means the Highland Loan Agreement and all other documents defined or identified as "Loan Documents" therein.

1.85.   HOA means the Landmark Towers Condominium Association, Inc., a Colorado non-profit corporation, and its successors and assigns.

1.86.   HOA Claims means [awaiting filing of HOA Claims], but excluding for the avoidance of doubt any Warranty Claims asserted by the HOA.

1.87.   HOA Obligations means the obligations of the Debtors, if any, to fund the Reserves.

1.88.   Hypo means Hypo Real Estate Capital Corporation, a Delaware corporation.

1.89.   Indemnification Insurance Claims shall have the meaning ascribed to such term in Section 10.01.

9

1.90.   Improvements means, collectively, all buildings, structures, fixtures and improvements constituting any portion of the Property as of the date hereof, together with any additions thereto or alterations or restorations thereof constituting any portion of the Property or, to the extent the same constitute any portion of the Property, by the applicable Condominium Association.  Notwithstanding the foregoing, "Improvements" shall not include condominium units in which or to which Borrower shall not have any right, title or interest.

1.91.   Insured Claim means any Claim (other than an Indemnification Insurance Claim) arising from an incident or occurrence that is covered under the Debtors' insurance policies.

1.92.   Land means the land more particularly described on Exhibit C.

1.93.   Late Disposition shall have the meaning ascribed to such term in Section 4.10(e)(ii).

1.94.   Lien shall have the meaning set forth in section 101 of the Bankruptcy Code.

1.95.   Liquidation Waterfall shall have the meaning ascribed to such term in Section 4.10(d).

1.96.   Metro District means the Marin Metropolitan District and the [Greenwood North Metropolitan District].

1.97.   Metro District Claims means any and all Causes of Action in favor of any of the Debtors accrued at any time prior to the Effective Date related to the Metro District.

1.98.   Mezzanine Borrower means, collectively, General Partner and 7677 Limited Interest Holder, LLC, as borrowers under the Mezzanine Loan.

1.99.   Mezzanine Claims means (i) any claims for repayment of the Mezzanine Loans and any other claims for payment of principal, interest, fees, expenses, reimbursement or other payment under the Mezzanine Loan Agreements, and (ii) any Highland Claims.

1.100.  Mezzanine Lender means NexBank SSB, as agent and lender, NexBank Capital, Inc., as lender, and any other lenders from time to time party to the Mezzanine Loan Agreements the lender under the Mezzanine Loan.

1.101.  Mezzanine Loan means the mezzanine loan in the original principal amount of up to $18,100,000 made by Mezzanine Lender to Mezzanine Borrower.

1.102.  Mezzanine Loan Agreement means that certain Mezzanine Construction Loan Agreement between Mezzanine Lender and Mezzanine Borrower, dated as of July 31, 2007, and as may be amended, restated, supplemented, or otherwise modified from time to time.

1.103.  Net Proceeds means, with respect to the Retained Causes of Action, the net proceeds from the prosecution and/or settlement of such Claims after (i) repayment by the GUC Litigation Trustee of the GUC Amount pursuant to Section 10.08 and (ii) payment of all

reasonable legal and professional fees and costs and other costs of finally resolving such Causes of Action and obtaining payment with respect thereto.

1.104. <u>NewCo</u> means [            ], LLC, a Delaware limited liability company to be established as of the Effective Date.

1.105. <u>NewCo Manager</u> means Hypo, or an Affiliate of Hypo designated by Hypo, as Manager pursuant to the Operating Agreement of NewCo, and any successor thereto.

1.106. <u>NewCo Membership Interests</u> means the membership interests in NewCo, all of which shall be held by the Prepetition Lenders (or their respective designees) as of the Effective Date.

1.107. <u>Non-Insider Actions</u> means Retained Causes of Action to the extent such Claims exist against Persons other than (i) present and former directors, officers, partners, members or managers of any of the Debtors, (ii) Affiliates of the Debtors or (iii) "insiders" of the Debtors (as defined in Section 101 of the Bankruptcy Code), but excluding for the avoidance of doubt Indemnification Insurance Claims, which shall not be treated as Non-Insider Claims under the Plan.

1.108. <u>Operating Agreement of NewCo</u> means the limited liability company agreement of NewCo, substantially in the form of such agreement filed with the Plan Supplement.

1.109. <u>Other Priority Claim</u> means any Claim, other than an Administrative Expense Claim or Priority Tax Claim entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

1.110. <u>Other Secured Claim</u> means the Claims set forth in Exhibit E and any other secured prepetition Claim against any Debtor, other than a Secured Tax Claim, Prepetition Facility Secured Claim, DIP Claim, Prepetition Mechanics' Lien Claim, in each case solely to the extent such Claim is secured by a valid, fully perfected lien on some or all of the Collateral.

1.111. <u>Permit</u> means any governmental license, permit, charter, franchise, authorization, entitlement, development right  or other similar grant held by any Debtor as of the Effective Date.

1.112. <u>Permitted Encumbrances</u> means those encumbrances and other interests set forth in Exhibit B.

1.113. <u>Permitted Sales</u> shall have the meaning ascribed to such term in Section 4.10(d).

1.114. <u>Person</u> means any individual, entity, trust, corporation, limited liability company partnership, company, association, estate or other entity or organization, including any governmental or political entity, subdivision or agency.

1.115. <u>Petition Date</u> means August 30, 2009, the date upon which Borrower filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

1.116.  Plan means this joint chapter 11 plan of reorganization, including, without limitation, the Plan Supplement and all exhibits, supplements, appendices, and schedules hereto and to the Plan Supplement, as any of the same may be altered, amended, or modified from time to time as provided herein.

1.117.  Plan Administration Account means an account with a nationally recognized financial institution, acceptable to Agent, to be established or designated by the Debtors prior to the Effective Date to hold the Cash to be made available to the Plan Administrator in accordance with, and as set forth in, the Plan Administration Budget.

1.118.  Plan Administration Budget means a budget reasonably determined by the Debtors with the consent of the Agent in its sole and absolute discretion, sufficient for the Plan Administrator to pay all costs of implementing the Plan including, without limitation, (i) the costs of winding up the affairs of the Debtors subsequent to the Effective Date, resolving Disputed Claims, and retaining professionals (including those retained by the Debtors and not paid as of the Effective Date), employees, and consultants, (ii) the fees and expenses of the Plan Administrator, the U.S. Trustee, and the Disbursing Agent, (iii) the payment of all Cure Claims, if any, (iv) the payment of all Allowed Administrative Expense Claims, Other Priority Claims, Secured Tax Claims, Priority Tax Claims, Prepetition Mechanics' Lien Claims, HOA Claims, Warranty Claims, and Other Secured Claims, and (v) an amount sufficient to establish a reserve for the full amount of all Claims (other than General Unsecured Claims, DIP Claims and Prepetition Facility Claims) that are Disputed as of the Effective Date, which budget will be filed with the Plan Supplement.

1.119.  Plan Administrator means a Person designated by Agent, in its sole and absolute discretion, in consultation with the Debtors, to be engaged by the Debtors immediately prior to the Effective Date, which Plan Administrator shall continue to serve after the Effective Date unless and until a successor Plan Administrator is designated pursuant to Section 5.06(f).

1.120.  Plan Supplement has the meaning ascribed to such term in Section 13.09.

1.121.  Plan Supplement Documents has the meaning ascribed to such term in Section 13.09.

1.122.  Prepetition Agent means Hypo, as agent, under the Prepetition Credit Agreement and any successor agent appointed in accordance with the terms thereof.

1.123.  Prepetition Credit Agreement means that certain Loan and Security Agreement, dated as of April 30, 2007, as amended, restated, supplemented or otherwise modified from time to time, between Borrower, Guarantor, Hypo, as Agent, and the Prepetition Lenders.

1.124.  Prepetition Facility Claims means all Claims arising under the Prepetition Facility Documents, including without limitation, any and all claims for interest, principal, fees, expenses, reimbursement or indemnification and other amounts with respect thereto.

1.125.  Prepetition Facility Documents means the Prepetition Credit Agreement and all other documents defined or indentified as "Loan Documents" therein.

1.126.   Prepetition Guarantor means, Zachary M. Davidson, a natural person.

1.127.   Prepetition Guaranty means, collectively, (i) that certain Completion Guaranty by the Prepetition Guarantor in favor of the Prepetition Agent on behalf of the Prepetition Lenders; (ii) that certain Guaranty of Payment by the Prepetition Guarantor in favor of the Prepetition Agent on behalf of the Prepetition Lenders; (iii) that certain Guaranty of Recourse Obligations by the Prepetition Guarantor in favor of the Prepetition Agent on behalf of the Prepetition Lenders; (iv) that certain Guaranty of Payment – Phase I $7 Million Advance by Prepetition Guarantor in favor of the Prepetition Agent on behalf of the Prepetition Lenders; and (v) that certain Environmental Indemnity Agreement by Borrower and Prepetition Guarantor in favor of the Prepetition Agent on behalf of the Prepetition Lenders, each dated April 30, 2007.

1.128.   Prepetition Lenders means Hypo, as lender, and the other banks and financial institutions that are from time to time lender parties to the Prepetition Credit Agreement and their respective successors and assigns.

1.129.   Prepetition Mechanics' Lien Claims means (i) any prepetition claims secured by prepetition mechanics', materialmens' or other similar statutory Liens, and (ii) the Claims set forth in Exhibit D, in each case solely to the extent secured by a valid, fully-perfected Lien on all or a portion of the Collateral.  For the avoidance of doubt, the inclusion herein of the identity of Persons asserting one or more Prepetition Mechanics' Lien Claims shall not constitute any determination that such Claims are Allowed or admission or determination as to the validity, amount, enforceability or secured status of any such Claims.

1.130.   Priority Tax Claim means any Claim of a Governmental Unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.131.   Pro Rata Share means, with respect to any Claim in a Class, at any time, the ratio of the amount of such Claim to the aggregate amount of all Claims (including Disputed Claims) in such Class.

1.132.   Professional Compensation and Reimbursement Claims has the meaning ascribed to such term in Section 2.02.

1.133.   Property means the Land and the Improvements.

1.134.   Record Date means the date of the hearing before the Bankruptcy Court on the adequacy of the Disclosure Statement.

1.135.   Rejected Agreements has the meaning ascribed to such term in Section 9.01.

1.136.   Rejection Claim means any Claim arising from the rejection by any of the Debtors of an executory contract or unexpired lease in the Chapter 11 Cases.

1.137.   Released Claims shall have the meaning ascribed to such term in Section 10.04(a).

1.138. Released Parties means (i) the holders of Prepetition Facility Claims and DIP Claims, (ii) Agent (both as DIP Agent and Prepetition Agent), and (iii) the Exit Facility Agent and each of the Exit Facility Lenders, (iv) the CRO, the Plan Administrator and the Disbursing Agent, and (v) each of their respective (A) present and former directors, officers, employees, managers, partners, partners members and Advisors, and (B) Affiliates and successors and assigns. For purposes of this definition, "Advisors" means each financial advisor, investment banker, professional, accountant, and attorney, and each of their respective employees, parent corporations, subsidiaries, Affiliates and partners.

1.139. Reorganization Transaction means the transactions set forth in Article VI.

1.140. Reorganized Debtors means the Debtors upon and after the Effective Date.

1.141. Reserves means the amounts, if any, Borrower is required to fund to designated accounts under the Condominium Documents.

1.142. Retained Cause of Action means (i) any avoidance, equitable subordination or recovery actions or other claims or causes of action under sections 105, 502(d), 510, 542 through 551, and 553 of the Bankruptcy Code that belonged to the Debtors or Debtors in Possession immediately prior to the Effective Date, (ii) any claims in favor of the Debtors accrued prior to the Effective Date for constructive fraud, breach of fiduciary duty and/or other similar causes of action against the present and former directors, officers, partners or members of any of the Debtors, and (iii) any Indemnification Insurance Claims, but excluding the Metro District Claims and all other Causes of Action constituting Transferred Assets.

1.143. Schedules means the schedules of assets and liabilities and the statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, and all amendments and modifications thereto filed with the Bankruptcy Court through and including the Confirmation Date.

1.144. Secured Claim means any Claim (i) to the extent reflected in the Schedules or upon a proof of claim as a secured claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code or (ii) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.145. Secured Tax Claim means any Secured Claim that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code.

1.146. Subordinated Claim means any Claim against any Debtor, whether or not the subject of an existing lawsuit, (i) arising from rescission of a purchase or sale of any partnership, membership or other interest shares or any other securities, if any, of such Debtor, (ii) for damages arising from the purchase or sale of any such security, (iii) for violations of the securities laws, misrepresentations, or any similar Claims, including, to the extent related to the forgoing or otherwise subject to subordination under section 510(b) of the Bankruptcy Code, but not limited to, any attorneys' fees, other charges, or costs incurred on account of the forgoing Claims, or, (iv) except as otherwise provided for in the Plan, for reimbursement, contribution, or indemnification allowed under section 502 of the Bankruptcy Code on account of any such

14

Claim, including Claims based upon allegations that any Debtor made false and misleading statements and engaged in other deceptive acts in connection with the sale of securities.  For purposes of this definition, the term "securities" shall include any item encompassed in (a) the definition of the term "securities" in section 101 of the Bankruptcy Code or (b) the definition of the term "securities" in Section 3 of the Securities Exchange Act of 1934, as amended.

1.147.  Tax means (a) any net income, alternative or add-on minimum, gross income, gross receipts, sales, use, ad valorem, value added, transfer, franchise, profits, license, property, environmental or other tax, assessment or charge of any kind whatsoever (together in each instance with any interest, penalty, addition to tax or additional amount) imposed by any federal, state or local taxing authority; or (b) any liability for payment of any amounts of the foregoing types as a result of being a member of an affiliated, consolidated, combined or unitary group, or being a party to any agreement or arrangement whereby liability for payment of any such amounts is determined by reference to the liability of any other entity.

1.148.  Tax Code means the Internal Revenue Code of 1986, as amended.

1.149.  TIF Agreements means (i) that certain Sales Tax Rebate Agreement dated November 22, 2005 between The City of Greenwood Village, Colorado, a Colorado home rule municipal corporation and Borrower, and (ii) that certain Development Improvement Agreement Relating to The Landmark dated as of November 22, 2005 between the City of Greenwood and Borrower, as amended, restated, modified, supplemented or assigned, and all other documents, agreements and instruments executed and/or delivered in connection therewith.

1.150.  TIF Net Proceeds means all net proceeds payable to Borrower that are derived from the sale of the TIF Agreements or a bond issuance relating thereto.

1.151.  TIF Payments means quarterly collections of retail sales tax rebates from the City of Greenwood Village pursuant to that certain Sales Tax Rebate Agreement, dated November 22, 2005, between Borrower and the City of Greenwood Village.

1.152.  Transferred Assets means substantially all assets of any type, including real and personal property of any type, of each of the Debtors, including, without limitation, all of each Debtor's right, title and interest to and in (i) the Assumed Agreements, (ii) the Condominiums and the Condominium Documents, the Land, all Improvements, and all unsold Units, (iii) the TIF Agreements and Borrower's rights to receive TIF Payments and TIF Net Proceeds, but excluding the Excluded Assets, (iv) all Causes of Action in favor of the Debtors (other than Retained Causes of Action), including, without limitation, the Metro District Claims and any Claims in favor of any of the Debtors under any insurance policy (other than the Indemnification Insurance Claims), and (v) the proceeds of any of the Debtors' causes of action under section 549 of the Bankruptcy Code relative to any transfers occurring prior to the Effective Date.

1.153.  Tort Claim means any Claim against any Debtor, whether or not the subject of an existing lawsuit, arising from or relating to personal injury, wrongful death, property damage, products liability, discrimination, employment or any other similar basis.  A Tort Claim may also be an Insured Claim.

1.154.  Unit means each individual condominium unit (including any residential, commercial, retail or parking unit and any appurtenant interest in the common elements and any appurtenant parking rights) in the Land and the Improvements created by the submission of the Property to the provisions of the Condominium Act in accordance with the Condominium Documents.

1.155.  U.S. Trustee means the Office of the United States Trustee for the District of Colorado.

1.156.  Warranty Claims means any Claim against any Debtor alleging any defect in the design or construction of the Improvements, including any such Claims asserted by the HOA.

Interpretation; Application of Definitions and Rules of Construction.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter.  Unless otherwise specified, all section, article, schedule, or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular Section, subsection, or clause contained in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.  A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.


ARTICLE II

TREATMENT OF ADMINISTRATIVE
EXPENSE CLAIMS, PRIORITY TAX CLAIMS AND DIP ADVANCE CLAIMS

2.01.  Administrative Expense Claims.  Subject to Section 2.02, except to the extent that a holder of an Allowed Administrative Expense Claim agrees to a less favorable treatment, each holder of an Allowed Administrative Expense Claim shall, to the extent such Allowed Administrative Expense Claim has not been paid by the Debtors in the ordinary course of business, receive Cash in an amount equal to such Allowed Administrative Expense Claim as soon as is practicable following the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided, however, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by the Debtors in Possession shall be paid in full and performed by the Debtors in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions. The holder of an Allowed Administrative Expense Claim shall not be entitled to, and shall not be paid, any interest, penalty, or premium thereon, and any interest, penalty, or premium asserted with respect to an Administrative Claim shall be deemed disallowed and expunged without the

16

need for any further Order of the Bankruptcy Court.  Requests for payment of Administrative Expense Claims must be filed by the applicable Bar Date or such other date fixed by the Bankruptcy Court.

2.02.   <u>Professional Compensation and Reimbursement Claims</u>.  All Persons seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date pursuant to sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code ("<u>Professional Compensation and Reimbursement Claims</u>") (i) shall file their respective final applications for allowances of compensation for services rendered and reimbursement of expenses incurred through the Effective Date by no later than the date that is thirty (30) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and (ii) if granted such an award by the Bankruptcy Court, shall be paid in full in such amounts as are Allowed by the Bankruptcy Court (A) on the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable or (B) upon such other terms as may be mutually agreed upon between such holder of an Administrative Expense Claim and the Plan Administrator.  Claims for payment of fees and reimbursement of expenses of professionals retained by the Plan Administrator and the Debtors (if applicable) accrued on and after the Effective Date shall not be subject to approval by the Bankruptcy Court.  For the avoidance of doubt, the fees of counsel retained by the GUC Litigation Trustee to prosecute the Retained Causes of Action shall not constitute Professional Compensation and Reimbursement Claims, shall not be payable as Administrative Expense Claims in the Chapter 11 Cases, and shall not be payable by, or charged to, any of the Reorganized Debtors, the Plan Administrator, NewCo, the Prepetition Lenders, the DIP Lenders or the Exit Lenders.

2.03.   <u>Priority Tax Claims</u>.  Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, at the sole option of the Plan Administrator, in full satisfaction, settlement, and release of such Allowed Priority Tax Claim, (a) in accordance with Bankruptcy Code section 1129(a)(9)(C) and (D), equal Cash payments made on or before the last Business Day of every fiscal year after the Effective Date, over a period not exceeding five years after the assessment of the Tax on which such Claim is based, totaling the principal amount of such Claim, plus interest on any outstanding balance of such Allowed Priority Tax Claim, calculated from the later of the Effective Date and the date the Priority Tax Claim is Allowed at a rate to be determined pursuant to section 511 of the Bankruptcy Code; (b) such other treatment agreed to by the holder of such Allowed Priority Tax Claim, *provided* such treatment is no more favorable than the treatment set forth in clause (a) hereof, or (c) payment in full in Cash.  The holder of an Allowed Priority Tax Claim shall not be entitled to assess any premium or penalty on such Claim and any asserted premium or penalty shall be deemed disallowed and expunged under the Plan without the need for a further order of the Bankruptcy Court.  The Plan Administrator shall have the right to pay any Allowed Priority Tax Claim, or any remaining balance of such Claim, in accordance with the foregoing, at any time on or after the Effective Date, without premium or penalty of any kind.

2.04.   <u>DIP Claims</u>.  All DIP Claims are deemed Allowed under the Plan.  No distributions shall be made on account of DIP Claims under the Plan.  Each holder of a DIP

17

Claim shall receive Exit Facility Term A Loans, as and to the extent provided for in Section 6.01(c), in full and final satisfaction of its DIP Claim.

## ARTICLE III

### CLASSIFICATION OF CLAIMS AND EQUITY INTERESTS

Claims, other than Administrative Expense Claims (including Professional Compensation and Reimbursement Claims), DIP Advance Claims and Priority Tax Claims, are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan, as follows:

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| Class 1 | Other Priority Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Secured Tax Claims | Unimpaired | No (deemed to accept) |
| Class 3 | Other Secured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | Prepetition Facility Claims | Impaired | Yes |
| Class 5 | HOA Claims | Unimpaired | No (deemed to accept) |
| Class 6 | General Unsecured Claims | Impaired | Yes |
| Class 7 | Subordinated Claims | Impaired | No (deemed to reject) |
| Class 8 | Equity Interests | Impaired | No (deemed to reject) |
| Class 9 | Warranty Claims | Unimpaired | No (deemed to accept) |
| Class 10 | Prepetition Mechanics' Lien Claims | Unimpaired | No (deemed to accept) |
| Class 11 | FirsTier Bank Claims | Unimpaired | No (deemed to accept) |
| Class 12 | Mezzanine Claims | Impaired | No (deemed to reject) |

## ARTICLE IV

### TREATMENT OF CLAIMS AND EQUITY INTERESTS

4.01.   CLASS 1 - OTHER PRIORITY CLAIMS.

(a)   Impairment and Voting.  Class 1 is unimpaired by the Plan.  Each holder of an Other Priority Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions.  Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim as soon as is practicable following the later of the Effective Date and the date such Other Priority Claim becomes an Allowed Other Priority Claim.

18

4.02.   CLASS 2 – SECURED TAX CLAIMS.

    (a)    Impairment and Voting.  Class 2 is unimpaired by the Plan.  Each holder of a Secured Tax Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

    (b)    Distributions.  Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a less favorable treatment, each holder of an Allowed Secured Tax Claim shall receive, at the sole option of the Plan Administrator, Cash in an amount equal to such Allowed Secured Tax Claim, including any interest on such Allowed Secured Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable.  The holder of an Allowed Secured Tax Claim shall not be entitled to assess any premium or penalty on such Claim and any asserted premium or penalty shall be deemed disallowed and expunged under the Plan without the need for a further order of the Bankruptcy Court.  The Plan Administrator shall have the right to pay any Allowed Secured Tax Claim, or any remaining balance of such Claim, in accordance with the foregoing, at any time on or after the Effective Date, without premium or penalty of any kind.

4.03.   CLASS 3 - OTHER SECURED CLAIMS.

    (a)    Impairment and Voting.  Class 3 is unimpaired by the Plan.  Each holder of an Other Secured Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

    (b)    Distributions/Reinstatement of Claims.  Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, as soon as is practicable following the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to such Allowed Other Secured Claim, including any non-default interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code.

4.04.   CLASS 4 - PREPETITION FACILITY CLAIMS.  All Prepetition Facility Claims are deemed Allowed under the Plan.

    (a)    Impairment and Voting.  Class 4 is impaired by the Plan.  Each holder of a Prepetition Facility Claim is entitled to vote to accept or reject the Plan.

    (b)    Distributions.  Except to the extent that a holder of a Prepetition Facility Claim agrees to a less favorable treatment, each holder of a Prepetition Facility Claim shall own its pro rata share of NewCo through the issuance of the NewCo Membership Interests as provided for in Section 6.02.  Each holder of a Prepetition Facility Claim shall be deemed to have released and discharged its Prepetition Facility Claim, effective as of the Effective Date.

4.05.  CLASS 5 – HOA CLAIMS.

(a)     Impairment and Voting.  Class 5 is unimpaired by the Plan.  Each holder of an HOA Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  Except to the extent that a holder of an Allowed HOA Claim agrees to a less favorable treatment, each holder of an Allowed HOA Claim shall receive as soon as is practicable following the later of the Effective Date and the date such HOA Claim becomes an Allowed HOA Claim, Cash in an amount equal to such Allowed HOA Claim.

4.06.  CLASS 6 - GENERAL UNSECURED CLAIMS.

(a)     Impairment and Voting.  Class 6 is impaired by the Plan.  Each holder of a General Unsecured Claim is entitled to vote to accept or reject the Plan.

(b)     Transfer of Retained Causes of Action.  As of the Effective Date, (i) all of the Debtors' and the Estates' respective rights, title and interests to and in the Retained Causes of Action shall be vested in the GUC Litigation Trust, on behalf of the holders of General Unsecured Claims, and (ii) the GUC Amount shall be deposited into the GUC Account, to be used to fund the investigation and prosecution of the Retained Causes of Action by the GUC Litigation Trustee.

(c)     Distributions.  Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of the GUC Net Proceeds, if any, of the Retained Causes of Action.  The GUC Litigation Trustee shall make an initial distribution, and one or more distributions thereafter, as and when determined by the GUC Litigation Trustee, from the GUC Account to holders of Allowed General Unsecured Claims, after the imposition of a reserve for (i) all Disputed General Unsecured Claims (i.e., a reserve equal to the then applicable aggregate distribution percentage multiplied by the aggregate total of the full face amount of all Disputed General Unsecured Claims) and (ii) the anticipated costs of pursuing any remaining Retained Causes of Action.  As Disputed General Unsecured Claims are resolved and as additional GUC Net Proceeds of Retained Causes of Action are placed into the GUC Account, the GUC Litigation Trustee shall make one or more additional distributions from the GUC Account to holders of Allowed General Unsecured Claims, in each case so as to effectuate such Catch-Up Distributions as are warranted.

4.07.  CLASS 7 – SUBORDINATED CLAIMS.

(a)     Impairment and Voting.  Class 7 is impaired by the Plan.  Each holder of a Subordinated Claim is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)     Distributions.  No property will be distributed to or retained by the holders of Subordinated Claims on account of such Claims.  All Subordinated Claims shall be extinguished and fully released as of the Effective Date.

4.08.   CLASS 8 –EQUITY INTERESTS.

(a)   Impairment and Voting.  Class 8 is impaired by the Plan.  Each holder of an Equity Interest is conclusively presumed to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Distributions.  No property will be distributed to or retained by the holders of Equity Interests on account of such Equity Interests.  All Equity Interests shall be deemed extinguished effective as of the Effective Date.

4.09.   CLASS 9 – WARRANTY CLAIMS.

(a)   Impairment and Voting.  Class 9 is unimpaired by the Plan.  Each holder of a Warranty Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Treatment.  Except to the extent that a holder of an Allowed Warranty Claim agrees to a less favorable treatment, as soon as is practicable following the later of the Effective Date and the date such Warranty Claim becomes an Allowed Warranty Claim, each holder of an Allowed Warranty Claim shall receive Cash in an amount equal to such Allowed Warranty Claim.

4.10.   CLASS 10 – PREPETITION MECHANICS' LIEN CLAIMS

(a)   Impairment and Voting.  Class 10 is unimpaired by the Plan.  Each holder of a Prepetition Mechanics' Lien Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Treatment.  On or before the Effective Date, an amount equal to the amount of all asserted Prepetition Mechanics' Lien Claims shall be placed into an escrow account (the "Escrow Account") for the benefit of the holders of Prepetition Mechanics' Lien Claims (in an amount to be agreed upon by Agent and the holders of Prepetition Mechanics' Lien Claims, but in no event less than $3,222,235.86 if any Prepetition Mechanics' Lien Claims are Disputed at the time).  Funds in the Escrow Account shall be distributed by the Disbursing Agent (i) as soon as is practicable after the Effective Date, but in no event more than thirty (30) days after the Effective Date, to holders of Allowed Prepetition Mechanics' Lien Claims, and (ii) thereafter to the holders of previously Disputed Prepetition Mechanics' Lien Claims that have become Allowed Claims.  The Escrow Account shall be augmented by the Reorganized Debtors or NewCo to the extent necessary, based upon the aggregate amount of Prepetition Mechanics' Lien Claims as finally resolved, within 10 Business Days after such resolution.  Any funds remaining in the Escrow Account after all Prepetition Mechanics' Lien Claims have been resolved and paid as provided for herein shall be transferred to the Reorganized Debtors or NewCo, as directed by Agent.

(c)   Additional Provisions Related to Prepetition Mechanics' Lien Claims.  On and after the Effective Date, NewCo shall not transfer all or substantially all of its assets (excluding, for the avoidance of doubt, sales of individual Units in the ordinary course of business), unless (x) if all Prepetition Mechanics' Lien Claims have been fully resolved, the

21

Escrow Account has been augmented to the extent, if any, provided for in Section 4.10(b), or, if any Prepetition Mechanics' Lien Claims are still Disputed, the Escrow Account shall have been augmented by an amount equal to such Disputed amounts, (y) the assets so transferred are made subject to the Liens securing the Prepetition Mechanics' Lien Claims, with such Liens being senior to, and not subordinate to, or *pari passu* with, any other Liens, or (z) an entity designated by Agent, with a net worth equal to or greater than that of NewCo, has committed in writing to guaranty the obligations of NewCo to augment the escrow as provided for in Section 4.10(b). The Confirmation Order shall provide that a breach of NewCo's obligations in Section 4.10(b) and this Section 4.10(c) shall be a contempt of a court order, whether or not the Plan has been substantially consummated, and the holders of Prepetition Mechanics' Lien Claims shall have all remedies available including a contempt of court order.

      (d)    <u>Application of Liquidation Waterfall</u>.  Until the earliest of the Effective date, the Termination Date (as defined in the Forbearance Agreement) or September 30, 2010 ("<u>Critical Date</u>"), the following shall apply:

      (i)    if individual Units totaling not more than 12 in the aggregate (the "<u>Permitted Sales</u>") have been disposed of after May 25, 2010, proceeds of such sales shall be applied as if an Event of Default ( as defined in the DIP Order) has not occurred and the distribution set forth in paragraph 24 of the Final DIP Financing Order (the "<u>Liquidation Waterfall</u>") shall not apply to such proceeds;

      (ii)    if individual Units in excess of the Permitted Sales are or have been disposed of prior to the Critical Date ("<u>Excess Disposition</u>") either (i) the proceeds of property subject to the Excess Disposition shall be subject to the Liens securing the Prepetition Mechanics' Lien Claims in the order of priority established in the Liquidation Waterfall, or (ii) at the election of Agent, the Prepetition Mechanics' Lien Claims shall be paid in full (and/or escrow funded to the extent of any Disputed amounts) in Cash.

      (e)    <u>Failure of Effective Date to Occur by Critical Date</u>.  If the Effective Date shall not have occurred on or prior to the Critical Date,  the following shall apply:

      (i)    Agent shall, within fifteen calendar days after the Critical Date, place into escrow for the benefit of the holders of Prepetition Mechanics' Lien Claims pursuant to the Final DIP Financing Order an amount equal to the total amount that would have been distributed and/or escrowed on account of Allowed and Disputed Prepetition Mechanics' Lien Claims if the Liquidation Waterfall had been triggered and in effect as of June 7, 2010 and applied to the Permitted Sales.  Solely for purposes of calculating the amount to be placed into escrow pursuant to this subsection (a), and without waiving any of the rights of any party in interest relative to any dispute regarding any Prepetition Mechanics' Lien Claim, the aggregate amount of all disputed and undisputed Prepetition Mechanics' Lien Claims as of June 7, 2010 shall be deemed to have been $3,222,235.86.

      (ii)    The Liquidation Waterfall shall be triggered and in effect and the proceeds from the disposition of any, some, or all of the DIP Collateral after the Critical Date (the "<u>Late Disposition</u>") shall be applied as provided in the Liquidation Waterfall.  If the DIP Lenders and/or Prepetition Lenders acquire any, some or all of the DIP Collateral (as defined in

the Final DIP Financing order), by a credit bid or other non-cash transaction, the Liens of the holders of Prepetition Mechanics' Lien Claims (including replacement Liens granted pursuant to the Final DIP Financing Order) shall remain on such assets as first priority Liens unless, in the alternative, the lender(s) so acquiring such assets funds an appropriate escrow account consistent with that provided in Section 4.10(c). For the avoidance of doubt, the Liquidation Waterfall shall apply to the disposition of any, some or all of the DIP Collateral (as defined in the Final DIP Financing Order) under this subparagraph, including individual Unit sales.

4.11.   CLASS 11 – FIRSTIER BANK CLAIMS

(a)   Impairment and Voting.  Class 11 is unimpaired by the Plan. Each holder of a FirsTier Claim is conclusively presumed to have accepted the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Treatment.  No distribution shall be made to the holders of FirsTier Claims under the Plan. The Transferred Assets shall include the TIF Agreements, which shall remain subject to the Lien of the holders of FirsTier Claims. On and after the Effective Date, NewCo, or an Affiliate of NewCo (which Affiliate may be a newly formed entity) shall assume all of Borrower's rights and obligations under the FirsTier Financing and the TIF Agreements. NewCo or its designated Affiliate shall make all payments, and fulfill all other obligations of the Debtors, to the extent such payments or obligations are on account of prepetition obligations fully secured by valid, fully perfected prepetition Liens, as and when would have been required under the FirsTier Financing had the Chapter 11 Cases not been commenced, *provided, however,* for the avoidance of doubt, that neither NewCo nor its designated Affiliate (if any) shall be required to provide any additional guaranty, indemnification or other credit enhancement or otherwise agree to any material modification of the FirsTier Financing. Neither NewCo no its designated Affiliate shall have any obligations to any holder of FirsTier Claims on account of any deficiency claims. On and after the Effective Date, all FirsTier Claims shall be deemed released and extinguished with respect to the Debtors and the holders of FirsTier Claims shall have no further recourse against the Debtors or the Estates or their property on account of the FirsTier Financing.

4.12.   CLASS 12 – MEZZANINE CLAIMS

(a)   Impairment and Voting.  Class 12 is impaired by the Plan. Each holder of Mezzanine Claim is deemed conclusively to have rejected the Plan and is not entitled to vote to accept or reject the Plan.

(b)   Treatment.  No distributions shall be made to holders of Mezzanine Claims under the Plan. All Mezzanine Claims shall be extinguished and fully released as of the Effective Date.

ARTICLE V

IMPLEMENTATION OF THE PLAN

5.01.   Funding of GUC Amount and Approval of Plan Administration Budget.  The GUC Amount shall be fully funded (through one or more transfers to the GUC Account) and the Plan Administration Budget approved, on or before the Effective Date; provided, however, that the Plan Administration Budget may be modified by the Plan Administrator from time to time to the extent the Plan Administrator reasonably determines such modifications are necessary to enable the Plan Administrator to carry out its duties under the Plan, subject to the consent of the Agent in its sole and absolute discretion.  The costs, fees and expenses reflected in the Plan Administration Budget shall be paid, in such amounts and at such time as set forth in the Plan Administration Budget, from the Plan Administration Account.  The Plan Administration Account shall be funded by NewCo from time to time, but in any case prior to the time any such budgeted amount is due in accordance with the Plan Administration Budget.

5.02.   Reorganization Transaction.

(a)      The Reorganization Transaction shall be implemented as set forth in Article VI.

(b)      The consummation of the Reorganization Transaction shall be conditioned upon the occurrence of each of the following on or prior to the Effective Date, (i) each holder of Prepetition Facility Claims will have been issued its pro rata share of NewCo Membership Interests, (ii) the transactions set forth in Article VI shall have been consummated such that NewCo will be the owner of the Transferred Assets, (iii) the Plan Administration Budget shall have been established as provided for herein, and (iv) the GUC Amount shall have been deposited into the GUC Account.

5.03.   Plan Distributions.  The Plan Administrator shall pay all Allowed Administrative Claims, Other Priority Claims, Secured Tax Claims, Priority Tax Claims, Prepetition Mechanics' Lien Claims, HOA Claims, Warranty Claims, Other Secured Claims and Cure Claims to the extent not paid on or before the Effective Date, as and when provided for in the Plan, and all distributions on account of such Claims shall be made by the Disbursing Agent.  NewCo shall guarantee the making of all such payments to the extent of any shortfall in the amounts to be funded to the Plan Administrator pursuant to the Plan Administration Budget.

5.04.   Intercompany Claims.  As of the Effective Date, any Claims of any Debtor against any other Debtor shall be discharged and released.

5.05.   Title to Accounts.  Title to all of the Debtors' bank accounts and the Plan Administration Account shall vest in the Plan Administrator, effective as of the Effective Date, and title to the GUC Account shall vest in the GUC Litigation Trustee, in each case without any further order of the Bankruptcy Court or further action on the part of any Person.  On and after the Effective Date, the Plan Administration Account shall be deemed to be an account in the name of the Plan Administrator, and the GUC Account shall be deemed to be an account in the

24

name of the GUC Litigation Trustee, without any further action by any Person or any further order of the Bankruptcy Court.

5.06.   Cancellation of Existing Equity Interests.   Effective as of the Effective Date, all Equity Interests shall be deemed cancelled and null and void.

5.07.   Plan Administrator.

(a)   Plan Implementation.   The Plan Administrator shall be authorized and obligated to implement the Plan on and after the Effective Date.   The Plan Administrator shall be acting for the benefit of the Debtors or the Reorganized Debtors, as applicable, and the duties, rights and obligations of the Plan Administrator may be modified at any time by the Reorganized Debtors, with the consent of Agent in its sole and absolute discretion.   The Plan Administrator shall be deemed appointed as of the Effective Date without the need for any further order of the Bankruptcy Court.   In the exercise of its reasonable business judgment, the Plan Administrator shall, in an expeditious but orderly manner and subject to the provisions of the Plan, make timely distributions and not unduly prolong the duration of the Chapter 11 Cases.

(b)   Role of the Plan Administrator.   The Plan Administrator shall have the following duties and powers in furtherance of and consistent with the purpose of the Plan.   The provisions of this Section do not apply to actions taken by the Plan Administrator in any capacity other than as Plan Administrator.

(i)   Implement and enforce all provisions of the Plan.

(ii)   Retain, oversee, and direct the Disbursing Agent in making distributions as provided for in the Plan.

(iii)   Exercise with reasonable business judgment all power and authority to file, prosecute, collect, compromise and resolve, in the name of the Debtors or the Reorganized Debtors, as applicable, all Disputed Claims.

(iv)   Maintain accounts (including the Plan Administration Account), make distributions, and take other actions consistent with the Plan and the implementation hereof.

(v)   Collect and liquidate at the direction of the Debtors or Reorganized Debtors, as applicable, all assets of the Estates pursuant to the Plan and to administer the winding up of the Debtors' affairs including, but not limited to, closing the Chapter 11 Cases.

(vi)   Incur any reasonable and necessary expenses in connection with the implementation of the Plan subject to and in accordance with the Plan Administration Budget, which expenses shall be paid in accordance with Section 13.06.

(vii)   Make decisions regarding (a) the retention or engagement of professionals, employees, and consultants by the Plan Administrator (b) payment, subject to and in accordance with the Plan Administration Budget, of the fees and charges incurred by the Plan Administrator on or after the Effective Date for fees and other expenses of professionals

25

employees, and consultants retained by the Plan Administrator, disbursements, expenses, or related support services relating to the winding down of the Debtors and implementation of the Plan, in each case without further Bankruptcy Court approval.

> (viii)   File Tax returns.

> (ix)   Seek a determination of Tax liability under section 505 of the Bankruptcy Code or otherwise and to pay, as provided in the Plan Administration Budget, any Taxes incurred by the Debtors at any time.

> (x)   Collect any accounts receivable or other claims of the Debtors not otherwise disposed of pursuant to the Plan.

> (xi)   Invest Cash in the Plan Administration Account in accordance with section 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Bankruptcy Court and as deemed appropriate by the Plan Administrator.

> (xii)   Enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Debtors' obligations thereunder, as applicable.

> (xiii)   With the consent of the Agent in its sole and absolute discretion, abandon in any commercially reasonable manner any assets of the Debtors and the Estates remaining after the Effective Date, which Plan Administrator reasonably concludes are of no benefit to the Estates.

> (xiv)   Take such actions and execute and deliver such agreements and other instruments as are necessary and desirable to enable the GUC Litigation Trustee to pursue the Indemnification Insurance Claims and other Retained Causes of Action.

> (xv)   Take such other actions not inconsistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable, with the consent of the Agent, with respect to administering the Plan.

> (c)   Indemnification of Plan Administrator.  The Plan Administrator and the Plan Administrator's agents and professionals, shall not be liable for actions taken or omitted in its capacity as, or on behalf of, the Plan Administrator, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each shall be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Plan Administrator, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts.  Any indemnification or reimbursement Claims of the Plan Administrator (and the other parties entitled to indemnification under this Subsection (c)) shall be satisfied by NewCo; *provided, however*, the Plan Administrator shall return any portion of such funds used to defend any action in which the Plan Administrator is found to have (i) acted with willful misconduct, gross negligence or bad faith, (ii) engaged in self-dealing, (iii) breached its fiduciary duty, or (iv) committed *ultra vires* acts.  The Plan Administrator shall be entitled to rely, in good faith, on the advice of its retained professionals.  The provisions of this Subsection do not apply to actions

26

taken by the Plan Administrator in any capacity other than as Plan Administrator or as Disbursing Agent.

    (d) <u>Plan Administration Budget</u>.  The Plan Administrator shall perform its duties within the parameters of the Plan Administration Budget, including without limitation using the Cash in the Plan Administration Account consistent therewith and with the terms and obligations of the Plan and the Plan Administration Budget, in each case in order to carry out its duties under the Plan.

    (e) <u>Taxes</u>.  The Plan Administrator shall have the powers of administration regarding all of the Debtors' and Reorganized Debtors' Tax obligations, including the filing of tax returns.

      (i) Where and as applicable, the Plan Administrator shall (A) complete and file within ninety (90) days after the Effective Date (or such longer period as authorized by the Bankruptcy Court) the Debtors' final federal, state, and local Tax returns, (B) request an expedited determination of any unpaid Tax liability of the Debtors, the Reorganized Debtors or the Estates under section 505 of the Bankruptcy Code for all taxable periods through the liquidation of the Reorganized Debtors as determined under applicable tax laws, and (C) represent the interest and account of the Reorganized Debtors or the Estates before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.

      (ii) The Plan Administrator may request that the Bankruptcy Court determine the amount of any Tax Claim pursuant to section 505 and/or section 502(c) of the Bankruptcy Code regardless of whether any Debtor previously objected to such Claim.  The Bankruptcy Court will retain jurisdiction to estimate Claims at any time.

    (f) <u>Resignation, Death, or Removal of Plan Administrator</u>.  The Plan Administrator may resign at any time upon sixty (60) days' written notice in accordance with the notice provisions of the Plan, but shall serve until a successor Plan Administrator is appointed. No successor Plan Administrator hereunder shall have any liability or responsibility for the acts or omissions of any predecessor Plan Administrators.  The Plan Administrator may be terminated at any time, with or without cause, by Agent in consultation with counsel for the Estates.  In the event the Plan Administrator has been terminated, resigns, dies, or is otherwise unwilling or unable to continue carrying out its duties as the Plan Administrator, a successor Plan Administrator shall be designated by Agent in consultation with counsel for the Estates.  Every successor Plan Administrator appointed pursuant hereto shall execute, acknowledge, and deliver to the Bankruptcy Court an instrument in writing accepting such appointment hereunder, and thereupon such successor Plan Administrator, without any further act, shall become fully vested with all of the rights, powers, duties, and obligations of his or her predecessor.

    (g) <u>Termination of Duties of Plan Administrator</u>.  The duties of the Plan Administrator will terminate upon the later to occur of (i) all assets held or controlled by the Plan Administrator have been distributed in accordance with the terms of this Plan and (ii) upon material completion of all other duties and functions of the Plan Administrator set forth herein,

but in no event later than three years after the Effective Date, unless extended by order of the Bankruptcy Court.

5.08.   <u>Powers of Officers; Resignations</u>.  The officers of the Debtors prior to the Effective Date, and the Plan Administrator thereafter, shall have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.  As of the Effective Date, each and every manager, officer and employee of each of the Debtors shall be deemed to have resigned, effective as of the Effective Date.

5.09.   <u>Retention of Counsel</u>.  On and after the Effective Date, the Plan Administrator may retain Brownstein, Hyatt Farber Schreck, LLP as its legal counsel.

5.10.   <u>GUC Litigation Trust</u>.[3]

(a)   <u>GUC Litigation Trust Generally</u>.  The GUC Litigation Trust shall be established on or before the Effective Date pursuant to the GUC Litigation Trust Agreement for the purpose of holding GUC Litigation Trust Assets, prosecuting the Retained Causes of Action, liquidating the GUC Litigation Trust Assets, resolving Disputed General Unsecured Claims, and making distributions to holders of Allowed General Unsecured Claims in accordance with the terms of the Plan.  The GUC Litigation Trust shall be organized for the primary purpose of holding, liquidating and distributing the assets transferred to it, with no objective to continue or engage in the conduct of a trade or business.  Immediately prior to the Effective Date, the GUC Litigation Trust Assets shall be irrevocably transferred to, and vest in, the GUC Litigation Trust.  Subject to and to the extent set forth in the Plan, the Confirmation Order, the GUC Litigation Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the GUC Litigation Trust (and the GUC Litigation Trustee) shall have the power and authority, to the exclusion of all other parties, to:  (i) accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the GUC Litigation Trust Assets (directly or through a third-party disbursing agent), each in accordance with the Plan and GUC Litigation Trust Agreement; (ii) calculate and make distributions to holders of Allowed General Unsecured Claims pursuant to the procedures for allowing Claims and making distributions prescribed in the Plan; (iii) administer the GUC Account; (iv) comply with the Plan and exercise the GUC Litigation Trust's rights and fulfill its obligations thereunder; (v) review, reconcile, settle or object to Disputed General Unsecured Claims and resolve such objections as set forth in the Plan; (vi) subject to Section 10.08, employ professionals to represent the GUC Litigation Trust with respect to its responsibilities; (vii) file appropriate Tax returns and other reports on behalf of the GUC Litigation Trust and pay Taxes or other obligations owed by the GUC Litigation Trust; (viii) exercise such other powers as may be vested in the GUC Litigation Trust; and (ix) dissolve the GUC Litigation Trust in accordance with the terms of the GUC Litigation Trust Agreement.

(b)   <u>Funding of the GUC Litigation Trust</u>.  The GUC Litigation Trust shall, in accordance with the terms of the GUC Litigation Trust Agreement and the Plan, be funded with the GUC Litigation Trust Assets.

---

[3] [The GUC Litigation Trust structure may be modified to include one or more additional trusts and/or limited liability companies due to tax and other considerations that are subject to the ongoing review of tax counsel.  These modifications will not effect the allocation of assets between the holders of General Unsecured Claims and NewCo.]

(c)     GUC Litigation Trustee. The GUC Litigation Trustee shall be the exclusive trustee of the assets of the GUC Litigation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3). The powers, rights and responsibilities of the GUC Litigation Trustee shall be specified in the GUC Litigation Trust Agreement and shall include the authority and responsibility to, among other things, take the actions set forth in Sections 5.10(a) and 10.08 of the Plan. The GUC Litigation Trustee shall distribute the GUC Litigation Trust Assets in accordance with the provisions of the Plan and the GUC Litigation Trust Agreement. Other rights and duties of the GUC Litigation Trustee and the beneficiaries of the GUC Litigation Trustee shall be as set forth in the GUC Litigation Trust Agreement.

(d)     Fees and Expenses of the GUC Litigation Trustee. Except as otherwise ordered by the Bankruptcy Court, the expenses of the GUC Litigation Trust shall be paid solely from the GUC Amount and the proceeds of the Retained Causes of Action in accordance with the Plan and the GUC Litigation Trust Agreement.

(e)     Reports to be Filed by the GUC Litigation Trustee. The GUC Litigation Trustee, on behalf of the GUC Litigation Trust, shall provide NewCo with quarterly reports regarding the status of all Retained Causes of Action.

(f)     Expenses for Professionals of the GUC Litigation Trust. Subject to Section 10.08, the GUC Litigation Trustee, on behalf of the GUC Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously retained by the Creditors' Committee) to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable fees and expenses of these professionals without further order of the Bankruptcy Court in accordance with, and subject to the limitations set forth in, the Plan and the GUC Litigation Trust Agreement.

(g)     Indemnification. The GUC Litigation Trust Agreement may include reasonable and customary indemnification provisions. Any such indemnification shall be the sole responsibility of the GUC Litigation Trust and payable solely from the assets of the GUC Litigation Trust.

(h)     Tax Treatment. The GUC Litigation Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d). For federal income tax purposes, the transfer of the GUC Litigation Trust Assets to the GUC Litigation Trust will be treated as a transfer of such assets from the Debtors to the initial recipients of the interests in the GUC Litigation Trust, subject to any liabilities of the Debtors or the GUC Litigation Trust payable from the proceeds of such assets, followed by such recipients' transfer of such assets (subject to such liabilities) to the GUC Litigation Trust. The initial recipients of the interests in the GUC Litigation Trust will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the GUC Litigation Trust Assets, subject to any liabilities of the Debtors or the GUC Litigation Trust payable from the proceeds thereof. The GUC Litigation Trust Agreement will: (i) require that the GUC Litigation Trustee file income tax returns for the GUC Litigation Trust as a grantor trust; (ii) pay all Taxes owed on any net income or gain of the GUC Litigation Trust, including net income or gain of the disputed claims reserve, on a current basis from GUC Litigation Trust Assets; (iii) provide for consistent valuations for all GUC Litigation Trust Assets by the GUC

29

Litigation Trustee and holders of the interests in the GUC Litigation Trust, and require that such valuations be used for all Tax reporting purposes; (iv) provide for the GUC Litigation Trust's termination no later than five years after the Effective Date unless the GUC Litigation Trustee elects to extend such period for an additional year as provided for in the GUC Litigation Trust Agreement or the Bankruptcy Court approves a fixed extension; (v) limit the investment powers of the GUC Litigation Trustee; and (vi) require that the GUC Litigation Trust distribute at least annually all net income and the net proceeds from the sale or other disposition of all GUC Litigation Trust Assets in excess of amounts reasonably necessary to maintain the value of the remaining GUC Litigation Trust Assets and pay claims and contingent liabilities.

## ARTICLE VI

## REORGANIZATION TRANSACTION

6.01.   Exit Facility.

(a)   Parties.  The Exit Facility Lenders, as lenders, shall make (severally and not jointly) the Exit Facility Loans to the Exit Facility Borrower upon the terms and conditions set forth in the Exit Facility Credit Documents (the "Exit Facility").  The Exit Facility Agent shall serve as Agent under the Exit Facility.

(b)   Exit Facility Term A Loans.  As of the Effective Date, each of the DIP Lenders shall hold Exit Facility Term A Loans in an aggregate principal amount equal to its DIP Claims accrued as of the Effective Date (including, for the avoidance of doubt, DIP Claims on account of interest fees, expenses, indemnification, reimbursement and other charges).

(c)   Exit Facility Term B Loans.  On and after the Effective Date, the Exit Lenders shall make Exit Facility Term B Loans available to NewCo, in accordance with the Exit Facility Credit Agreement and pursuant to the Approved Project Cost Budget to be approved by Exit Facility Agent, in its sole discretion, in consultation with the Exit Facility Lenders.

(d)   Security.  Each of the Exit Loans shall be secured by a Lien on substantially all assets of NewCo.  The Confirmation Order shall approve the Exit Credit Facility and provide that the Liens of the Exit Facility Lenders shall be valid, enforceable and fully perfected, as of the Effective Date, without any further action on the part of any Person.

(e)   Loan and Security Priority.  As to all Persons other than the Exit Lenders, the Liens of the Exit Lenders shall be senior to all other Liens other than Permitted Encumbrances and such other permitted Liens as are specified in the Exit Facility Credit Agreement.  The Exit Facility Term A Loans, and the Liens securing such loans, shall be senior in priority and order of payment to the Exit Facility Term B Loans, and the Liens securing such Loans.

(f)   Terms of Exit Facility Loans.  The anticipated terms (including interest rates, fees, priorities, terms and other similar provisions) of the Exit Facility Loans are set forth in Exhibit A attached hereto; *provided*, *however*, that the actual terms and conditions of the Exit Facility Loans shall be as set forth in the Exit Facility Credit Documents, which shall be

controlling in the event of any conflict between the terms of the Exit Facility Credit Documents and the terms set forth in Exhibit A.

6.02.   Formation and Operation of NewCo.

(a)   NewCo shall be established as of the Effective Date.

(b)   As of the Effective Date, the NewCo Membership Interests shall be deemed issued to, and held by, the holders of Prepetition Facility Claims, allocated among such holders on a pro rata basis based upon the respective amounts of such claims.

(c)   Effective as of the Effective Date, each holder of a Prepetition Facility Claim shall be deemed to have discharged and released such Claim in consideration of its receiving NewCo Membership Interests as provided for herein, and Agent shall be deemed to have discharged and released the Prepetition Guaranty on behalf of itself and all holders of Prepetition Facility Claims.

(d)   NewCo and Davidson shall enter into the Davidson Consulting Agreement, effective as of the Effective Date.

6.03.   Vesting of Transferred Assets in NewCo.

(a)   Transfer of Assets.  On the Effective Date, the Transferred Assets shall be transferred to, and vested in, NewCo, without the requirement of any further action on the part of any Person.  Notwithstanding the foregoing, the Debtors, NewCo and the Plan Administrator are authorized and directed to execute and deliver such agreements, instruments and other documents as Agent determines in its sole discretion are necessary or desirable to effectuate and/or memorialize such transfer to NewCo.

(b)   Assumed Agreements.  Without limiting the generality of any provision in this Section 6.03, the Transferred Assets shall include all of the Debtors' right, title and interest to and in the Assumed Agreements, and each of the Assumed Agreements shall be deemed to be assigned to NewCo, effective as of the Effective Date, pursuant to section 365 of the Bankruptcy Code.

(c)   Condominiums.  Without limiting the generality of any provision in this section 6.03, upon transfer of the Transferred Assets to NewCo, NewCo shall be vested with all of Borrower's rights as (i) the sponsor of the Condominiums, and (ii) the declarant under the Declarations, and each of the Condominium Documents shall be deemed transferred and assigned to NewCo, effective as of the Effective Date.

(d)   TIF Agreements/FirsTier Financing.  The Transferred Assets shall include all of the Debtors' right, title and interest to and in the TIF Agreements and the FirsTier Financing, including without limitation the Debtors' rights to receive TIF Payments and TIF Net Proceeds.  Without limiting the effectiveness of the immediately preceding sentence, FirsTier Bank shall execute and deliver such agreements and other instruments as NewCo shall reasonably request to effectuate and memorialize the vesting of the aforesaid assets in NewCo.

(e)     Assets Transferred Free and Clear of Liens and Claims.  The Transferred Assets shall be transferred to NewCo pursuant to section 363 of the Bankruptcy Code, and, subject only to the Permitted Encumbrances, shall be transferred free and clear of all Liens, Claims, mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens, judgments, demands, encumbrances, rights of first refusal, offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or Tax, decrees of any court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or the Debtors' predecessors or affiliates, reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfilled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the Chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability, in each case, other than Permitted Encumbrances.  For the avoidance of doubt, and without limiting the generality of the immediately proceeding sentence, none of the Liens (if any) securing payment of the Prepetition Mechanics' Lien Claims, Secured Tax Claims, Other Secured Claims, Prepetition Facility Claims or DIP Claims shall attach to the Transferred Assets on or after the Effective Date.

(f)     Causes of Action.  On and after the Effective Date, NewCo shall have the full and exclusive right, authority and standing to investigate, prosecute, settle and compromise all Causes of Action in favor of the Debtors accrued prior to the Effective Date, including the Metro District Claims but excluding the Retained Causes of Action, and NewCo shall have the sole right to receive all proceeds thereof.

6.04.   Condominium and Property Matters.

(a)     Funding of Reserves.  NewCo shall fulfill HOA Obligations, if any, as and when required under the Condominium Documents and applicable law.

(b)     European Village Sharing Agreement/Metro Bonds.  The European Village Sharing Agreement shall be deemed terminated effective as of the Effective Date, and NewCo shall be authorized to make such filings as it deems necessary or desirable to effectuate, memorialize and record such termination.

6.05.   Discharge of Prepetition Facility Claims.  The full amount of all Prepetition Facility Claims shall be deemed released and discharged in exchange for ownership of one-hundred percent of the NewCo Membership Interests.

6.06.   Corporate Action.  Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) all actions necessary to consummate the Reorganization Transaction, including without limitation those necessary or desirable to cause the consummation of the transactions specified in Section 5.02, (ii) all actions otherwise necessary to implement the Operating Agreement of NewCo and (iii) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, shall occur in accordance with the Plan and any applicable Charter Documents or governing agreements and shall be in effect, without any requirement of further action by the security holders, members of boards of managers, managers, directors or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) prior to the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, (x) the Plan Supplement Documents and (y) any and all other agreements, documents, securities and instruments relating to the foregoing (including without limitation security documents).  The authorizations and approvals contemplated by this Section 6.04 shall be effective notwithstanding any requirements under non-bankruptcy law.

6.07.   Operation of NewCo.

(a)    Operating Agreement of NewCo.  The Operating Agreement of NewCo will be filed under seal with the Plan Supplement and, pursuant to the Confirmation Order, effective as of the Effective Date, shall establish the rights and obligations of the holders of the NewCo Membership Interests and the governance of NewCo.  The Operating Agreement of NewCo shall designate NewCo Manager as the manager of NewCo.

(b)    Indemnification of NewCo Manager.  The Operating Agreement for NewCo shall provide a release and indemnification in favor of NewCo Manager, by the members of NewCo, pursuant to which the members of NewCo shall agree to indemnify, defend and hold harmless NewCo Manager with respect to its actions and omissions as manager of NewCo, except for NewCo Manager's gross negligence or willful misconduct.

(c)    Davidson Consulting Agreement.  The Davidson Consulting Agreement shall become effective as of the Effective Date.

6.08.   Securities Law Matters.  Pursuant to, in accordance with, and solely to the extent provided under section 1145 of the Bankruptcy Code, the issuance by NewCo of the NewCo Membership Interests to the Prepetition Lenders (or their respective designees, as applicable) pursuant to the Operating Agreement of NewCo shall be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code, and may each be sold with registration to the extent permitted under section 1145 of the Bankruptcy Code.

6.09.   Books and Records.  On the Effective Date, title to the books and records of the Debtors shall be deemed vested in NewCo as Transferred Assets; *provided, however,* that the

Plan Administrator may maintain such books and records, as and when directed by NewCo. On and after the Effective Date, upon reasonable prior notice, NewCo and the Plan Administrator shall provide counsel and other representatives of the Estates with reasonable access, during normal business hours, to the books and records in their custody and control.

6.10.   Effective Date and Closing of Reorganization Transaction.   The Debtors shall each use commercially reasonable efforts to cause the Effective Date to occur, the Exit Facility to close, and the Reorganization Transaction to close, in each case, as soon as is reasonably practicable following the date of this Plan.

## ARTICLE VII

### PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

7.01.   Voting of Claims.   Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article IV of the Plan shall be entitled to vote separately to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

7.02.   Nonconsensual Confirmation.   If any impaired Class of Claims entitled to vote shall not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 13.10 or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.

7.03.   Distributions.   All distributions of Cash under the Plan shall be made by the Disbursing Agent, who shall make distributions as and when directed by the Plan Administrator and in accordance with the Plan.

7.04.   Distributions of Cash.   Any payment of Cash made pursuant to the Plan shall, at the Disbursing Agent's option, be made by check drawn on a domestic bank or wire transfer.

7.05.   Timing of Distributions.   In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

7.06.   Delivery of Distributions.   Subject to Bankruptcy Rule 9010, all distributions of Cash under the Plan to holders of Allowed Claims shall be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of January 11, 2010, unless the Disbursing Agent has been properly notified in writing of a change of address. In the event that any distribution to any such holder is returned as undeliverable, the Disbursing Agent shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current

34

address of such holder, at which time such distribution shall be made to such holder; *provided, however*, that, with respect to any Claim of any creditor whose distribution is returned as undeliverable, any interest payable on such Claim shall cease accruing on the date that such undeliverable distribution was first distributed; *provided further, however*, that, at the expiration of ninety (90) days from the date such distribution is first made such distribution shall be deemed unclaimed property and shall be treated in accordance with Section 7.09.

7.07.   Minimum Distributions.   No payment of Cash of less than one hundred dollars ($100.00) shall be made to any holder of a Claim unless a request therefor is made in writing to the Disbursing Agent.

7.08.   Distributions to Holders as of the Record Date.   As of the close of business on the Record Date, the Claims register shall be closed, and there shall be no further changes in the record holder of any Claim.  Neither the Plan Administrator nor the Disbursing Agent shall have any obligation to recognize any transfer of any Claim occurring after the Record Date (including Administrative Expense Claims accruing on or after the applicable Bar Date).  The Plan Administrator and the Disbursing Agent shall instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Record Date.

7.09.   Unclaimed Distributions.   All distributions under the Plan that are unclaimed for a period of at least ninety (90) days after distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Reorganized Debtors and any entitlement of any holder of any Claim to such distributions shall be extinguished and forever barred.

7.10.   Cancellation and Surrender of Existing Securities and Agreements.   Notwithstanding any other provision of the Plan, as a condition precedent to receiving any distribution under the Plan, each holder of a promissory note, or other instrument or security evidencing a Claim must tender such promissory note or other instrument or security to the Plan Administrator or must execute and deliver an affidavit of loss and furnish an indemnity or bond in substance and amount reasonably satisfactory to the Plan Administrator.  Any holder of a Claim that fails to surrender such instrument or to provide the affidavit and indemnity or bond before the later of six months following the (i) Effective Date or (ii) the date such holder's Claim becomes an Allowed Claim shall be deemed to have forfeited all rights and/or Claims and may not receive or participate in any distribution under the Plan.

7.11.   Setoffs.   The Plan Administrator may, but shall not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution shall be made), any Claims of any nature whatsoever that any of the Debtors may have had prior to the Effective Date against the holder of such Claim (including Retained Causes of Action, as provided for in Section 10.09), but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by of any such Claim that any of the Debtors may have had prior to the Effective Date against the holder of such Claim.

7.12.   Votes Solicited in Good Faith.   The Debtors have, and upon confirmation of the Plan shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance

35

with the applicable provisions of the Bankruptcy Code.  The Debtors (and each of their
Affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have
participated in good faith and in compliance with the applicable provisions of the Bankruptcy
Code in the offer, issuance and sale (if applicable) of the securities offered, issued and sold under
the Plan and therefore have not been, and on account of such offer, issuance and sale will not be,
liable at any time for the violation of any applicable law, rule, or regulation governing the
solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities
offered and distributed under the Plan.

7.13.   <u>Tax Matters Concerning Distributions</u>.  The aggregate consideration distributed to
the holders of Allowed Claims hereunder shall be treated as first satisfying an amount equal to
the principal amount of each such Allowed Claim and, for those Allowed Claims that include
unpaid interest accrued prior to the Petition Date, any remaining consideration shall be treated as
satisfying such interest.

# ARTICLE VIII

## PROCEDURES FOR TREATING DISPUTED CLAIMS

8.01.   <u>Objections to Claims</u>.  Any objections to Claims shall be filed and served on or
before such date as may be fixed by the Bankruptcy Court, after the giving of proper notice in
accordance with Bankruptcy Rule 2002 and a hearing.

8.02.   <u>No Distributions Pending Allowance</u>.  Notwithstanding any other provision of the
Plan, if any Claim or portion thereof is Disputed, no payment or distribution provided hereunder
shall be made on account of such Claim unless and until such Claim shall have become an
Allowed Claim through settlement and/or an order of the Bankruptcy Court.  The Disbursing
Agent shall only make distributions on account of Claims that have become fully Allowed.  If
and when a previously Disputed Claim becomes a fully Allowed Claim, the Disbursing Agent
shall make a Catch-Up Distribution on account of such claim to the extent warranted on the next
Distribution Date.  Nothing in this Section 8.02 shall limit the obligations of the Reorganized
Debtors and NewCo to escrow funds pursuant to Section 4.10.

8.03.   <u>Tort Claims</u>.  All Tort Claims are Disputed Claims.  No distributions shall be
made on account of any Tort Claim unless and until such Claim is liquidated and becomes an
Allowed Claim.  Any Tort Claim which has not been liquidated prior to the Effective Date and as
to which a proof of claim was timely filed in the Chapter 11 Cases, shall be determined and
liquidated in the administrative or judicial tribunal in which it is pending on the Effective Date
or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of
appropriate jurisdiction.  Any Tort Claim determined and liquidated (i) pursuant to a judgment
obtained in accordance with this Section and applicable nonbankruptcy law which is no longer
appealable or subject to review, or (ii) in any alternative dispute resolution or similar proceeding
as same may be approved by order of a court of competent jurisdiction, shall be paid as follows:
(A) to the extent such liquidated Claim is, in whole or in part, an Insured Claim, the insured
portion shall be paid by the applicable insurer pursuant to the provisions of Section 8.04 and (B)
to the extent any portion of such liquidated Claim is not covered by any of the Debtors'

insurance policies, such uninsured portion shall be deemed an Allowed Claim in Class 6 and treated in accordance with Section 4.06. Nothing contained in this Section 8.03 shall constitute or be deemed a waiver of any Claim, right, or Cause of Action that any Debtor may have had prior to the Effective Date against any Person in connection with or arising out of any Tort Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code. Notwithstanding any other provision of the Plan, interest shall not commence accruing on any Tort Claim until such Claim has been liquidated and Allowed as set forth in this Section 8.03.

8.04. <u>Distributions Relating to Allowed Insured Claims</u>. Distributions under the Plan to each holder of an Allowed Insured Claim shall be in accordance with the provisions of any applicable insurance policy. Nothing contained herein shall constitute or be deemed a waiver of any Cause of Action that any Reorganized Debtor may hold against any other Person, including, without limitation, insurers under any of the Debtors' or Reorganized Debtors' insurance policies.

8.05. <u>Resolution of Claims</u>. On and after the Effective Date, the Plan Administrator shall have the authority to litigate, compromise, settle, otherwise resolve, or withdraw any objections to Claims and compromise, settle, or otherwise resolve Disputed Claims without approval of the Bankruptcy Court.

8.06. <u>Estimation</u>. Notwithstanding any other provision in the Plan to the contrary, the Plan Administrator may at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Plan Administrator has previously objected to such Claim. The Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim. In the event that the Bankruptcy Court estimates any Disputed Claim, such estimated amount may constitute either (i) the Allowed amount of such Claim, (ii) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan, or (iii) a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, Plan Administrator may elect to object to ultimate payment of such Claim. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

8.07. <u>No Interest or Penalties</u>. No interest or penalties shall be paid on account of Disputed Claims, including, without limitation, Disputed Claims that become Allowed Claims.

ARTICLE IX

<u>EXECUTORY CONTRACTS AND UNEXPIRED LEASES</u>

9.01. <u>Assumption or Rejection of Executory Contracts and Unexpired Leases</u>. All executory contracts and unexpired leases that exist between any Debtor and any Person, including, without limitation, the executory contracts and unexpired leases set forth in Schedule B (together, the "<u>Rejected Agreements</u>"), shall be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (together, the "<u>Assumed</u>

Agreements") (i) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion or notice for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Effective Date, (iii) that is specifically designated on Schedule A-1 as a contract or lease to be assumed as modified by mutual agreement of the Debtors on one hand and the Agent on the other hand (for the avoidance of doubt, any such contract or lease that is not so mutually modified shall be deemed rejected by the Debtors as of the Effective Date), which contracts and/or leases, as so mutually modified, will be filed with the Plan Supplement or (iv) that is specifically designated as a contract or lease to be assumed on Schedule A to the Plan; *provided, however,* that the Debtors may, on or prior to the Effective Date, amend Schedules A, A-1 and B to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, as and when directed by Agent in its sole and absolute discretion, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be, respectively, Assumed Agreements or Rejected Agreements. The Debtors shall provide notice of any amendments to Schedules A, A-1, and B to the parties to the executory contracts and unexpired leases affected thereby. In the event Schedules A, A-1 and/or B have been amended as provided for in this Section 9.01(a), the Debtors shall file an amended version of such Schedules with the Plan Supplement. The listing of a document on Schedule A shall not constitute an admission by the Debtors that such document is an executory contract or an unexpired lease or that the any Debtor has any liability thereunder. Notwithstanding anything to the contrary herein or on any schedule hereto, Permits shall not be deemed rejected by virtue of the Plan notwithstanding the fact that they may be deemed executory contracts.

9.02.   Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases. Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption and assignment to NewCo of the Assumed Agreements, and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the Rejected Agreements.

9.03.   Inclusiveness. Unless otherwise specified thereon, each executory contract and unexpired lease listed or to be listed on Schedule A, A-1, or B shall include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly, as of the Effective Date, by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such modifications, amendments, supplements, restatements or other such agreements or documents are listed on Schedule A, A-1, or B.

9.04.   Cure of Defaults. Except as may otherwise be agreed to by the parties, within sixty (60) days after the Effective Date, the Plan Administrator shall pay all Allowed Cure Claims. All Disputed Cure Claims shall be paid by the Plan Administrator as soon as is practicable after they become Allowed Claims.

9.05.   Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan. Rejection Claims must be filed with the Bankruptcy Court and served upon the Plan Administrator no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or

unexpired lease, (ii) notice of entry of the Confirmation Order, and (iii) notice of an amendment to Schedule B. All such Claims not filed within such time will be forever barred from assertion against the Debtors, Reorganized Debtors, their respective property and their successors and assigns.

## ARTICLE X

## EFFECT OF CONFIRMATION

10.01. <u>Survival of Corporate Reimbursement Obligations</u>. Except as expressly provided for in this Section 10.01, the obligations of the Debtors and Reorganized Debtors to defend, indemnify, reimburse or limit the liability of their present and former directors, officers, partners or employees who were directors, officers, members, managers, or employees, respectively, prior to the Effective Date, in their capacity as directors, officers, members, managers or employees, against any Claims or obligations pursuant to the Debtors' Charter Documents, applicable state law or specific agreement, or any combination of the foregoing, shall not survive confirmation of the Plan, and shall be discharged irrespective of whether indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before, on or after the Effective Date, and, for the avoidance of doubt, none the foregoing obligations shall be deemed to have been assumed by NewCo or included in the Transferred Assets. Notwithstanding the foregoing, the obligations of the Debtors described in the immediately preceding sentence shall survive the Effective Date to the extent (i) they are covered by one or more of the Debtors' insurance policies and (ii) the applicable insurer actually pays the Debtors, Reorganized Debtors and/or the GUC Litigation Trustee on account of such obligations, and the right to collect with respect to such claims under such policies (the "<u>Indemnification Insurance Claims</u>") shall be included in the Retained Causes of Action. The GUC Litigation Trust shall be solely responsible for paying any previous or other costs incurred or accrued under the aforesaid insurance policies at any time subsequent to the Effective Date. For the avoidance of doubt, neither NewCo, the Debtors, nor the Reorganized Debtors shall have any obligation to maintain or acquire any insurance coverage to facilitate the availability of Indemnification Insurance Claims.

10.02. <u>Discharge of Claims</u>. Except as otherwise provided herein or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder shall be in exchange for and in complete satisfaction, discharge, and release of all existing debts and Claims of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Petition Date, against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and their assets shall be, and shall be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests shall be precluded and enjoined from asserting against the Debtors, the Estates, the Reorganized Debtors, or any of their respective assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim. For the avoidance of doubt, the discharge provided for in this Section 10.02 shall not operate to release or impair the Retained Causes of Action.

10.03.  Discharge of Debtors.  Upon the Effective Date, except as otherwise expressly provided herein, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any Affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, the Reorganized Debtors and the Estates, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, including rights of setoff and recoupment, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Persons shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim.  For the avoidance of doubt, the discharge provided for in this Section 10.03 shall not operate to release or impair the Retained Causes of Action.

10.04.  Releases of Claims

(a)  Mutual Releases of Debtors and Lenders.  **As of the Effective Date, (i) each of the Debtors, Davidson and Guarantor, on behalf of themselves, their respective Affiliates, and their respective officers, members, directors, agents, shareholders, employees and Affiliates, and the predecessors, successors and/or assigns of any of the foregoing, on the one hand, and (ii) the Prepetition Lenders, the DIP Lenders, Agent (both as DIP Agent and as Prepetition Agent), the CRO and their respective Affiliates, and their respective officers, members, directors, agents, shareholders, employees and affiliates, and the predecessors, successors and/or assigns of any of the foregoing, on the other hand, and any of the Affiliates, officers, members, directors, agents, shareholders and employees, and the predecessors, successors and/or assigns of any of the foregoing Persons specified in (i) and (ii), shall be deemed to have released, and shall release, one another from any and all Claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and costs), whether known or unknown, suspected or unsuspected, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, then existing or thereafter arising, in law, equity or otherwise (collectively, "Released Claims"), based in whole or in part upon any actions, omissions, occurrences and/or facts occurring or existing on or prior to the Effective Date, including, without limitation, any Released Claims arising from or in any manner related to the Prepetition Credit Agreement or the transactions contemplated thereunder, the DIP Credit Agreement or the transactions contemplated thereunder, the Condominiums, and/or the Property; *provided, however,* that the foregoing shall not operate as a waiver or release from any causes of action arising out of the willful misconduct or gross negligence of any such Person as determined by a Final Order entered by a court of competent jurisdiction.  For the avoidance of doubt, the releases provided for in this Section 10.04(a) shall not operate to release or limit the enforceability of any Retained Cause of Action to the extent it is prosecuted against any Person other than the Persons specified in subsection (ii) hereof and does not create or impose any liability of or upon such Persons.**

(b)  Mutual Releases of Lenders.  **As of the Effective Date, (i) the Prepetition Lenders, on behalf of themselves, their respective Affiliates, and their respective officers, members, directors, agents, shareholders, employees and Affiliates, and the predecessors, successors and/or assigns of any of the foregoing, on the one hand, and (ii) Agent (both as Prepetition Agent and DIP Agent), and Hypo, as a Prepetition Lender,**

40

**and their respective Affiliates, on the other hand, and any of the Affiliates, officers, members, directors, agents, shareholders and employees, and the predecessors, successors and/or assigns of any of the foregoing Persons specified in (i) and (ii), shall be deemed to have released, and shall release, one another from all Released Claims arising from or in any manner related to the Prepetition Credit Agreement or the transactions contemplated thereunder, the DIP Credit Agreement or the transactions contemplated thereunder, the Property, the Condominiums, the Chapter 11 Cases and/or the Debtors including, without limitation, the lawsuit captioned *Bank Midwest, N.A. v. Hypo Real Estate Capital Corporation*, Index No. 10 Civ. 0232 (WHP), currently pending in the Southern District of New York, which action shall be promptly discontinued with prejudice by the plaintiffs therein.**

> (c)    Releases of Released Parties.  **Except for any right to enforce the Plan, on and after the Effective Date, each of the Released Parties shall be released and discharged from any and all Released Claims related to or in connection with Debtors, the Reorganized Debtors, the Prepetition Credit Agreement or the transactions contemplated thereunder, the DIP Credit Agreement or the transactions contemplated thereunder, the Property, the Condominiums, the Chapter 11 Cases, and/or the Plan, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date; *provided, however,* that the foregoing shall not operate as a waiver or release from any causes of action arising out of the willful misconduct or gross negligence of any such Person as determined by a Final Order entered by a court of competent jurisdiction; *provided, further,* that nothing in this Section 10.04(c) shall be deemed to release or limit the enforceability of any Retained Cause of Action to the extent it is prosecuted against any Person other than the Released Parties, and does not create or impose any liability of or upon any Released Parties.**

> (d)    Injunction Related to Releases.  The Confirmation Order will enjoin permanently the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to this Section 10.04.

10.05.  Injunction.  Except as otherwise provided in the Plan or an order of the Court, on and after the Confirmation Date, all Persons who have held, hold or may hold Claims against or Equity Interests in the Debtors or the Estates are, with respect to any such Claims or Equity Interests, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estates, the Reorganized Debtors, the Released Parties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons (collectively, the "Injunction Parties"), or against any property of the Injunction Parties; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, of any judgment, award, decree or order against the Injunction Parties or against any property of the Injunction Parties; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Injunction Parties or against any property of the Injunction Parties; (d) asserting

41

any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due the Injunction Parties; and (e) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan.

10.06.  Term of Injunctions or Stays.  Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Petition Date, shall remain in full force and effect until the earlier of the time the Chapter 11 Cases are closed and the time the Chapter 11 Cases are dismissed.

10.07.  Exculpation.  None of the Released Parties, the Reorganized Debtors, the Creditors' Committee, or their respective present or former subsidiaries, Affiliates, agents, directors, officers, employees, members, shareholders, managers, agents, attorneys, other advisors and representatives, and each of the successors and assigns of each of the foregoing shall have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, arising out of or in preparation for filing, the Chapter 11 Cases, the preparation or negotiation of the Disclosure Statement and Plan, the solicitation of votes in connection with the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence.  Nothing in this Section 10.07 shall limit the liability of the professionals of the foregoing exculpated parties to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.  This provision shall not be deemed to act to release any Retained Causes of Action.

10.08.  Retained Causes of Action.

(a)  On and after the Effective Date, the GUC Litigation Trustee shall have the full and exclusive right, authority and standing to investigate, prosecute, settle and compromise the Retained Causes of Action, including, without limitation, the Indemnification Insurance Claims.  The GUC Litigation Trustee may retain legal counsel and other professionals, in each case in consultation with Agent.  All fees and expenses of legal and other professionals retained by the GUC Litigation Trustee in connection with the Retained Causes of Action or otherwise shall be either paid from the GUC Amount or from the proceeds of the Retained Causes of Action pursuant to such contingency or other similar arrangements agreed to by the parties.

(b)  The proceeds of all Retained Causes of Action, net of all attorneys' fees and other litigation costs shall be promptly transferred by the GUC Litigation Trustee to NewCo until such time as NewCo shall have received an amount equal to the GUC Amount.  Thereafter, the GUC Litigation Trustee shall (i) deposit all GUC Net Proceeds of the Retained Causes of Action into the GUC Account as soon is practicable, and distribute such funds as provided for in Section 4.06, and (ii) transfer all other Net Proceeds of Retained Causes of Action as soon as is practicable to one or more accounts to be designated by Agent, and distributed to NewCo as and when directed by Agent.  Notwithstanding the immediately preceding sentence, if the aggregate amount of all GUC Net Proceeds exceeds the aggregate amount of all Allowed General Unsecured Claims, calculated after all Disputed General Unsecured Claims have been resolved, then the full amount of such excess shall be transferred to NewCo.

42

(c)     Subject to Section 13.08, any funds remaining in the GUC Account following the final resolution of all Retained Causes of Action and the transfer to NewCo of all amounts specified in Section 10.08 (b) shall be distributed to holders of Allowed General Unsecured Claims by the GUC Litigation Trustee.

(d)     The GUC Litigation Trustee shall have the exclusive right to prosecute the Retained Causes of Action, as provided for in Section 10.08(a), and the obligation to transfer the GUC Net Proceeds to the GUC Account and all other Net Proceeds of the Retained Causes of Action the account designated by Agent for the benefit of NewCo. Any dispute as to the respective rights and obligations of the Plan Administrator and the GUC Litigation Trustee that cannot be resolved consensually shall be determined by the Bankruptcy Court.

10.09.  Reservation of Rights.  Nothing contained in the Plan or the Confirmation Order to the contrary, the Reorganized Debtors shall retain the right to assert any rights or Causes of Action, including the Retained Causes of Action, that the Reorganized Debtors may have or choose to assert on behalf of the Estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law, solely to the extent that such Claims are used defensively, whether by way of set-off, counterclaim or otherwise.  The Reorganized Debtors shall retain any and all legal or equitable defenses which the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced.

10.10.  Substantive Consolidation.  The Confirmation Order shall approve the consolidation of the Debtors solely for the purpose of implementing the Plan, including for purposes of voting, confirmation and distributions to be made under the Plan.  Pursuant to such order: (1) all assets and liabilities of the Debtors shall be deemed merged; (2) all guarantees by one Debtor of the obligations of any other Debtor shall be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors shall be deemed to be one obligation of the Debtors; and (3) each and every Claim filed or to be filed in the Chapter 11 Cases of any of the Debtors shall be deemed filed against all of the Debtors and shall be deemed one Claim against all of the Debtors.  Such consolidation (other than for the purpose of implementing the Plan) shall not affect: (1) the legal and organizational structures of the Debtors; or (2) distributions from any insurance policies or proceeds of such policies.  In addition, such consolidation shall not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code.  If any party in interest challenges the proposed limited substantive consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by entity basis.

## ARTICLE XI

## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

11.01.  Effectiveness.  The Plan shall not become effective unless and until the following conditions shall have been satisfied or waived pursuant to Section 11.03:

(a)     The Confirmation Order, in form and substance acceptable to Agent, shall have been entered and become a Final Order;

(b)     The Reorganization Transaction satisfying the requirements of Section 5.02 shall have been consummated and the conditions specified in Section 5.02 shall have been satisfied;

(c)     All actions, documents, and agreements necessary or desirable to implement the Plan shall have been effected or executed, in form and substance acceptable to Agent in its sole discretion;

(d)     The Debtors shall have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, audited financial statements, and documents that are necessary to implement the Plan and consummate the Reorganization Transaction, and that are required by law, regulation, or order; and

(e)     Any other actions Agent determines are necessary or desirable, in its sole discretion in consultation with the Debtors to implement the terms of the Plan shall have been taken.

11.02.  Failure of Conditions.  In the event that one or more of the conditions specified in Section 11.01 have not occurred or otherwise been waived pursuant to Section 11.03 on or before the thirty first day after the date the Confirmation Order is entered by the Bankruptcy Court, as such date may be extended from time to time by Agent, in its sole and absolute discretion, (i) the Confirmation Order shall be vacated, (ii) the Debtors and all holders of Claims and Equity Interests shall be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) the Debtors' obligations with respect to Claims and Equity Interests shall remain unchanged (subject to a reduction of such Claims for any amounts distributed by the Plan Administrator and/or the Debtors prior to such date) and nothing contained herein shall constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

11.03.  Waiver of Conditions.  Agent in its sole and absolute discretion, in consultation with the Debtors and to the extent not prohibited by applicable law, may waive one or more of the conditions precedent to effectiveness of the Plan set forth in Section 11.01.

ARTICLE XII

RETENTION OF JURISDICTION

12.01.  Subject to Section 8.03, the Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

44

(a)     To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Chapter 11 Cases;

(b)     To hear and determine any and all adversary proceedings, applications, and contested matters;

(c)     To hear and determine any objection to any Claim;

(d)     To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)     To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

(f)     To consider any amendments to, or modifications of, the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)     To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

(h)     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

(i)     To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)     To recover all assets of the Debtors and property of the Debtors and the Estates, wherever located;

(k)     To hear and determine matters concerning Taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of Tax under section 505(b) of the Bankruptcy Code);

(l)     To resolve any Disputed Claims;

(m)     To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

(n)     To resolve any disputes (i) regarding the payment of fees and reimbursement of expenses of any professional retained by the Plan Administrator or the Reorganized Debtors (if applicable) on and after the Effective Date and (ii) between the Exit

Facility Agent and counsel for the Estates regarding the choice of a successor Plan
Administrator;

        (o)     To resolve any disputes related to the Retained Causes of Action between
or among NewCo, the Plan Administrator, the GUC Litigation Trustee and/or the Reorganized
Debtors;

        (p)     To hear any other matter not inconsistent with the Bankruptcy Code; and

        (q)     To enter a final decree closing the Chapter 11 Cases.

## ARTICLE XIII

### MISCELLANEOUS PROVISIONS

13.01.  <u>Settlement and Compromise</u>.  Pursuant to Bankruptcy Rule 9019 and section
1123(b)(3)(A) of the Bankruptcy Code, this Plan, including without limitation, the substantive
consolidation provisions set forth in Section 10.11, serves as an implementation of the global
settlement which represents a good faith compromise and settlement of all Equity Interests in the
Debtors and any Claims brought, asserted or assertable, or that could have been brought, asserted
or assertable, by any creditor or any other interested party.  The classification, treatment,
distribution, releases and other benefits provided to creditors under the Plan serve as
consideration for the settlement.  The entry of the Confirmation Order shall constitute the
Court's approval of the implementation of the global settlement and the related waivers and
releases set forth herein shall be binding on all creditors, the Creditors Committee and any other
party in interest.  The Bankruptcy Court's findings shall constitute its determination that the
global settlement and its implementation herein is in the best interest of the Debtors, the Estates
and the creditors and other parties in interest in the Chapter 11 cases, and is fair, equitable and
within the range of reasonableness.

13.02.  <u>Effectuating Documents and Further Transactions</u>.  The Plan Administrator is
authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures,
and other agreements or documents and take such actions, all on behalf of the Debtors or
Reorganized Debtors, as applicable, as may be necessary or appropriate to effectuate and further
evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

13.03.  <u>Withholding and Reporting Requirements</u>.  In connection with the Plan and all
instruments issued in connection therewith and distributed thereon, any party issuing any
instrument or making any distribution under the Plan, shall comply with all applicable
withholding and reporting requirements imposed by any federal, state, or local taxing authority,
and all distributions under the Plan shall be subject to any such withholding or reporting
requirements.  Notwithstanding the above, each holder of an Allowed Claim that is to receive a
distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction
and payment of any Tax obligations imposed by any governmental unit, including income,
withholding, and other Tax obligations, on account of such distribution.  Any party issuing any
instrument or making any distribution under the Plan has the right, but not the obligation, to not

make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such Tax obligations.

13.04.  Exemption from Transfer Taxes.  Pursuant to section 1146(a) of the Bankruptcy Code, the transfer of the Transferred Assets to NewCo, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under the Plan, including, without limitation, any merger agreements or agreements of consolidation, deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar Tax.

13.05.  Payment of Statutory Fees.  On the Effective Date, and thereafter as may be required, the Plan Administrator shall pay all fees payable pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

13.06.  Post-Effective Date Professional Fees and Expenses.  From and after the Effective Date, the Plan Administrator shall, in the ordinary course of business and without the necessity for any approval by the Bankruptcy Court, pay the reasonable fees and expenses of professional Persons thereafter incurred by the Reorganized Debtors and/or the Plan Administrator, including, without limitation, those fees and expenses incurred in connection with the implementation and consummation of the Plan.

13.07.  Dissolution of the Creditors' Committee.  The Creditors' Committee shall terminate effective as of the 30-day anniversary of the Effective Date, and, as of such date, the Creditors' Committee's members and employees or agents (including attorneys, financial advisors, accountants, and other professionals) shall be released and discharged from any further authority, duties, responsibilities, and obligations relating to, arising from, or in connection with their service on the Creditors' Committee.

13.08.  Disposition of Remaining Funds.  At such time as the Plan Administrator determines that it has fully implemented of the Plan and liquidated and wound down the affairs of the Debtors, and that all retained Causes of Action have been fully resolved, in the event there are any remaining funds of the Estates in the possession of the Plan Administrator, including any funds in the Plan Administration Account, the Plan Administrator shall transfer such funds as directed by Agent; *provided, however,* that any funds remaining in the GUC Account shall be distributed to holders of Allowed General Unsecured Claims other than any de minimis amounts remaining in the GUC Account to the extent such amounts are not reasonably sufficient to make a distribution to holders of General Unsecured Claims practicable, in which case such funds shall be transferred as directed by Agent in its sole discretion.

13.09.  Plan Supplement.  The Debtors will file with the Clerk of the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing a supplement to the Plan (the "Plan Supplement"), which shall include: (a) amended Schedules A, A-1 or B, if amended pursuant to Section 9.01(a), (b) the form of Exit Facility Credit Agreement, (c) the Approved Project Cost Budget (which shall be filed under seal), (d) the form of Operating Agreement of NewCo (which shall be filed under seal), (e) those forms of contracts or leases listed on Schedule A-1 that are

47

modified, in the form as so mutually modified, (f) the Plan Administration Budget, (g) the GUC Litigation Trust Agreement, (h) those schedules and exhibits to the Plan not previously filed by the Debtors, and (i) any other appropriate documents (the "Plan Supplement Documents"); *provided, however*, the Debtors may amend (i) Schedules A, A-1 and B through and including the Confirmation Date to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in each case subject to Section 9.01(a), and solely with the consent of Agent, in which event such executory contract(s) or unexpired lease(s) shall be deemed to be Assumed Agreements or Rejected Agreements, as applicable, and (ii) each of the other Plan Supplement Documents through and including the Effective Date in a manner consistent with the Plan and Disclosure Statement and subject to the consent of the Agent, its sole and absolute discretion, to such amendments. The Debtors shall provide notice of any amendments to Schedules A, A-1 and B to the parties to the executory contracts and unexpired leases affected by such amendment. Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours. Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to Plan Administrator in accordance with Section 13.20 of the Plan.

13.10. <u>Amendment or Modification of the Plan</u>. Alterations, amendments, or modifications of or to the Plan (including, for the avoidance of doubt, any exhibits or schedules thereto) may be proposed in writing by the Debtors, subject to the consent of Agent, at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code. The Plan (including, for the avoidance of doubt, any exhibits or schedules thereto) may be altered, amended, or modified at any time after the Confirmation Date and before the Effective Date, with the consent of Agent, provided that the Plan, as altered, amended, or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended, or modified, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments, or modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such holder.

13.11. <u>Revocation or Withdrawal of the Plan</u>. The Debtors reserve the right, with the consent of Agent, to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any or Equity Interests in or Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

13.12. <u>Vacatur of Confirmation Order</u>. If a Final Order denying confirmation of the Plan is entered, or if the Confirmation Order is vacated, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall (a) constitute a waiver, release or discharge of any Claims against or Equity Interests in the Debtors; (b) prejudice in any manner the rights of the holder of any Claim against, or Equity Interest in, the Debtors; (c) prejudice in any manner

48

any right, remedy or claim of the Debtors; or (d) be deemed an admission against interest by the Debtors.

13.13.  Severability.  If, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

13.14.  Expedited Tax Determination.  The Plan Administrator may request an expedited determination of Taxes under section 505(b) of the Bankruptcy Code for all returns filed for, or on behalf of, the Debtors at any time.

13.15.  Governing Law.  Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit or schedule hereto or in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Colorado, without giving effect to the principles of conflict of laws thereof.

13.16.  Binding Effect.  The Plan shall be binding upon and inure to the benefit of the Debtors, NewCo, the holders of Claims and Equity Interests and their respective successors and assigns, including, without limitation, the Plan Administrator.

13.17.  Exhibits/Schedules.  All exhibits and schedules to the Plan, including the Plan Supplement, are incorporated into and are a part of the Plan as if set forth in full herein.

13.18.  Waiver of Federal Rule of Civil Procedure 62(a) and Bankruptcy Rule 6004(h).  The Debtors may request that the Confirmation Order include (a) a finding that Federal Rules of Civil Procedure 62(a) and/or Bankruptcy Rule 6004(h) shall not apply to the Confirmation Order, and/or (b) authorization for the Debtors to consummate the Plan immediately after entry of the Confirmation Order.

13.19.  Notice of Confirmation of Plan and Effective Date.  On or before ten (10) Business Days after the occurrence of the Effective Date, the Plan Administrator shall mail or cause to be mailed to all holders of Claims and Equity Interests, a notice that informs such holders of (a) entry of the Confirmation Order; (b) the Effective Date; and (c) such other matters as the Plan Administrator deems to be appropriate.

13.20.  Notices.  All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by facsimile transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in

the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

If to Agent:

> Hypo Real Estate Capital Corporation
> 622 Third Avenue
> 31st Floor
> New York, New York  10017
> Attention:  Head of Portfolio Management
> Facsimile No. (212) 671-6434

with a copy to:

> Hypo Real Estate Capital Corporation
> 622 Third Avenue
> 31st Floor
> New York, New York  10017
> Attention:  Chief Legal Officer
> Facsimile No. (212) 671-6368

and a copy to:

> Cooley LLP
> 1114 Avenue of the Americas
> New York, New York 10036
> Attention:  Thomas D. O'Connor, Esq.
>               Jeffrey L. Cohen, Esq.
> Facsimile No.:  (212) 479-6275

If to Debtors:

> [TO BE ADDED]

With a copy to:

> Brownstein Hyatt Farber Schreck, LLP.
> 410 Seventeenth Street, Suite 2200
> Denver, Colorado  80202
> Attn:   Michael Pankow, Esq.
>            Daniel J. Garfield, Esq.
> Facsimile No.:  (303) 223-1111

13.21.  Consent of Debtors.  Any consent, designation, election, approval, waiver, or other similar action of the Debtors permitted or required hereunder may be made by Borrower on

behalf of each of the other Debtors, and shall be binding and irrevocable as to such other Debtors once made.

**[REMAINDER OF PAGE INTENTIONALLY BLANK]**

Dated: Denver, Colorado
      July 9, 2010

Respectfully submitted,

**DEBTORS:**

**7677 EAST BERRY AVENUE ASSOCIATES, L.P.**

By:    EDC Denver I, LLC, a Delaware
        limited liability company,
        its General Partner

By: _____
Name:  Zachary Davidson
Title:  Manager

By: _____
Name:  Andrew Miller
Title:   Chief Restructuring Officer

**EDC DENVER I, LLC**

By: _____
Name:  Zachary Davidson
Title:  Manager

**EVEREST HOLDINGS, LLC**

By: _____
Name:  Zachary Davidson
Title:  Manager

Dated: Denver, Colorado
July 9, 2010

Respectfully submitted,

**DEBTORS:**

**7677 EAST BERRY AVENUE ASSOCIATES, L.P.**

By:     EDC Denver I, LLC, a Delaware
        limited liability company,
        its General Partner

        By:_____
        Name: Zachary Davidson
        Title:  Manager

        By:_____
        Name:  Andrew Miller
        Title:   Chief Restructuring Officer

**EDC DENVER I, LLC**

        By:_____
        Name:  Zachary Davidson
        Title:  Manager

**EVEREST HOLDINGS, LLC**

        By:_____
        Name:  Zachary Davidson
        Title:  Manager

52

Counsel:

BROWNSTEIN HYATT FARBER SCHRECK, LLP


By:  *s/Daniel J. Garfield*
Michael J. Pankow (CO Bar No. 21212)
Daniel J. Garfield (CO Bar No. 26054)
410 Seventeenth Street
Suite 2200
Denver, CO 80202-4432
Telephone:  (303) 223-1100
Facsimile:  (303) 223-1111

*Counsel for Debtors and Debtors in Possession*

EXHIBIT A

**Exit Loan Facility Credit Terms**

**Maturity:**
**Interest Rate:**

**Default Interest:**

**Fees:**

**Amortization:**

**Mandatory Prepayments:**

**Affirmative Covenants:**

**Negative Covenants:**

**Events of Default:**

**Conditions Precedent:**  Entry of an order acceptable in form and substance to Hypo confirming the Plan.

**Condominium/Construction Provisions:**

EXHIBIT B

**Permitted Encumbrances**

EXHIBIT C

**<u>Land</u>**

EXHIBIT D

**PREPETITION MECHANICS' LIEN CLAIMS**

EXHIBIT E

**<u>Other Secured Claims</u>**

## SCHEDULE A

### Executory Contracts and Unexpired Leases to be Assumed

|  | Name of Counterparty | Title | Cure Amount |
|---|---|---|---|
| 1. |  |  |  |

## SCHEDULE A-1

## Executory Contracts and Unexpired Leases to be Assumed as Modified

**SCHEDULE B**

**Executory Contracts and Unexpired Leases to be Rejected**