# NOT APPROVED FOR SOLICITATION

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re:<br><br>7677 EAST BERRY AVENUE<br>ASSOCIATES, L.P., *et al.*<br><br>          Debtors. | Case Nos. 09-27906, 09-27907,<br>09-28000-MER<br><br>Jointly Administered under<br>Case No. 09-28000-MER<br><br>*Chapter 11* |

## DISCLOSURE STATEMENT FOR THE
## DEBTORS' JOINT PLAN OF REORGANIZATION
## UNDER CHAPTER 11 OF THE BANKRUPTCY CODE[1]

Dated: July 9, 2010
      Denver, Colorado

BROWNSTEIN HYATT FARBER
SCHRECK, LLP
Michael J. Pankow (CO Bar No. 21212)
410 Seventeenth Street
Suite 2200
Denver, CO 80202-4432
Telephone: (303) 223-1106
Facsimile: (303) 223-0906

*Counsel for Debtors and Debtors in
Possession*

---

[1] The Debtors are 7677 East Berry Avenue Associates, L.P., EDC Denver I, LLC and Everest Holdings, LLC.

## DISCLOSURE STATEMENT, DATED JULY 9, 2010 WITH RESPECT TO THE DEBTORS' JOINT PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

The Debtors believe that the Debtors' Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code, dated July [____], 2010 and attached as **Exhibit I** hereto (the "Plan") is in the best interests of creditors. All creditors entitled to vote thereon are urged to vote in favor of the Plan. Detailed voting instructions are set forth below, and contained on the Ballots distributed to creditors entitled to vote on the Plan. To be counted, your Ballot must be duly completed, executed and **received by 5:00 p.m. (Mountain time), on [_____], 2010** (the "Voting Deadline"), unless otherwise extended by the Debtors.

As discussed below, the effectiveness of the proposed Plan is subject to material conditions precedent, some of which may not be satisfied.

No person is authorized by any of the Debtors in connection with the Plan or the solicitation of acceptances of the Plan to give any information or to make any representation, other than as contained in this Disclosure Statement and the exhibits hereto or incorporated by reference or referred to herein, and, if given or made, such information or representation may not be relied upon as having been authorized by any of the Debtors. Although the Debtors will make available to creditors entitled to vote on acceptance of the Plan such additional information as may be required by applicable law prior to the Voting Deadline, the delivery of this Disclosure Statement will not under any circumstances imply that the information herein is correct as of any time after the date hereof.

**By an order of the Bankruptcy Court dated [_____], 2010 (the "Solicitation Order") attached hereto as Exhibit II, this Disclosure Statement has been approved as containing "adequate information" for creditors and equity security holders of the Debtors in accordance with section 1125 of the Bankruptcy Code. The Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records . . . that would enable . . . a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan . . . ." 11 U.S.C. § 1125(a)(1).**

All creditors are encouraged to read and carefully consider this entire Disclosure Statement, including the Plan attached as **Exhibit I** hereto and the **Risk Factors** described in Article VII hereof prior to submitting Ballots in response to this solicitation.

The summaries of the Plan and other documents contained in this Disclosure Statement are qualified in their entirety by reference to the Plan itself, the exhibits thereto and documents described therein as being filed before approval of the Disclosure Statement. The Debtors will file all exhibits to the Plan with the Bankruptcy Court.

The information contained in this Disclosure Statement, including the information regarding the history, businesses and operations of the Debtors and other information regarding the Debtors, is included for purposes of soliciting acceptances of the Plan, but, as to any contested matter and adversary proceeding, is not to be construed as an admission or stipulation, but rather as a statement made in settlement negotiations.

## FORWARD-LOOKING STATEMENTS

This Disclosure Statement contains forward-looking statements based primarily on the current expectations of the Debtors and projections about future events and financial trends affecting the financial condition of the Debtors' businesses.  The words "believe," "may," "estimate," "continue," "anticipate," "intend," "expect" and similar expressions identify these forward-looking statements.  These forward-looking statements are subject to a number of risks, uncertainties and assumptions, including those described below under the caption "Risk Factors" in Article VII hereof.  In light of these risks and uncertainties, the forward-looking events and circumstances discussed in this Disclosure Statement may not occur, and actual results could differ materially from those anticipated in the forward looking statements.  The Debtors do not undertake any obligation to update or revise publicly any forward looking statements, whether as a result of new information, future events or otherwise.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), any state securities commission or any securities exchange or association nor has the SEC, any state securities commission or any securities exchange or association passed upon the accuracy or adequacy of the statements contained herein.

All capitalized terms used in this Disclosure Statement and not otherwise defined herein will have the meanings given to them in the Plan.

# Table of Contents

Page

I.     PRELIMINARY STATEMENT AND EVENTS LEADING UP TO CHAPTER 11 FILINGS ................................................................................................... 1

     A.    History of the Debtors' Business .......................................................... 1
     B.    Common Interest Associations ............................................................ 1
     C.    Events Leading to the Commencement of the Chapter 11 Cases .......... 2

II.    OVERVIEW OF THE PLAN ............................................................................. 3

     A.    Introduction ........................................................................................ 3
     B.    Plan Requirements for a Qualifying Transaction .................................. 3
     C.    Summary of Classes and Treatment of Claims and Interests ................ 4
     D.    Voting on and Confirmation of the Plan .............................................. 7
          i.     Voting Procedures and Requirements ...................................... 7
          ii.    Confirmation Hearing .............................................................. 8
          iii.   Confirmation Requirements ..................................................... 8
          iv.    Best Interests Test; Liquidation Analysis ................................. 9
          v.     Conditions Precedent to the Effectiveness of the Plan ............ 10
     E.    Effect of Nonoccurrence of Conditions to the Effective Date and Amendments to or Revocation of the Plan .......................................... 10
     F.    Alternatives to Confirmation and Consummation of the Plan .............. 11
     G.    Nonconsensual Confirmation ............................................................. 11

III.   CAPITAL STRUCTURE AS OF THE PETITION DATE ................................. 11

     A.    General ............................................................................................. 11
     B.    Secured Debt ..................................................................................... 11
     C.    Unsecured Debt ................................................................................. 12
          i.     Trade Debt ............................................................................. 12
          ii.    Subordinated Debt .................................................................. 12
     D.    Equity Interests ................................................................................. 13
          i.     Other Affiliates of the Debtors ............................................... 13

IV.   EVENTS DURING THE CHAPTER 11 CASES ............................................. 13

     A.    First Day Relief ................................................................................. 13
          i.     Key First Day Motions: ......................................................... 14
     B.    The Postpetition Credit Agreement .................................................... 14
     C.    Retention of Debtors' Professionals ................................................... 15
     D.    Appointment of the Creditors' Committee ........................................... 15
     E.    Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs ............................................................................................... 17
     F.    Bar Date Order .................................................................................. 17
     G.    Litigations ........................................................................................ 19
          i.     Beck v. Oberman, et al ........................................................... 19

**Table of Contents**
(continued)

|  |  | ii. | 7677 East Berry Avenue Associates, L.P. v. Blue Architects, P.C | 19 |
|  |  | H. | Extension of the Debtors' Exclusive Periods | 19 |
| V. |  |  | MEANS FOR IMPLEMENTATION OF THE PLAN | 20 |
|  | A. |  | Funding of GUC Amount and Approval of Plan Administration Budget | 20 |
|  | B. |  | Reorganization Transaction | 20 |
|  |  | i. | Plan Distributions | 20 |
|  |  | ii. | Intercompany Claims | 21 |
|  |  | iii. | Title to Accounts | 21 |
|  |  | iv. | Cancellation of Existing Equity Interests | 21 |
|  |  | v. | Plan Administrator | 21 |
|  |  | vi. | Powers of Officers | 24 |
|  |  | vii. | Retention of Counsel | 24 |
|  |  | viii. | GUC Litigation Trust | 24 |
|  |  | ix. | Vesting of Transferred Assets in NewCo | 26 |
|  | C. |  | Miscellaneous Plan Provisions | 27 |
|  |  | i. | Plan Supplement | 27 |
|  |  | ii. | Amendment or Modification of the Plan | 28 |
|  |  | iii. | Revocation or Withdrawal of the Plan | 28 |
| VI. |  |  | REORGANIZATION TRANSACTION | 29 |
|  | A. |  | Exit Facility | 29 |
|  |  | i. | Parties | 29 |
|  |  | ii. | Exit Facility Term A Loans | 29 |
|  |  | iii. | Exit Facility Term B Loans | 29 |
|  |  | iv. | Security | 29 |
|  |  | v. | Loan and Security Priority | 29 |
|  |  | vi. | Terms of Exit Facility Loans | 29 |
|  | B. |  | Formation and Operation of NewCo | 30 |
|  | C. |  | Discharge of Claims | 30 |
|  | D. |  | Corporate Action | 30 |
|  | E. |  | Operation of NewCo | 31 |
|  |  | i. | Operating Agreement of NewCo | 31 |
|  |  | ii. | Indemnification of NewCo Manager | 31 |
|  |  | iii. | Davidson Consulting Agreement | 31 |
|  | F. |  | Approval of Exit Facility | 31 |
|  | G. |  | Securities Law Matters | 31 |
|  | H. |  | Books and Records | 32 |
|  | I. |  | Effective Date and Closing of Reorganization Transaction | 32 |
| VII. |  |  | RISK FACTORS | 32 |
|  | A. |  | Risk of Non-Confirmation of the Plan | 32 |

## Table of Contents
(continued)

Page

B. Nonconsensual Confirmation...........................................................................32
C. Delays of Confirmation and/or Effective Date .............................................33
D. Allowance of Claims .......................................................................................33
E. Risks Related to the Debtors' Business and Operations: Decline in the Financial Markets and Deterioration of the Mortgage Lending and Financing Industries.......................................................................................33
F. Risks Related to the Realization of GUC Net Proceeds ...............................34

VIII. PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN ...................................................................................................................34

A. Voting of Claims ..............................................................................................34
B. Nonconsensual Confirmation..........................................................................34
C. Distributions.....................................................................................................34
D. Distributions of Cash .......................................................................................34
E. Timing of Distributions ...................................................................................34
F. Delivery of Distributions .................................................................................35
G. Minimum Distributions ...................................................................................35
H. Distributions to Holders as of the Record Date .............................................35
I. Unclaimed Distributions .................................................................................35
J. Cancellation and Surrender of Existing Securities and Agreements .................35
K. Setoffs ..............................................................................................................36
L. Votes Solicited in Good Faith..........................................................................36
M. Tax Matters Concerning Distributions............................................................36

IX. PROCEDURES FOR TREATING DISPUTED CLAIMS ..................................36

A. Objections to Claims........................................................................................36
B. No Distributions Pending Allowance .............................................................36
C. Tort Claims ......................................................................................................37
D. Distributions Relating to Allowed Insured Claims.........................................37
E. Resolution of Claims........................................................................................37
F. Estimation ........................................................................................................38
G. No Interest or Penalties ...................................................................................38

X. EXECUTORY CONTRACTS AND UNEXPIRED LEASES....................................38

A. Assumption or Rejection of Executory Contracts and Unexpired Leases...........38
B. Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.............................................................................................39
C. Inclusiveness....................................................................................................39
D. Cure of Defaults...............................................................................................39
E. Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan...............................................39

## Table of Contents
(continued)

Page

XI. EFFECT OF CONFIRMATION ........................................................................ 39

    A. Survival of Corporate Reimbursement Obligations................................ 39
    B. Vesting of Assets ................................................................................ 40
    C. Discharge of Claims ........................................................................... 40
    D. Discharge of Debtors ......................................................................... 41
    E. Release of Claims .............................................................................. 41
        i. Mutual Releases of Debtors and Lenders ............................... 41
        ii. Mutual Releases of Lenders ................................................. 42
        iii. Releases of Released Parties................................................. 42
        iv. Injunction Related to Releases.............................................. 42
    F. Injunction ......................................................................................... 42
    G. Term of Injunctions or Stays............................................................... 43
    H. Exculpation ....................................................................................... 43
    I. Retained Causes of Action .................................................................. 43
    J. Substantive Consolidation ................................................................... 44

XII. CONDITIONS PRECEDENT TO THE EFFECTIVE DATE ............................... 45

    A. Effectiveness...................................................................................... 45
    B. Failure of Conditions ......................................................................... 45
    C. Waiver of Conditions ......................................................................... 45

XIII. RETENTION OF JURISDICTION .................................................................. 46

    A. Exclusive Jurisdiction ........................................................................ 46

XIV. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF PLAN
CONSUMMATION ......................................................................................... 48

XV. ADDITIONAL INFORMATION ..................................................................... 52

XVI. RECOMMENDATION AND CONCLUSION................................................... 52

I.   **PRELIMINARY STATEMENT AND EVENTS LEADING UP TO CHAPTER 11 FILINGS**

A.   **History of the Debtors' Business**

The Debtors consist of 7677 East Berry Avenue Associates, L.P., a Delaware limited partnership ("Borrower"), EDC Denver I, LLC, a Delaware limited liability company and the general partner of the Borrower (the "General Partner"), and Everest Holdings, LLC, an Oklahoma limited liability company and the sole member of the General Partner ("Everest").

On August 28, 2009, Everest and the General Partner each filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code, Case Nos. 09-27906 and 09-27907, respectively.   On August 30, 2009 (the "Petition Date"), the Borrower filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.   The three cases are jointly administered under the Borrower's case number.

The Debtors own and operate a luxury residential, retail, and entertainment development in Greenwood Village, Colorado (the "Property").   The Property includes two residential condominium towers, known as The Landmark and The Meridian, and retail and entertainment space called The Village Shops, which contain approximately 167,937 leasable square feet.   The Debtors broke ground on the Property in 2004 and opened The Landmark in 2006 and The Meridian in 2007.   Construction of The Village Shops commenced in February 2006 and started opening in the summer of 2007.   There are 276 total residences on the Property, which range in size from approximately 800 to 2,500 square feet.

The first condominium tower, known as The Landmark, is a fourteen-story building, with each Unit averaging approximately 1,570 square feet, in addition to 10,850 square feet of ground floor retail space.   The Landmark was completed at the end of 2007.   The average sales price for Units in The Landmark has been approximately $378 per square foot.   Of the 135 Units in The Landmark building, 117 have been sold and an additional 3 are under contract to be sold.

The second condominium building, known as the Meridian, is a sixteen-story tower, with each Unit averaging approximately 2,000 square feet, in addition to 19,000 square feet of retail space located on the first and second floors.   Construction of the Meridian was completed in 2009.   The average sales price for Units in the Meridian is just over $425 per square foot.   Of the 141 Units in the Meridian, 30 have been sold and 1 is under contract to be sold.   The Units in both towers are resort-lifestyle residences with high-end amenities, including room service, valet parking, a fitness center, a business center, and concierge services.

The Borrower generated gross income of $112,505 and $66,015,236 in calendar years 2007 and 2008, respectively, and $36,732,154 from January 1, 2009, through the Petition Date.

B.   **Common Interest Associations**

Borrower is the declarant for three common interest associations organized under Colorado law for the Property: the Landmark Village Center Master Association, Inc. (the "Master Association"), the Landmark Lot 2 Retail Condominium Association, Inc. (the "Retail

Association"), and the Landmark Towers Condominium Association, Inc. (the "HOA," and together with the Master Association and the Retail Association, the "Condominium Associations"). The Master Association is responsible for maintenance of the parking garage and the common areas of the Property, excluding the common areas maintained by the other Condominium Associations. The Retail Association is responsible for maintenance of the common areas for the retail shops located within the boundaries of Lot 2, excluding any common areas maintained by the other Condominium Associations. The HOA is responsible for maintenance of the common areas located within the boundaries of Lot 1 and/or Lot 3, excluding any common areas maintained by the other Condominium Associations. The HOA is also responsible for the provision of certain amenities for the two residential towers, services which are provided by a third-party management company. Borrower employs a third-party management company to act as property manager for the retail shops, which company also provides services to the Retail Association and to the Master Association.

### C.    Events Leading to the Commencement of the Chapter 11 Cases

The primary sources of revenue for Borrower's businesses are sales of Units and retail leasing. Because of the Borrower's reliance on Condominium sales, the profitability and continuing operations of the Property depend in large part on the stability and performance of the residential luxury housing market. Although sales at the Landmark and Meridian continued in spite of the downturn, sales slowed as the recession deepened in 2008. Many prospective buyers were unable to sell their existing homes and obtain financing for their new homes at the Property. Slowing sales of Units materially impacted Borrower's cash flow and increased the necessity for a Chapter 11 reorganization. Borrower furloughed a number of employees to cut costs and also cut salaries prior to the Chapter 11 filing. It also ceased construction a number of months prior to the Petition Date, due to mechanic's lien issues, other than construction on certain Units that were sold.

As of the Petition Date, Borrower had repaid Hypo and the other prepetition lenders approximately $90 million toward their $182 million construction loan, resulting in an outstanding balance of approximately $93.8 million. The maturity date of the construction loan was November 1, 2009. Prior to the Petition Date, Hypo and Borrower did not come to an agreement concerning additional financing, nor was Borrower able to raise additional sufficient working capital from other sources. As noted below, Hypo later agreed to provide additional financing during these Chapter 11 Cases.

On July [___], 2010, the Debtors filed the Plan, the purpose of which is to bring the Chapter 11 Cases to a close by settling the remaining outstanding claims against the Estates through a Reorganization Transaction, as discussed more fully below.

## II.     OVERVIEW OF THE PLAN[2]

### A.     Introduction

The confirmation of a plan of reorganization, which is the vehicle for satisfying the rights of holders of claims against, and equity interests in, a debtor, is the overriding purpose of a chapter 11 case.  A plan may provide anything from a complex restructuring of a debtor's business and its related obligations to a simple liquidation of assets.  In either event, upon confirmation, the plan becomes binding on the debtor and all of its creditors and stakeholders, and the obligations owed by the debtor to those parties are compromised and exchanged for the obligations specified in the plan.

The primary objectives of the Plan are to: (a) maximize the value of the ultimate recoveries for creditors on a fair and equitable basis; and (b) settle, compromise or otherwise dispose of certain claims and interests on terms that the Debtors believe to be fair and reasonable and in the best interests of the Estates and creditors.  The Plan provides for the distribution, after the payment of expenses of the Estates, of cash, and new equity interests to the holders of Allowed Claims as and to the extent provided for in the Plan.  The Plan also provides for, among other things:  (i) the resolution of all claims against each of the Debtors in the manner set forth below and in the Plan; (ii) the assumption or rejection of certain executory contracts and unexpired leases to which one or more of the Debtors is a party, and (iii) certain other transactions necessary to effectuate the terms of the Reorganization Transaction and the Plan.

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the applicable requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation are that the plan: (i) be accepted by the requisite holders of claims and interests in impaired classes of the debtor entitled to vote on the Plan; (ii) is in the "best interests" of each holder of a claim or interest in each impaired class under the plan for the debtor; and (iii) complies with the applicable provisions of the Bankruptcy Code.  In this instance, only holders of Allowed Claims in Class 4 (Prepetition Facility Claims) and Class 6 (General Unsecured Claims) are entitled to vote on the Plan.  Holders of Claims in Class 1 (Other Priority Claims), 2 (Secured Tax Claims), 3 (Other Secured Claims), 5 (HOA Claims), 9 (Warranty Claims), 10 (Prepetition Mechanics' Lien Claims), and 11 (FirsTier Bank Claims) are deemed to have accepted the Plan and are not entitled to vote on the Plan.  Holders of Claims in Class 7 (Subordinated Claims), Class 8 (Equity Interests), and Class 12 (Mezzanine Claims) are deemed to have rejected the Plan and are not entitled to vote on the Plan.  See Section II(D)(iii) of this Disclosure Statement for a discussion of Bankruptcy Code requirements for Plan confirmation.

### B.     Plan Requirements for a Qualifying Transaction

The Plan requires, among other things, that the consummation of the Reorganization Transaction will be conditioned upon the occurrence of each of the following on or prior to the Effective Date: (i) each holder of Prepetition Facility Claims will have been issued its pro rata

---

[2]     The overview of the Plan set forth herein is intended as a summary of the Plan's terms.  The Debtors urge you to review the Plan in its entirety.  To the extent that anything set forth in this Disclosure Statement is inconsistent with the terms of the Plan, the Plan will govern.

share of NewCo Membership Interests, (ii) the transactions set forth in Article VI of the Plan will have been consummated such that NewCo will be the owner of the Transferred Assets, (iii) the Plan Administration Budget will have been established as provided for in the Plan, and (iv) the GUC Amount will have been deposited into the GUC Account.

### C.   Summary of Classes and Treatment of Claims and Interests

The estimated aggregate amount of claims in each class, and the estimated amount and nature of consideration to be distributed to each class, is summarized in the table below.   In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.   Additionally, DIP Claims and Professional Compensation and Reimbursement Claims are unimpaired by the Plan and therefore have not been classified.   All other Claims have been classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan.

The estimated amount of Claims shown in the table below are based upon the Debtors' preliminary review of their books and records and may be revised substantially following further analysis.   There can be no guaranty that the Debtors' estimates will prove to be accurate.

The amount designated in the table below as "Estimated Percentage Recovery" for each Class is the quotient of the estimated cash to be distributed to holders of Allowed Claims in such Class, divided by the estimated aggregate amount of Allowed Claims in such Class.   For a discussion of various factors that could materially affect the amount of cash to be distributed to unsecured creditors under the Plan, see Article VII.

### SUMMARY OF CLASSIFICATION AND TREATMENT UNDER THE PLAN

| CLASS | TREATMENT | STATUS/ RIGHT TO VOTE | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED RECOVERY PERCENTAGE |
|---|---|---|---|---|
| Class 1 (*Other Priority Claims*) | Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, each holder of an Allowed Other Priority Claim will receive Cash in an amount equal to such Allowed Other Priority Claim as soon as is practicable following the later of the Effective Date and the date such Other Priority Claim becomes an Allowed Other Priority Claim. | **Unimpaired** **Not** Entitled to **Vote (deemed to accept)** | $0 - $75,379.81 | 100% |
| Class 2 (*Secured Tax Claims*) | Except to the extent that a holder of an Allowed Secured Tax Claim agrees to a less favorable treatment, each holder of an Allowed Secured Tax Claim will receive Cash in an amount equal to such Allowed Secured Tax Claim, including any non-default interest on such Allowed Secured | **Unimpaired** **Not** Entitled to **Vote (deemed to accept)** | $0 - $12,839.48 | 100% |

- 4 -

| CLASS | TREATMENT | STATUS/ RIGHT TO VOTE | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED RECOVERY PERCENTAGE |
|---|---|---|---|---|
| | Tax Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, on the later of the Effective Date and the date such Allowed Secured Tax Claim becomes an Allowed Secured Tax Claim, or as soon thereafter as is practicable.  Holders of Allowed Secured Tax Claims will not be entitled to assess any premium or penalty on such Claim and any asserted premium or penalty will be deemed disallowed and expunged under the Plan without the need for a further order of the Bankruptcy Court. | | | |
| Class 3 (*Other Secured Claims*) | Except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, as soon as is practicable following the later of the Effective Date and the date such Other Secured Claim becomes an Allowed Other Secured Claim, each holder of an Allowed Other Secured Claim will receive Cash in an amount equal to such Allowed Other Secured Claim, including any non-default interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code. | **Unimpaired** **Not** Entitled to Vote (deemed to accept) | $0 | 100% |
| Class 4 (*Prepetition Facility Claims*) | Except to the extent that a holder of a Prepetition Facility Claim agrees to a less favorable treatment, each holder of a Prepetition Facility Claim will own its pro rata share of NewCo through the issuance of the NewCo Membership Interests as provided for in Section 6.02 of the Plan. Each holder of a Prepetition Facility Claim will be deemed to have released and discharged its Prepetition Facility Claim, effective as of the Effective Date. | **Impaired** **Entitled to Vote** | $90,039,756.96 | N/A |
| Class 5 (*HOA Claims*) | Except to the extent that a holder of an Allowed HOA Claim agrees to a less favorable treatment, each holder of an Allowed HOA Claim will receive as soon as is practicable following the later of the Effective Date and the date such HOA Claim becomes an Allowed HOA Claim, Cash in an amount equal to such Allowed HOA Claim. | **Unimpaired** **Not** Entitled to Vote (deemed to accept) | [To Be Determined] | 100% |
| | | | | |

- 5 -

| CLASS | TREATMENT | STATUS/ RIGHT TO VOTE | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED RECOVERY PERCENTAGE |
|---|---|---|---|---|
| Class 6 (*General Unsecured Claims*) | As of the Effective Date, (i) all of the Debtors' and the Estates' respective rights, title and interests to and in the Retained Causes of Action will be vested in the GUC Litigation Trust, on behalf of the holders of General Unsecured Claims, and (ii) the GUC Amount will be deposited into the GUC Account, to be used to fund the investigation and prosecution of the Retained Causes of Action by the GUC Litigation Trustee. Except to the extent that a holder of an Allowed General Unsecured Claim agrees to a less favorable treatment, each holder of an Allowed General Unsecured Claim will receive its Pro Rata Share of the GUC Net Proceeds, if any, of the Retained Causes of Action.  The GUC Net Proceeds will be distributed as and when provided for in the Plan. | **Impaired** **Entitled to Vote** | $2,304,886.10 – $8,649,704.90 | [0 – 100%] |
| Class 7 (*Subordinated Claims*) | No property will be distributed to or retained by the holders of Subordinated Claims on account of such Claims, and all Subordinated Claims will be deemed extinguished as of the Effective Date. | **Impaired** **Not Entitled to Vote (deemed to reject)** | $0 | 0% |
| Class 8 (*Equity Interests*) | No property will be distributed to or retained by the holders of Equity Interests on account of such Equity Interests.  All Equity Interests will be deemed extinguished effective as of the Effective Date. | **Impaired** **Not Entitled to Vote (deemed to reject)** | $0 | 0% |
| Class 9 (*Warranty Claims*) | Except to the extent that a holder of an Allowed Warranty Claim agrees to a less favorable treatment, as soon as is practicable following the later of the Effective Date and the date such Warranty Claim becomes an Allowed Warranty Claim, each holder of an Allowed Warranty Claim will receive Cash in an amount equal to such Allowed Warranty Claim. | **Unimpaired** **Not Entitled to Vote (deemed to accept)** | [To Be Determined] | 100% |
| Class 10 (*Prepetition Mechanics' Lien Claims*) | On or before the Effective Date, an amount equal to the amount of all asserted Prepetition Mechanics' Lien Claims will be placed into an escrow account (the "Escrow Account") for the benefit of the holders of Prepetition Mechanics' Lien Claims (in an amount to be agreed upon by Agent and the | **Unimpaired** **Not Entitled to Vote (deemed to accept)** | $931,803.36 – $4,180,084.83 | 100% |

- 6 -

| CLASS | TREATMENT | STATUS/ RIGHT TO VOTE | ESTIMATED AGGREGATE AMOUNT OF ALLOWED CLAIMS OR INTERESTS | ESTIMATED RECOVERY PERCENTAGE |
|---|---|---|---|---|
| | holders of Prepetition Mechanics' Lien Claims, but in no event less than $3,222,235.86 if any Prepetition Mechanics' Lien Claims are Disputed at the time), as more fully described in Section 4.10 of the Plan. Thereafter, Allowed Prepetition Mechanics' Lien Claims will be paid in full, in Cash, as and when provided for in the Plan. | | | |
| Class 11 (FirsTier Bank Claims) | The Transferred Assets shall include the TIF Agreements, which will remain subject to the Lien of the holders of FirsTier Claims. On and after the Effective Date, NewCo, or an Affiliate of NewCo (which Affiliate may be a newly formed entity) will assume all of Borrower's rights and obligations under the FirsTier Financing and the TIF Agreements. NewCo or its designated Affiliate will make all payments, and fulfill all other obligations of the Debtors, to the extent such payments or obligations are on account of prepetition obligations fully secured by valid, fully perfected prepetition Liens, as and when would have been required under the FirsTier Financing had the Chapter 11 Cases not been commenced, *provided, however,* for the avoidance of doubt, that neither NewCo nor its designated Affiliate (if any) will be required to provide any additional guaranty, indemnification or other credit enhancement or otherwise agree to any material modification of the FirsTier Financing. Neither NewCo no its designated Affiliate will have any obligations to any holder of FirsTier Claims on account of any deficiency claims. On and after the Effective Date, all FirsTier Claims will be deemed released and extinguished with respect to the Debtors and the holders of FirsTier Claims will have no further recourse against the Debtors or the Estates or their property on account of the FirsTier Financing. | **Unimpaired** **Not** **Entitled to Vote (deemed to accept)** | $7,477,058.53 | 100% |
| Class 12 (Mezzanine Claims) | No distribution will be made to holders of Mezzanine Claims under the Plan. All Mezzanine Claims will be discharged and fully released as of the Effective Date. | **Impaired** **Not** **Entitled to Vote (deemed to reject)** | $0 | 0% |

- 7 -

**D.     Voting on and Confirmation of the Plan**

  **i.     Voting Procedures and Requirements**

   Pursuant to the Bankruptcy Code, only classes of claims against, or equity interests in, a debtor that are "impaired" under the terms of a plan of liquidation or reorganization, and who receive distributions under such plan, are entitled to vote to accept or reject the plan.  Generally, a class is "impaired" under a plan unless such plan leaves unaltered the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest. Classes of claims and interests that are not impaired are not entitled to vote on the plan and are conclusively presumed to have accepted the plan.

   As set forth in the above chart, holders of Claims in Classes 4 and 6 are entitled to vote on the Plan, Class 1, 2, 3, 5, 9, 10, and 11 are not entitled to vote on the Plan and are deemed to have accepted the Plan, and Class 7, 8, and 12 are not entitled to vote on the Plan and are deemed to have rejected the Plan.  If at least one of the Classes entitled to vote on the Plan votes to accept the Plan, (a) the Debtors may seek to satisfy the requirements for Confirmation of the Plan under the "cramdown" provisions of section 1129(b) of the Bankruptcy Code and, (b) if required, may amend the Plan to conform to the standards of such section.

   Please carefully follow all of the instructions contained on the Ballot or Ballots provided to you with this Disclosure Statement if you are entitled to vote on the Plan.  All Ballots must be completed and returned in accordance with the instructions provided.

   To be counted, your Ballot or Ballots must be **received by [_____], 2010** (the "Voting Deadline") at the address set forth on the preaddressed envelope provided to you.  **It is of the utmost importance to the Debtors that you vote promptly to accept the Plan**.

   If you are entitled to vote and did not receive a Ballot, received a damaged Ballot or lost your Ballot, please call [_____].

   **Votes cannot be transmitted orally, by facsimile, or by email**.  Accordingly, you are urged to return your signed and completed Ballot, by hand delivery, overnight service or regular U.S. mail, promptly, so that it is **received by** the Debtors on or before the Voting Deadline.

  **ii.     Confirmation Hearing**

   The Bankruptcy Code requires the Bankruptcy Court, after proper notice to parties in interest, to hold a hearing on whether the Debtors have fulfilled the confirmation requirements of section 1129 of the Bankruptcy Code.  The Confirmation Hearing with respect to the Plan has been scheduled for [_____], 2010 at [____].m. (prevailing Mountain time) before the Honorable Michael E. Romero, United States Bankruptcy Judge of the United States Bankruptcy Court for the District of Colorado at 721 19th Street, Denver, Colorado.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and must specify in detail the name and address of the objecting party, all grounds for the objection and the amount of the Claim held by

the objecting party. Any such objections must be filed and served upon the persons designated in the notice of the Confirmation Hearing and in the manner and by the deadline described therein.

### iii.     Confirmation Requirements

To confirm the Plan, the Bankruptcy Code requires that the Bankruptcy Court make a series of findings concerning the Plan and the Debtors, including, without limitation, that:

- the Plan has classified Claims and Equity Interests in a permissible manner;

- the Plan complies with the applicable provisions of the Bankruptcy Code;

- the Debtors have complied with the applicable provisions of the Bankruptcy Code;

- the Debtors, as proponents of the Plan, have proposed the Plan in good faith and not by any means forbidden by law;

- the disclosure regarding the Plan required by section 1125 of the Bankruptcy Code has been made;

- the Plan has been accepted by all impaired classes of claims and interests by the requisite number of votes; or, alternatively, at least one class of impaired claims or interests has voted to accept the plan (without counting the votes of insiders), and the plan otherwise meets the "cramdown" requirements with respect to any rejecting classes of claims or interests;

- the Plan is feasible;

- all fees and expenses payable under 28 U.S.C. § 1930, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of such fees on or after the Effective Date; and

- the disclosures required under section 1129(a)(5) of the Bankruptcy Code concerning the identity and affiliations of persons who will serve as officers, directors and voting trustees of the Debtors or the successors to the Debtors have been made.

### iv.     Best Interests Test; Liquidation Analysis

In order to confirm the Plan, the Bankruptcy Court also must determine that the Plan is in the "best interest" of each holder of a Claim or Equity Interest in any such impaired Class who has not voted to accept the Plan. Accordingly, if an impaired Class does not accept the Plan as required under the Bankruptcy Code, the "best interests" test requires that the Bankruptcy Court find that the Plan provides to each member of such impaired Class a recovery on account of the member's Claim or Equity Interest that has a value, as of the Effective Date, at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

10732\29\1421175.4

To estimate what members of each impaired Class of Claims or Equity Interests would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the aggregate dollar amount that would be available if the Chapter 11 Cases were converted to a chapter 7 case under the Bankruptcy Code and the Debtors' assets were liquidated by a chapter 7 trustee (the "Liquidation Value"). The Liquidation Value of the Debtors would consist of the net proceeds received from the disposition of the Debtors' assets plus any cash held by the Debtors.

The Liquidation Value available to holders of Claims or Equity Interests that are not Secured Claims would be reduced by, among other things: (i) the Claims of all secured creditors to the extent of the value of their collateral; (ii) the costs, fees and expenses of the liquidation, as well as other administrative expenses of the Debtors' chapter 7 case; (iii) unpaid Administrative Expense Claims of the Chapter 11 Cases; and (iv) Other Priority Claims. The Debtors' costs of liquidation in chapter 7 cases would include the compensation of trustees, as well as of counsel and of other professionals retained by such trustees, asset disposition expenses, applicable taxes, litigation costs, claims arising from the administration of the Debtors during the pendency of the chapter 7 cases and all unpaid administrative claims incurred by the Debtors during the Chapter 11 Cases that are allowed in the chapter 7 cases.

The information contained in **Exhibit III** hereto provides a summary of the Liquidation Values of the Debtors' interests in property, assuming a chapter 7 liquidation in which one or more trustees appointed by the Bankruptcy Court would liquidate the Debtors' properties and interests. In summary, the Debtors believe that chapter 7 liquidations would result in diminution in the value to be realized by holders of Claims, as compared to the proposed distributions under the Plan. Consequently, the Debtors believe that the Plan will provide a greater ultimate return to holders of Claims than would a chapter 7 liquidation of the Debtors.

### v.        Conditions Precedent to the Effectiveness of the Plan

In addition to the requirements for confirmation set forth in the Bankruptcy Code, the Plan itself sets forth certain conditions that must be met before the Effective Date can occur and the Plan can be consummated. These conditions include:

1.        The Confirmation Order, in form and substance acceptable to Agent, will have been entered and become a Final Order;

2.        The Reorganization Transaction satisfying the requirements of Section 5.02 of the Plan will have been consummated and the conditions specified in Section 5.02(b) of the Plan will have been satisfied;

3.        All actions, documents, and agreements necessary or desirable to implement the Plan will have been effected or executed, in form and substance acceptable to Agent in its sole discretion;

4.        The Debtors will have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, audited financial statements, and documents that are necessary to implement the Plan and consummate the Reorganization Transaction, and that are required by law, regulation, or order; and

- 10 -

5.      Any other actions Agent determines are necessary or desirable, in its sole discretion in consultation with the Debtors to implement the terms of the Plan will have been taken.

**E.      Effect of Nonoccurrence of Conditions to the Effective Date and Amendments to or Revocation of the Plan**

In the event that one or more of the conditions specified in Section 11.01 of the Plan have not occurred or otherwise been waived pursuant to Section 11.03 of the Plan on or before the thirty first day after the date the Confirmation Order is entered by the Bankruptcy Court, as such date may be extended from time to time by the Agent, in its sole and absolute discretion, (i) the Confirmation Order will be vacated, (ii) the Debtors and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) the Debtors' obligations with respect to Claims and Equity Interests will remain unchanged (subject to a reduction of such Claims for any amounts distributed by the Plan Administrator and/or the Debtors prior to such date) and nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

**F.      Alternatives to Confirmation and Consummation of the Plan**

If no plan of reorganization under chapter 11 of the Bankruptcy Code can be confirmed, the Chapter 11 Cases may be converted to chapter 7 cases.  As previously discussed, in a liquidation case under chapter 7 of the Bankruptcy Code, a trustee or trustees would be appointed to liquidate the remaining assets of each Debtor and distribute proceeds to creditors.  The proceeds of the liquidation would be distributed to the respective creditors of the Debtors in accordance with the priorities established by chapter 7 of the Bankruptcy Code.  The Debtors believe that confirmation and consummation of the Plan is in the best interests of the Estates and would provide a greater ultimate return to creditors than a conversion of these Chapter 11 Cases to chapter 7.

**G.      Nonconsensual Confirmation**

Pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Debtors' request if at least one impaired Class has accepted the Plan and, as to each impaired Class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired Class.

The Debtors reserve the right to proceed with confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code and, in connection therewith modify the terms of the Plan as necessary for confirmation without the acceptance of all impaired Classes.  Such modification could result in less favorable treatment for any non-accepting Classes than the treatment currently provided for in the Plan.

### III.   CAPITAL STRUCTURE AS OF THE PETITION DATE

#### A.   General

As of the Petition Date, the Debtors' primary liabilities consisted of: (1) a senior secured credit facility; (2) unsecured debt; and (3) mechanics' lien claims. These liabilities are described in more detail below.

#### B.   Secured Debt

As of the Petition Date, the aggregate principal amount of the Debtors' secured indebtedness was approximately $90,662,942 plus accrued and unpaid interest, fees and other costs. The Borrower is party to a certain Loan and Security Agreement, dated as of April 30, 2007 (as amended, restated, supplemented or otherwise modified, the "Prepetition Credit Agreement"), by and among the Borrower, Hypo Real Estate Capital Corporation, as administrative agent ("Hypo") and the syndicate lenders party thereto (collectively, the "Prepetition Lenders").

The Prepetition Credit Agreement provided for a construction loan in the original principal amount of $182,241,000. The primary purpose of the Prepetition Credit Agreement was to provide debt financing for, *inter alia*, the development, construction, installation, engineering, design, operation, and maintenance of the residential and retail components of the Property and costs and expenses related thereto, including taxes and insurance premiums. The obligations owed under the Prepetition Credit Agreement are secured by substantially all of the assets of the Borrower.

#### C.   Unsecured Debt

##### i.   Trade Debt

The Debtors' unsecured trade debt consists mostly of outstanding prepetition obligations due to the Debtors' various [suppliers and service providers]. As of the Petition Date, the Debtors estimate that they owed approximately $[_____] on account of unsecured obligations for goods and services.

##### ii.   Subordinated Debt

A mezzanine loan in the amount of $18,100,000 was provided in July 2007 by NexBank, SSA ("NexBank") to the General Partner and 7677 Limited Interest Holder, LLC. This loan is secured by a pledge of all of the general and limited partnership interests in the Borrower. Proceeds of the mezzanine loan were used to finance the costs of construction for the project after they were transferred to the Borrower. The General Partner and 7677 Limited Interest Holder, LLC did not make any payments on this loan. As of the Petition Date, approximately $19,246,803.24 was outstanding under this loan.

In March 2008, a loan in the amount of $8,000,000.00 was provided by NexBank to the Borrower. This loan was secured by a second priority pledge by Everest of all its membership

- 12 -

interests in the General Partner.   As of the Petition Date, approximately $12,370,856.74 was outstanding under this loan.

Also in March 2008, FirsTier Bank made a $7,000,000.00 loan to Borrower for additional financing.  Borrower pledged its interest in the sales tax revenues realized under that certain Sales Tax Rebate Agreement dated November 22, 2005, between the City of Greenwood Village and Borrower as collateral.   Under that agreement, Borrower is to receive, after certain conditions are met as to public and other improvements at the Property, 50% of every sales tax dollar generated by the Property until approximately $14,000,000 is received over a 20-year period.  Prior to the Petition Date, Borrower retained the quarterly tax rebates and services the loan from operating cash on a monthly basis.

Zachary Davidson personally guaranteed each of the foregoing loans, including the construction loan from Hypo, and Everest also guaranteed the $8,000,000 subordinated loan and mezzanine loan from NexBank.

**D.     Equity Interests**

Borrower is a privately held Delaware limited partnership and sole owner of the Property. Borrower was formed as an Oklahoma limited partnership on December 30, 2004.  On March 30, 2007, an entity with the same name was formed as a Delaware limited partnership, and the Oklahoma entity was merged into the Delaware entity.  From time to time, Borrower has done and continues to do business under the name of "Everest Development Company," a name which is registered with the Colorado Secretary of State.

The General Partner, a privately held Delaware limited liability company formed on February 2, 2007, is the general partner of the Borrower.  The General Partner does not own any assets other than its general partnership interest in Borrower.

Borrower's limited partner interests are held by 7677 Limited Interest Holder, LLC, a Delaware limited liability company (the "Limited Partner").

Everest, a privately held Oklahoma limited liability company formed on May 12, 2005, is the sole member of the General Partner.  The manager and sole equity holder of Everest is Zachary Davidson.  Everest does not own any assets other than its 100% membership interest in the General Partner.

**i.       Other Affiliates of the Debtors**

Everest Marin, L.P. is a separate phase of the Landmark community, a development known as The European Village of Homes, and is an asset of Everest Marin, L.P., a Colorado limited partnership.  The general partner of Everest Marin, L.P. is EDC Marin, LLC, a Colorado limited liability company.  The sole equity holder of EDC Marin I, LLC is Zachary Davidson. The Property and The European Village of Homes are related developments and have entered into various agreements with respect to operation and development of the properties.

From time to time, Borrower did business with various entities owned by Mr. Davidson, including Everest Construction Company, LLC; Everest Design Group, LLC; and Everest Management Company, LLC.

## IV.   EVENTS DURING THE CHAPTER 11 CASES

### A.   First Day Relief

On the Petition Date, the Debtors filed certain motions and other pleadings (the "First Day Motions"), the most significant of which are described below. The First Day Motions were proposed to ensure an orderly transition into chapter 11.

#### i.   Key First Day Motions:

- a motion to obtain postpetition debtor in possession financing (the "DIP Motion");

- a motion to obtain approval of the use of cash collateral; and

- a motion to approve a postpetition financing break-up fee.

The First Day Motions, other than the DIP Motion, were granted with certain adjustments or modifications to accommodate the concerns of the Bankruptcy Court, the United States Trustee, Hypo and other parties in interest. As discussed below, the DIP Motion was withdrawn, and the postpetition financing initially proposed by the Debtors was supplanted by the DIP Credit Agreement by and among the Borrower, Hypo, as agent and lender, and the other lenders party thereto.

### B.   The Postpetition Credit Agreement

Prior to the Petition Date, the Debtors lacked sufficient unencumbered funds with which to preserve, operate and maintain their businesses and assets during the pendency of these Chapter 11 Cases. The Debtors' ability to pay critical preservation, administrative, and operating expenses was and is essential to the Debtors' ability to survive and maintain their asset values. Accordingly, to provide the Debtors with the funding necessary to fulfill their administrative and operational obligations for the duration of the Chapter 11 Cases, the Debtors required a postpetition lending facility and the use of the cash collateral of their prepetition lenders.

Prior to the Petition Date, the Debtors and their advisors were is discussions with Carmel Landmark LLC ("Carmel") regarding a superpriority $15,000,000 postpetition loan to fund the Debtors' maintenance and operation of the Property during the Chapter 11 Cases. The proposed loan from Carmel would have primed the prepetition loan from the Prepetition Lenders. Hypo and the other Prepetition Lenders would not consent to being primed by a superpriority loan from a third-party. In light of these circumstances, Hypo stepped forward to extend postpetition financing to prevent the loan from Carmel from priming the Prepetition Facility Claims of the Prepetition Lenders. Ultimately, the Debtors concluded that the debtor-in-possession credit agreement (dated as of November 20, 2009 and as amended, restated, supplemented or otherwise modified, the "DIP Credit Agreement") proposed by Hypo,

- 14 -

as administrative agent for the DIP Lenders, and the DIP Lenders was desirable because, among other things, the DIP Credit Agreement permitted the Debtors to secure the postpetition financing needed for their reorganization without having to prime the security interests securing the Prepetition Credit Agreement obligations through an extended, contested hearing.

The Debtors also concluded that Hypo's proposal offered the most attractive combination of quality, pricing, fees, and covenant flexibility. Importantly, the DIP Credit Agreement provides that the Debtors could draw funds immediately to meet their administrative and operational obligations during these Chapter 11 Cases. Finally, Hypo has a substantial base of knowledge with respect to the Debtors' business and assets that provide significant benefits, including, but not limited to, the speed with which they were able to close the proposed postpetition financing. Consequently, the Debtors determined that the postpetition financing proposed by the DIP Lenders was the best financing option available under the circumstances. Moreover, the Debtors and the DIP Lenders engaged in vigorous and extensive, arms-length negotiations with respect to the terms and conditions of the DIP Credit Agreement. Indeed, the Debtors estimate that over 50 hours were spent in face-to-face meetings and conference calls and hundreds of e-mails and other forms of communications were directed between the parties.

The DIP Credit Agreement was approved by the Bankruptcy Court on a final basis by Order entered October 29, 2009 (the "Final DIP Financing Order").

The Postpetition Credit Agreement authorizes the Debtors to use the proceeds of the debtor-in-possession financing to pay the transaction costs related to the closing of the DIP Credit Agreement, and thereafter to fund their working capital and general corporate needs in the ordinary course of business and to pay such other amounts as required or permitted to be paid pursuant to the terms of the DIP Credit Agreement, the Final DIP Financing Order and any other orders of the Bankruptcy Court, in each case subject to and in accordance with the Approved Project Cost Budget annexed to the DIP Credit Agreement as Exhibit IV.

On May 20, 2010, the Borrower failed to make certain mandatory prepayments that were required under the terms of the DIP Credit Agreement. This triggered an Event of Default (as defined in the DIP Credit Agreement). Rather than foreclosing upon the Borrower's assets, as permitted under the DIP Credit Agreement, Hypo agreed to forbear and modify the terms of the Borrower's debt and other obligations. To that end, on June 8, 2010, the Borrower entered into that certain Forbearance and Modification Agreement, by and among Borrower, Agent and the DIP Lenders approved by the Bankruptcy Court on June 15, 2010 (the "Forbearance Agreement"). Among other things, the Forbearance Agreement provided that (i) Hypo and the DIP Lenders would forbear from exercising their rights and remedies under the DIP Credit Agreement on the terms and conditions set forth in the Forbearance and Modification Agreement, (ii) the Debtors would file a plan of reorganization in form and substance acceptable to Agent, and (iii) the Debtors would achieve certain additional milestones related to such Plan, as and when specified in the Forbearance Agreement.

## C.    Retention of Debtors' Professionals

On November 19, 2009, the Bankruptcy Court entered an order granting the Debtors' motions to retain Brownstein Hyatt Farber Schreck, LLP, as the Debtors' counsel. On October

28, 2009, the Bankruptcy Court entered an order granting the Debtors' motion to retain CPH Holdings, LLC, as the Debtors' financial advisor ("CPH").

**D.    Appointment of the Creditors' Committee**

On September 17, 2009, the U.S. Trustee appointed the Creditors' Committee in these Chapter 11 Cases.  The current membership of the Creditors' Committee is as follows:

**Creditors' Committee Members:**

**Counsel:**

Josh Cruze
Global Development & Engineering Group
2258 Larimer Street, Suite B
Denver, CO 80205
Phone: (720) 542-8526
Fax: (720) 542-8527

Lee M. Kutner
Kutner Miller Brinen, P.C.
303 E. 17th Ave., Suite 500
Denver, CO 80203
Phone: (303) 832-2711
Fax: (303) 832-1510

Michael Gold
Newberry Brothers Greenhouse
201 Garfield St.
Denver, CO 80206
Phone: (303) 588-5946
Fax: (303) 399-6063

Jay Finesilver (Chair)
Wende City South Development LLC
5345 Landmark Place
Greenwood Village, CO 80111
Phone: (303) 596-5592
Fax: (720) 274-6801

**E.    Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs**

On September 14, 2009, each of the Debtors filed schedules of assets and liabilities and statements of financial affairs.  Among other things, the Schedules identify the Debtors' known creditors, classify their claims as secured, unsecured priority or general unsecured, list the amount of such claims as they appeared on the Debtors' books and records as of the Petition Date and indicate whether the Debtors dispute such claims or whether they have determined such claims are contingent or unliquidated.

**F.    Bar Date Order**

On November 24, 2009, the Bankruptcy Court entered an order (the "Bar Date Order") that authorized the Debtors to establish **January 11, 2010** as the general claims bar date by

which all entities holding prepetition claims had to file proofs of claim in these Chapter 11 Cases.[3]

On March 31, 2010, the Bankruptcy Court entered an order (the "Extension Order") extending the time for filing of proofs of claim by: First American Title Company; The Landmark Towers Condominium Association; and the Policy Holders (as defined in the Extension Order) until **June 30, 2010**. On July 1, 2010, the Bankruptcy Court entered an order (the "Second Extension Order") further extending the time for filing proofs of claim by: First American Title Company; The Landmark Towers Condominium Association; and the Policy Holders until **September 30, 2010** (collectively, the "Bar Date").

As of July 8, 2010, 118 proofs of claim have been filed in these Chapter 11 Cases. The Debtors are assessing all of the proofs of claim filed as of the Bar Date and expect to object to Claims in the coming weeks.

Pursuant to the Plan, as of the close of business on the Record Date, the Claims register will be closed, and there will be no further changes in the record holder of any Claim. Neither the Plan Administrator nor the Disbursing Agent will have any obligation to recognize any transfer of any Claim occurring after the Record Date (including Administrative Expense Claims accruing on or after the applicable Bar Date). The Plan Administrator and the Disbursing Agent will instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Record Date.

**REQUESTS FOR PAYMENT OF ADMINISTRATIVE EXPENSE CLAIMS MUST BE FILED ON OR BEFORE THE 30TH DAY AFTER NOTICE OF THE OCCURRENCE OF THE EFFECTIVE DATE IS FILED WITH THE BANKRUPTCY COURT AND THE PLAN ADMINISTRATOR WILL HAVE NO OBLIGATION TO RECOGNIZE OR MAKE ANY PAYMENT UPON ANY SUCH CLAIM FILED AFTER SUCH DATE.**

    **G.**    **Litigations**

        **i.**    **Beck v. Oberman, *et al*.**

On September 30, 2009, Beck Development, LLC, d/b/a Beck Residential, LLC ("Beck") commenced a civil action (the "Beck Lawsuit") in the District Court for the 18th Judicial District, Arapahoe County, Colorado. The Beck Lawsuit is an action to foreclose mechanics' liens on already-sold condominiums in the Property. Beck allegedly performed general contractor services and provided materials in connection with the construction of the Property.

On July 31, 2009, Beck recorded a Statement of Lien in the amount of $2,030,819.20 in the records of the Arapahoe County Clerk and Recorder with respect to the entire Property,

---

[3] The requirement to file a proof of claim prior to the Bar Date applies to all prepetition claims which are not scheduled, are scheduled as disputed, contingent or unliquidated in the schedules of liabilities filed with the Bankruptcy Court by the Debtors, or are scheduled and such creditor disagrees with the amount of the scheduled claim.

including both sold condominium units and property still belonging to the Borrower.  On November 30, 2009, Beck submitted a proof of claim in Borrower's Chapter 11 case (Claim No. 23-1) for the total amount of $4,023,747.52.  According to the proof of claim, Beck holds a secured claim against Borrower for $2,335,857.52 and an unsecured claim for $1,687,890.00.

On January 26, 2010, Borrower filed an objection to Beck's proof of claim, which objection is currently pending.  Beck seeks to foreclose its liens on already-sold units and sell them with the proceeds applied to pay amounts purportedly due to Beck by Borrower, although if Beck is successful, rather than seek sale of such property, Beck would likely be paid via title insurance policies held by the unit owners, issued by First American Title Insurance, which would then be subrogated to Beck's claim.  Beck did not name Borrower as a party because it would violate the automatic stay of Section 362(a) of the Bankruptcy Code.

On December 7, 2009, Borrower filed a notice of removal to remove the Beck Lawsuit to the Bankruptcy Court since the basis for the action was a debt owed by Borrower.  Beck later filed motions to remand the Beck Lawsuit back to state court and to name Borrower as a party since it was the primary obligor for the claimed debt.  The Bankruptcy Court agreed and remanded the matter back to state court and allowed Beck to name Borrower as a party.  The Beck Lawsuit remains pending; however, Beck has yet to name Borrower as a party or to serve it with a complaint.

## ii.       7677 East Berry Avenue Associates, L.P. v. Blue Architects, P.C.

On June 30, 2010, Borrower filed an adversary proceeding against Blue Architects, P.C. ("Blue"), the former architect for portions of the Property.  The lawsuit seeks turnover of certain plans for entitlement work for the Property that are necessary for completion of those entitlements and related aspects of the Property.  The case is pending, and Blue's answer to the complaint is due August 2, 2010.

## H.     Extension of the Debtors' Exclusive Periods

During the first 120 days of these Chapter 11 Cases, the Debtors had the exclusive right to file a plan of reorganization, and to solicit votes for approval of a plan during the first 180 days pursuant to Section 1121(d) of the Bankruptcy Code.  The Bankruptcy Code permits the Debtors to extend these "exclusivity" periods up to 18 months for "cause."  The Debtors filed a first motion to extend exclusivity on December 24, 2009, seeking to extend those periods by 90 days.  The Creditors' Committee objected to this extension.  The parties engaged in discussions with respect to the objection, which objection was not resolved.  The Debtors filed a subsequent motion to extend the exclusivity periods by an additional 60 days on March 26, 2010.  The Creditors' Committee also objected to this motion, and the parties did not resolve that objection. The matters have not been set for hearing; *however*, no other party has filed a plan of reorganization, and the Debtors do not anticipate that any other party will do so.

## V.   MEANS FOR IMPLEMENTATION OF THE PLAN

### A.   Funding of GUC Amount and Approval of Plan Administration Budget.

The GUC Amount will be fully funded and the Plan Administration Budget approved, on or before the Effective Date; provided, however, that the Plan Administration Budget may be modified by the Plan Administrator from time to time to the extent the Plan Administrator reasonably determines such modifications are necessary to enable the Plan Administrator to carry out its duties under the Plan, subject to the consent of the Agent in its sole and absolute discretion.   The costs, fees and expenses reflected in the Plan Administration Budget will be paid, in such amounts and at such time as set forth in the Plan Administration Budget, from the Plan Administration Account.   The Plan Administration Account will be funded by NewCo from time to time, but in any case prior to the time any such budgeted amount is due in accordance with the Plan Administration Budget.

### B.   Reorganization Transaction.

The Reorganization Transaction will be implemented as set forth in Article VI of the Plan. The consummation of the Reorganization Transaction will be conditioned upon the occurrence of each of the following on or prior to the Effective Date, (i) each holder of Prepetition Facility Claims will have been issued its pro rata share of NewCo Membership Interests, (ii) the transactions set forth in Article VI of the Plan will have been consummated such that NewCo will be the owner of the Transferred Assets, (iii) the Plan Administration Budget will have been established as provided for in the Plan, and (iv) the GUC Amount will have been deposited into the GUC Account. The Reorganization Transaction will be, according to its terms, subject to and conditioned upon the approval of the Bankruptcy Court.

#### i.   Plan Distributions.

The Plan Administrator will pay all Allowed Administrative Claims, Other Priority Claims, Secured Tax Claims, Priority Tax Claims, Prepetition Mechanics' Lien Claims, HOA Claims, Warranty Claims, Other Secured Claims and Cure Claims to the extent not paid on or before the Effective Date, as and when provided for in the Plan, and all distributions on account of such Claims will be made by the Disbursing Agent.  NewCo will guarantee the making of all such payments to the extent of any shortfall in the amounts to be funded to the Plan Administrator pursuant to the Plan Administration Budget

#### ii.   Intercompany Claims.

As of the Effective Date, any Claims of any Debtor against any other Debtor will be discharged and released.

#### iii.   Title to Accounts.

Title to all of the Debtors' bank accounts and the Plan Administration Account will vest in the Plan Administrator, effective as of the Effective Date, and title to the GUC Account will vest in the GUC Litigation Trustee, in each case without any further order of the Bankruptcy Court or further action on the part of any Person.  On and after the Effective Date, the Plan

Administration Account will be deemed to be an account in the name of the Plan Administrator, and the GUC Account will be deemed to be an account in the name of the GUC Litigation Trustee, without any further action by any Person or any further order of the Bankruptcy Court.

### iv.    Cancellation of Existing Equity Interests.

Effective as of the Effective Date, all Equity Interests will be deemed cancelled and null and void.

### v.    Plan Administrator.

1.    <u>Plan Implementation</u>.    The Plan Administrator will be authorized and obligated to implement the Plan on and after the Effective Date.  The Plan Administrator will be acting for the benefit of the Debtors or the Reorganized Debtors, as applicable, and the duties, rights and obligations of the Plan Administrator may be modified at any time by the Reorganized Debtors, with the consent of Agent in its sole and absolute discretion.  The Plan Administrator will be deemed appointed as of the Effective Date without the need for any further order of the Bankruptcy Court.  In the exercise of its reasonable business judgment, the Plan Administrator will, in an expeditious but orderly manner and subject to the provisions of the Plan, make timely distributions and not unduly prolong the duration of the Chapter 11 Cases.

2.    <u>Role of the Plan Administrator</u>.    The Plan Administrator will have the following duties and powers in furtherance of and consistent with the purpose of the Plan.  The provisions of Section 5.07(b) of the Plan do not apply to actions taken by the Plan Administrator in any capacity other than as Plan Administrator.

a.    Implement and enforce all provisions of the Plan.

b.    Retain, oversee, and direct the Disbursing Agent in making distributions as provided for in the Plan.

c.    Exercise with reasonable business judgment all power and authority to file, prosecute, collect, compromise and resolve, in the name of the Debtors or the Reorganized Debtors, as applicable, all Disputed Claims.

d.    Maintain accounts (including the Plan Administration Account), make distributions, and take other actions consistent with the Plan and the implementation hereof.

e.    Collect and liquidate at the direction of the Debtors or Reorganized Debtors, as applicable, all assets of the Estates pursuant to the Plan and to administer the winding up of the Debtors' affairs including, but not limited to, closing the Chapter 11 Cases.

f.    Incur any reasonable and necessary expenses in connection with the implementation of the Plan subject to and in accordance with the Plan Administration Budget, which expenses will be paid in accordance with Section 13.06 of the Plan.

g.      Make decisions regarding (a) the retention or engagement of professionals, employees, and consultants by the Plan Administrator (b) payment, subject to and in accordance with the Plan Administration Budget, of the fees and charges incurred by the Plan Administrator on or after the Effective Date for fees and other expenses of professionals employees, and consultants retained by the Plan Administrator, disbursements, expenses, or related support services relating to the winding down of the Debtors and implementation of the Plan, in each case without further Bankruptcy Court approval.

h.      File Tax returns.

i.      Seek a determination of Tax liability under section 505 of the Bankruptcy Code or otherwise and to pay, as provided in the Plan Administration Budget, any Taxes incurred by the Debtors at any time.

j.      Collect any accounts receivable or other claims of the Debtors not otherwise disposed of pursuant to the Plan.

k.      Invest Cash in the Plan Administration Account and the GUC Account in accordance with section 345 of the Bankruptcy Code or as otherwise permitted by a Final Order of the Bankruptcy Court and as deemed appropriate by the Plan Administrator.

l.      Enter into any agreement or execute any document required by or consistent with the Plan and perform all of the Debtors' obligations thereunder, as applicable.

m.      With the consent of the Agent in its sole and absolute discretion, abandon in any commercially reasonable manner any assets of the Debtors and the Estates remaining after the Effective Date, which Plan Administrator reasonably concludes are of no benefit to the Estates.

n.      Take such actions and execute and deliver such agreements and other instruments as are necessary and desirable to enable the GUC Litigation Trustee to pursue the Indemnification Insurance Claims and other Retained Causes of Action.

o.      Take such other actions not inconsistent with the provisions of the Plan which the Plan Administrator deems reasonably necessary or desirable, with the consent of the Agent, with respect to administering the Plan.

3.      <u>Indemnification of Plan Administrator</u>.  The Plan Administrator and the Plan Administrator's agents and professionals, will not be liable for actions taken or omitted in its capacity as, or on behalf of, the Plan Administrator, except those acts arising out of its or their own willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts, and each will be entitled to indemnification and reimbursement for fees and expenses in defending any and all of its actions or inactions in its capacity as, or on behalf of, the Plan Administrator, except for any actions or inactions involving willful misconduct, gross negligence, bad faith, self-dealing, breach of fiduciary duty, or *ultra vires* acts.  Any indemnification or reimbursement Claims of the Plan Administrator (and the other parties entitled to indemnification under Subsection 5.07(c) of the Plan) will be satisfied by NewCo; *provided, however*, the Plan Administrator shall return any portion of such funds used to defend

- 21 -

any action in which the Plan Administrator is found to have (i) acted with willful misconduct, gross negligence or bad faith, (ii) engaged in self-dealing, (iii) breached its fiduciary duty, or (iv) committed *ultra vires* acts. The Plan Administrator will be entitled to rely, in good faith, on the advice of its retained professionals. The provisions of Subsection 5.07(c) of the Plan do not apply to actions taken by the Plan Administrator in any capacity other than as Plan Administrator or as Disbursing Agent.

    4. <u>Plan Administration Budget</u>. The Plan Administrator shall perform its duties within the parameters of the Plan Administration Budget, including without limitation using the Cash in the Plan Administration Account consistent therewith and with the terms and obligations of the Plan and the Plan Administration Budget, in each case in order to carry out its duties under the Plan.

    5. <u>Taxes</u>. The Plan Administrator will have the powers of administration regarding all of the Debtors' and Reorganized Debtors' Tax obligations, including the filing of tax returns.

    a. Where and as applicable, the Plan Administrator will (A) complete and file within ninety (90) days after the Effective Date (or such longer period as authorized by the Bankruptcy Court) the Debtors' final federal, state, and local Tax returns, (B) request an expedited determination of any unpaid Tax liability of the Debtors, the Reorganized Debtors or the Estates under section 505 of the Bankruptcy Code for all taxable periods through the liquidation of the Reorganized Debtors as determined under applicable tax laws, and (C) represent the interest and account of the Reorganized Debtors or the Estates before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit.

    b. The Plan Administrator may request that the Bankruptcy Court determine the amount of any Tax Claim pursuant to section 505 and/or section 502(c) of the Bankruptcy Code regardless of whether any Debtor previously objected to such Claim. The Bankruptcy Court will retain jurisdiction to estimate Claims at any time.

    6. <u>Resignation, Death, or Removal of Plan Administrator</u>. The Plan Administrator may resign at any time upon sixty (60) days' written notice in accordance with the notice provisions of the Plan, but will serve until a successor Plan Administrator is appointed. No successor Plan Administrator hereunder will have any liability or responsibility for the acts or omissions of any predecessor Plan Administrators. The Plan Administrator may be terminated at any time, with or without cause, by Agent in consultation with counsel for the Estates. In the event the Plan Administrator has been terminated, resigns, dies, or is otherwise unwilling or unable to continue carrying out its duties as the Plan Administrator, a successor Plan Administrator will be designated by Agent in consultation with counsel for the Estates. Every successor Plan Administrator appointed pursuant hereto will execute, acknowledge, and deliver to the Bankruptcy Court an instrument in writing accepting such appointment hereunder, and thereupon such successor Plan Administrator, without any further act, will become fully vested with all of the rights, powers, duties, and obligations of his or her predecessor.

    7. <u>Termination of Duties of Plan Administrator</u>. The duties of the Plan Administrator will terminate upon the later to occur of (i) all assets held or controlled by the Plan

Administrator have been distributed in accordance with the terms of this Plan and (ii) upon material completion of all other duties and functions of the Plan Administrator set forth in the Plan, but in no event later than three years after the Effective Date, unless extended by order of the Bankruptcy Court.

### vi.     Powers of Officers.

The officers of the Debtors prior to the Effective Date, and the Plan Administrator thereafter, will have the power to enter into or execute any documents or agreements that they deem reasonable and appropriate to effectuate the terms of the Plan.  As of the Effective Date, each and every manager, officer and employee of each of the Debtors will be deemed to have resigned, effective as of the Effective Date.

### vii.    Retention of Counsel.

On and after the Effective Date, the Plan Administrator may retain Brownstein, Hyatt Farber Schreck, LLP as its legal counsel.

### viii.   GUC Litigation Trust.

1.     GUC Litigation Trust Generally.[4]  The GUC Litigation Trust will be established on or before the Effective Date pursuant to the GUC Litigation Trust Agreement for the purpose of holding GUC Litigation Trust Assets, prosecuting the Retained Causes of Action, liquidating the GUC Litigation Trust Assets, resolving Disputed General Unsecured Claims, and making distributions to holders of Allowed General Unsecured Claims in accordance with the terms of the Plan.  The GUC Litigation Trust will be organized for the primary purpose of holding, liquidating and distributing the assets transferred to it, with no objective to continue or engage in the conduct of a trade or business.  Immediately prior to the Effective Date, the GUC Litigation Trust Assets will be irrevocably transferred to, and vest in, the GUC Litigation Trust. Subject to and to the extent set forth in the Plan, the Confirmation Order, the GUC Litigation Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the GUC Litigation Trust (and the GUC Litigation Trustee) will have the power and authority, to the exclusion of all other parties, to:  (i) accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the GUC Litigation Trust Assets (directly or through a third-party disbursing agent), each in accordance with the Plan and GUC Litigation Trust Agreement; (ii) calculate and make distributions to holders of Allowed General Unsecured Claims pursuant to the procedures for allowing Claims and making distributions prescribed in the Plan; (iii) administer the GUC Account; (iv) comply with the Plan and exercise the GUC Litigation Trust's rights and fulfill its obligations thereunder; (v) review, reconcile, settle or object to Disputed General Unsecured Claims and resolve such objections as set forth in the Plan; (vi) subject to Section 10.08 of the Plan, employ professionals to represent the GUC Litigation Trust with respect to its responsibilities; (vii) file appropriate Tax returns and other reports on behalf of the GUC Litigation Trust and pay Taxes or other obligations owed by

---

[4] [The GUC Litigation Trust structure may be modified to include one or more additional trusts and/or limited liability companies due to tax and other considerations that are subject to the ongoing review of tax counsel. These modifications will not effect the allocation of assets between the holders of General Unsecured Claims and NewCo.]

the GUC Litigation Trust; (viii) exercise such other powers as may be vested in the GUC Litigation Trust; and (ix) dissolve the GUC Litigation Trust in accordance with the terms of the GUC Litigation Trust Agreement.

2.   Funding of the GUC Litigation Trust.   The GUC Litigation Trust will, in accordance with the terms of the GUC Litigation Trust Agreement and the Plan, be funded with the GUC Litigation Trust Assets.

3.   GUC Litigation Trustee.   The GUC Litigation Trustee will be the exclusive trustee of the assets of the GUC Litigation Trust for purposes of 31 U.S.C. § 3713(b) and 26 U.S.C. § 6012(b)(3).   The powers, rights and responsibilities of the GUC Litigation Trustee will be specified in the GUC Litigation Trust Agreement and will include the authority and responsibility to, among other things, take the actions set forth in Sections 5.10(a) and 10.08 of the Plan.   The GUC Litigation Trustee will distribute the GUC Litigation Trust Assets in accordance with the provisions of the Plan and the GUC Litigation Trust Agreement.   Other rights and duties of the GUC Litigation Trustee and the beneficiaries of the GUC Litigation Trustee will be as set forth in the GUC Litigation Trust Agreement.

4.   Fees and Expenses of the GUC Litigation Trustee.   Except as otherwise ordered by the Bankruptcy Court, the expenses of the GUC Litigation Trust will be paid solely from the GUC Amount and the proceeds of the Retained Causes of Action in accordance with the Plan and the GUC Litigation Trust Agreement.

5.   Reports to be Filed by the GUC Litigation Trustee.   The GUC Litigation Trustee, on behalf of the GUC Litigation Trust, will provide NewCo with quarterly reports regarding the status of all Retained Causes of Action.

6.   Expenses for Professionals of the GUC Litigation Trust.   Subject to Section 10.08 of the Plan, the GUC Litigation Trustee, on behalf of the GUC Litigation Trust, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously retained by the Creditors' Committee) to assist in carrying out its duties hereunder and may compensate and reimburse the reasonable fees and expenses of these professionals without further order of the Bankruptcy Court in accordance with, and subject to the limitations set forth in, the Plan and the GUC Litigation Trust Agreement.

7.   Indemnification.   The GUC Litigation Trust Agreement may include reasonable and customary indemnification provisions.   Any such indemnification shall be the sole responsibility of the GUC Litigation Trust and payable solely from the assets of the GUC Litigation Trust.

8.   Tax Treatment.   The GUC Litigation Trust is intended to be treated for U.S. federal income tax purposes as a liquidating trust within the meaning of Treasury Regulation Section 301.7701-4(d).   For federal income tax purposes, the transfer of the GUC Litigation Trust Assets to the GUC Litigation Trust will be treated as a transfer of such assets from the Debtors to the initial recipients of the interests in the GUC Litigation Trust, subject to any liabilities of the Debtors or the GUC Litigation Trust payable from the proceeds of such assets, followed by such recipients' transfer of such assets (subject to such liabilities) to the GUC

Litigation Trust. The initial recipients of the interests in the GUC Litigation Trust will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the GUC Litigation Trust Assets, subject to any liabilities of the Debtors or the GUC Litigation Trust payable from the proceeds thereof. The GUC Litigation Trust Agreement will: (i) require that the GUC Litigation Trustee file income tax returns for the GUC Litigation Trust as a grantor trust; (ii) pay all Taxes owed on any net income or gain of the GUC Litigation Trust, including net income or gain of the disputed claims reserve, on a current basis from GUC Litigation Trust Assets; (iii) provide for consistent valuations for all GUC Litigation Trust Assets by the GUC Litigation Trustee and holders of the interests in the GUC Litigation Trust, and require that such valuations be used for all Tax reporting purposes; (iv) provide for the GUC Litigation Trust's termination no later than five years after the Effective Date unless the GUC Litigation Trustee elects to extend such period for an additional year as provided for in the GUC Litigation Trust Agreement or the Bankruptcy Court approves a fixed extension; (v) limit the investment powers of the GUC Litigation Trustee; and (vi) require that the GUC Litigation Trust distribute at least annually all net income and the net proceeds from the sale or other disposition of all GUC Litigation Trust Assets in excess of amounts reasonably necessary to maintain the value of the remaining GUC Litigation Trust Assets and pay claims and contingent liabilities.

ix.     **Vesting of Transferred Assets in NewCo.**

1.     <u>Transfer of Assets</u>. On the Effective Date, the Transferred Assets will be transferred to, and vested in, NewCo, without the requirement of any further action on the part of any Person. Notwithstanding the foregoing, the Debtors, NewCo and the Plan Administrator are authorized and directed to execute and deliver such agreements, instruments and other documents as Agent determines in its sole discretion are necessary or desirable to effectuate and/or memorialize such transfer to NewCo.

2.     <u>Assumed Agreements</u>. Without limiting the generality of any provision in Section 6.03 of the Plan, the Transferred Assets will include all of the Debtors' right, title and interest to and in the Assumed Agreements, and each of the Assumed Agreements will be deemed to be assigned to NewCo, effective as of the Effective Date, pursuant to section 365 of the Bankruptcy Code.

3.     <u>Condominiums</u>. Without limiting the generality of any provision in Section 6.03 of the Plan, upon transfer of the Transferred Assets to NewCo, NewCo will be vested with all of Borrower's rights as (i) the sponsor of the Condominiums, and (ii) the declarant under the Declarations, and each of the Condominium Documents will be deemed transferred and assigned to NewCo, effective as of the Effective Date.

4.     <u>TIF Agreements/FirsTier Financing</u>. The Transferred Assets will include all of the Debtors' right, title and interest to and in the TIF Agreements and the FirsTier Financing, including without limitation the Debtors' rights to receive TIF Payments and TIF Net Proceeds. Without limiting the effectiveness of the immediately preceding sentence, FirsTier Bank will execute and deliver such agreements and other instruments as NewCo will reasonably request to effectuate and memorialize the vesting of the aforesaid assets in NewCo. On and after the Effective Date, NewCo or a designated Affiliate of NewCo will make all payments and fulfill all other obligations of the Debtors, as and when would have been required under the FirsTier

- 25 -

Financing had the Chapter 11 Cases not been commenced, in each as and to the extent set forth in the Plan.

     5.     <u>Assets Transferred Free and Clear of Liens and Claims</u>.  The Transferred Assets will be transferred to NewCo free and clear of all Liens, Claims, and encumbrances pursuant to section 363 of the Bankruptcy Code, subject only to the Permitted Encumbrances. For the avoidance of doubt, and without limiting the generality of the immediately proceeding sentence, none of the Liens (if any) securing payment of the Prepetition Mechanics' Lien Claims, Secured Tax Claims, Other Secured Claims, Prepetition Facility Claims or DIP Claims will attach to the Transferred Assets on or after the Effective Date.

     6.     <u>Causes of Action</u>.  On and after the Effective Date, NewCo will have the full and exclusive right, authority and standing to investigate, prosecute, settle and compromise all Causes of Action in favor of the Debtors accrued prior to the Effective Date, including the Metro District Claims but excluding the Retained Causes of Action, and NewCo will have the sole right to receive all proceeds thereof.

**C.**    **Miscellaneous Plan Provisions.**

**i.**    **Plan Supplement.**

The Debtors will file with the Clerk of the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing a supplement to the Plan (the "<u>Plan Supplement</u>"), which will include: (a) amended Schedules A, A-1 or B, if amended pursuant to Section 9.01(a) of the Plan, (b) the form of Exit Facility Credit Agreement, (c) the Approved Project Cost Budget (which will be filed under seal), (d) the form of Operating Agreement of NewCo (which will be filed under seal), (e) those forms of contracts or leases listed on Schedule A-1 that are modified, in the form as so mutually modified, (f) the Plan Administration Budget, (g) the GUC Litigation Trust Agreement, (h) those schedules and exhibits to the Plan not previously filed by the Debtors, and (i) any other appropriate documents (the "<u>Plan Supplement Documents</u>"); *provided, however*, the Debtors may amend (i) Schedules A, A-1 and B through and including the Confirmation Date to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in each case subject to Section 9.01 of the Plan (a), and solely with the consent of Agent, in which event such executory contract(s) or unexpired lease(s) will be deemed to be Assumed Agreements or Rejected Agreements, as applicable, and (ii) each of the other Plan Supplement Documents through and including the Effective Date in a manner consistent with the Plan and Disclosure Statement and subject to the consent of the Agent, its sole and absolute discretion, to such amendments.  The Debtors will provide notice of any amendments to Schedules A, A-1 and B to the parties to the executory contracts and unexpired leases affected by such amendment.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be inspected in the office of the Clerk of the Bankruptcy Court during normal court hours.  Holders of Claims or Equity Interests may obtain a copy of the Plan Supplement upon written request to Plan Administrator in accordance with Section 13.20 of the Plan.

### ii.        Amendment or Modification of the Plan.

Alterations, amendments, or modifications of or to the Plan (including, for the avoidance of doubt, any exhibits or schedules thereto) may be proposed in writing by the Debtors, subject to the consent of Agent, at any time prior to the Confirmation Date, provided that the Plan, as altered, amended, or modified, satisfies the conditions of sections 1122, 1123, and 1129 of the Bankruptcy Code, and the Debtors will have complied with section 1125 of the Bankruptcy Code.  A holder of a Claim that has accepted the Plan will be deemed to have accepted the Plan, as altered, amended, or modified, if the proposed alteration, amendment, or modification does not materially and adversely change the treatment of the Claim of such holder.

### iii.       Revocation or Withdrawal of the Plan.

The Debtors reserve the right, with the consent of Agent, to revoke or withdraw the Plan prior to the Confirmation Date.   If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan will be deemed null and void.  In such event, nothing contained in the Plan will constitute or be deemed a waiver or release of any or Equity Interests in or Claims by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

# VI.    REORGANIZATION TRANSACTION

## A.    Exit Facility.

### i.    Parties.

The Exit Facility Lenders, as lenders, will make (severally and not jointly) the Exit Facility Loans to the Exit Facility Borrower upon the terms and conditions set forth in the Exit Facility Credit Documents (the "Exit Facility").  The Exit Facility Agent will serve as Agent under the Exit Facility.

### ii.    Exit Facility Term A Loans.

As of the Effective Date, each of the DIP Lenders will hold Exit Facility Term A Loans in an aggregate principal amount equal to its DIP Claims accrued as of the Effective Date (including, for the avoidance of doubt, DIP Claims on account of interest fees, expenses, indemnification, reimbursement and other charges).

### iii.    Exit Facility Term B Loans.

On and after the Effective Date, the Exit Lenders will make Exit Facility Term B Loans available to NewCo, in accordance with the Exit Facility Credit Agreement and pursuant to the Approved Project Cost Budget to be approved by Exit Facility Agent, in its sole discretion, in consultation with the Exit Facility Lenders.

### iv.    Security.

Each of the Exit Loans will be secured by a Lien on substantially all assets of NewCo. The Confirmation Order will approve the Exit Credit Facility and provide that the Liens of the Exit Facility Lenders will be valid, enforceable and fully perfected, as of the Effective Date, without any further action on the part of any Person.

### v.    Loan and Security Priority.

As to all Persons other than the Exit Lenders, the Liens of the Exit Lenders will be senior to all other Liens other than Permitted Encumbrances and such other permitted Liens as are specified in the Exit Facility Credit Agreement.  The Exit Facility Term A Loans, and the Liens securing such loans, will be senior in priority and order of payment to the Exit Facility Term B Loans, and the Liens securing such Loans.

### vi.    Terms of Exit Facility Loans.

The anticipated terms (including interest rates, fees, priorities, terms and other similar provisions) of the Exit Facility Loans are set forth in Exhibit A attached to the Plan; provided, however, that the actual terms and conditions of the Exit Facility Loans shall be as set forth in the Exit Facility Credit Documents, which will be controlling in the event of any conflict between the terms of the Exit Facility Credit Documents and the terms set forth in Exhibit A to the Plan.

**B.      Formation and Operation of NewCo.**

     **i.**      NewCo will be established as of the Effective Date.

     **ii.**      As of the Effective Date, the NewCo Membership Interests will be deemed issued to, and held by, the holders of Prepetition Facility Claims, allocated among such holders on a pro rata basis based upon the respective amounts of such claims.

     **iii.**      Effective as of the Effective Date, each holder of a Prepetition Facility Claim will be deemed to have discharged and released such Claim in consideration of its receiving NewCo Membership Interests as provided for in the Plan, and Agent will be deemed to have discharged and released the Prepetition Guaranty on behalf of itself and all holders of Prepetition Facility Claims.

     **iv.**      NewCo and Davidson will enter into the Davidson Consulting Agreement, effective as of the Effective Date.

**C.      Discharge of Claims.**

     Except as otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder will be in exchange for and in complete satisfaction, discharge, and release of all existing debts and Claims of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Petition Date, against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code.  Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and their assets will be, and will be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests will be precluded and enjoined from asserting against the Debtors, the Estates, the Reorganized Debtors, or any of their respective assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim.  For the avoidance of doubt, the discharge provided for in Section 10.02 of the Plan will not operate to release or impair the Retained Causes of Action.

**D.      Corporate Action.**

     Upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved in all respects, including (i) all actions necessary to consummate the Reorganization Transaction, including without limitation those necessary or desirable to cause the consummation of the transactions specified in Section 5.02 of the Plan, (ii) all actions otherwise necessary to implement the Operating Agreement of NewCo and (iii) all other actions contemplated by the Plan (whether to occur before, on or after the Effective Date).  All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, and any corporate action required by the Debtors or the Reorganized Debtors in connection with the Plan, will occur in accordance with the Plan and any applicable Charter Documents or governing agreements and will be in effect, without any requirement of further action by the security holders, members of boards of managers, managers, directors or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) prior to the Effective Date, the

appropriate officers of the Debtors or the Reorganized Debtors, as applicable, will be authorized and directed to issue, execute and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtors, including, without limitation, (x) the Plan Supplement Documents and (y) any and all other agreements, documents, securities and instruments relating to the foregoing (including without limitation security documents). The authorizations and approvals contemplated by Section 6.04 of the Plan will be effective notwithstanding any requirements under non-bankruptcy law.

### E.     Operation of NewCo.

#### i.        Operating Agreement of NewCo.

The Operating Agreement of NewCo will be filed under seal with the Plan Supplement and, pursuant to the Confirmation Order, effective as of the Effective Date, will establish the rights and obligations of the holders of the NewCo Membership Interests and the governance of NewCo. The Operating Agreement of NewCo will designate NewCo Manager as the manager of NewCo.

#### ii.        Indemnification of NewCo Manager.

The Operating Agreement for NewCo will provide a release and indemnification in favor of NewCo Manager, by the members of NewCo, pursuant to which the members of NewCo will agree to indemnify, defend and hold harmless NewCo Manager with respect to its actions and omissions as manager of NewCo, except for NewCo Manager's gross negligence or willful misconduct.

#### iii.        Davidson Consulting Agreement.

The Davidson Consulting Agreement will become effective as of the Effective Date.

### F.     Approval of Exit Facility.

The Exit Facility and the execution and delivery by the Reorganized Debtors of the Exit Facility Credit Agreement and the Plan Supplement Documents, as applicable, will be approved pursuant to the Confirmation Order.

### G.     Securities Law Matters.

Pursuant to, in accordance with, and solely to the extent provided under section 1145 of the Bankruptcy Code, the issuance by NewCo of the NewCo Membership Interests to the Prepetition Lenders (or their respective designees, as applicable) pursuant to the Operating Agreement of NewCo will be exempt from registration under applicable securities laws pursuant to section 1145(a) of the Bankruptcy Code.

- 30 -

**H.     Books and Records.**

On the Effective Date, title to the books and records of the Debtors will be deemed vested in NewCo as Transferred Assets; *provided, however,* that the Plan Administrator may maintain such books and records, as and when directed by NewCo. On and after the Effective Date, upon reasonable prior notice, NewCo and the Plan Administrator will provide counsel and other representatives of the Estates with reasonable access, during normal business hours, to the books and records in their custody and control.

**I.     Effective Date and Closing of Reorganization Transaction.**

The Debtors will each use commercially reasonable efforts to cause the Effective Date to occur, the Exit Facility to close, and the Reorganization Transaction to close, in each case, as soon as is reasonably practicable following the date of the Plan.

**VII.     RISK FACTORS**

PRIOR TO VOTING ON THE PLAN, EACH HOLDER OF A CLAIM ENTITLED TO VOTE SHOULD CONSIDER CAREFULLY THE RISK FACTORS DESCRIBED BELOW, AS WELL AS ALL OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE EXHIBITS HERETO. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

**A.     Risk of Non-Confirmation of the Plan**

Even if all impaired classes accept or could be deemed to have accepted the Plan, the Plan may not be confirmed by the Bankruptcy Court. As set forth above, section 1129 of the Bankruptcy Code sets forth the requirements for plan confirmation. Although the Debtors believe that the Plan will meet all applicable tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**B.     Nonconsensual Confirmation**

Pursuant to the "cramdown" provisions of section 1129(b) of the Bankruptcy Code, the Bankruptcy Court can confirm the Plan at the Debtors' request if at least one impaired class has accepted the Plan and, as to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such impaired class.

The Debtors reserve the right to modify the terms of the Plan as necessary for confirmation without the acceptance of all impaired classes. Such modification could result in less favorable treatment for any non-accepting classes than the treatment currently provided for in the Plan.

**C.     Delays of Confirmation and/or Effective Date**

Any delay in confirmation and effectiveness of the Plan could result in, among other things, increased Administrative Expense Claims. These or any other negative effects of delays in confirmation or effectiveness of the Plan could endanger the ultimate approval of the Plan by the Bankruptcy Court and reduce recoveries to Claim holders.

**D.     Allowance of Claims**

The estimates of Allowed Claims in this Disclosure Statement are based on the Debtors' review of their books and records. As set forth above, upon the completion of further analyses of the proofs of Claim, the completion of Claims litigation and related matters, the total amount of Claims that ultimately become Allowed Claims in these Chapter 11 Cases  may differ significantly from the Debtors' estimates.

**E.     Risks Related to the Debtors' Business and Operations: Decline in the Financial Markets and Deterioration of the Mortgage Lending and Financing Industries.**

The recent disruptions within numerous major financial institutions and the resulting crisis in the financial markets has impacted the residential market in particular and has consequently made it extremely difficult for otherwise qualified borrowers to obtain mortgages. This has lead to a decline in the demand for new condominium units, as purchasers are unable to obtain sufficient financing.  A continued freeze of the credit markets could have significant adverse consequences on the residential and retail industry, and thus the Reorganized Debtors.

The Debtors face the risk that demand for housing may decline further or that the costs of labor and materials to complete and maintain the Property may increase in the future.  Should this be the case, the Debtors may not be able to sell their remaining Condominium Units at expected prices or profit margins or within anticipated time frames.

If the current downturn in the housing market continues, these effects may continue, which could have a continuing material adverse impact on the Debtors' businesses.

10732\29\1421175.4

### F.      Risks Related to the Realization of GUC Net Proceeds

As with all litigation, the probability that the GUC Litigation Trustee will prevail in litigating the Retained Causes of Action on behalf of the General Unsecured Claim holders is uncertain.  The GUC Litigation Trustee has no assurances of a favorable outcome for the General Unsecured Claim holders.  Further, in the event the GUC Litigation Trustee is able to successfully litigate any of the Retained Causes of Action, the ability of the GUC Litigation Trustee to collect any such judgments is also uncertain.  Moreover, any judgment obtained by the GUC Litigation Trustee in any of the Retained Causes of Action would not be collected immediately and appeals would be taken, resulting in additional costs and delays.  For all of these reasons, it is impossible to predict the amount, if any, of GUC Net Proceeds that will be available for distribution to holders of Allowed General Unsecured Claims.

## VIII.      PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN

### A.      Voting of Claims.

Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article IV of the Plan will be entitled to vote separately to accept or reject the Plan as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

### B.      Nonconsensual Confirmation.

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 13.10 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.

### C.      Distributions.

All distributions of Cash under the Plan will be made by the Disbursing Agent, who will make distributions as and when directed by the Plan Administrator and in accordance with the Plan.

### D.      Distributions of Cash.

Any payment of Cash made pursuant to the Plan will, at the Disbursing Agent's option, be made by check drawn on a domestic bank or wire transfer.

### E.      Timing of Distributions.

In the event that any payment, distribution, or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or distribution or the performance of such act may be completed on or as soon as reasonably practicable after

- 33 -

the next succeeding Business Day, but will be deemed to have been completed as of the required date.

### F.    Delivery of Distributions.

Subject to Bankruptcy Rule 9010, all distributions of Cash under the Plan to holders of Allowed Claims will be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules as of January 11, 2010, unless the Disbursing Agent has been properly notified in writing of a change of address. In the event that any distribution to any such holder is returned as undeliverable, the Disbursing Agent will use reasonable efforts to determine the current address of such holder, but no distribution to such holder will be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution will be made to such holder; *provided*, *however*, that, with respect to any Claim of any creditor whose distribution is returned as undeliverable, any interest payable on such Claim will cease accruing on the date that such undeliverable distribution was first distributed; *provided further*, *however*, that, at the expiration of ninety (90) days from the date such distribution is first made such distribution will be deemed unclaimed property and will be treated in accordance with Section 7.09 of the Plan.

### G.    Minimum Distributions.

No payment of Cash of less than one hundred dollars ($100.00) will be made to any holder of a Claim unless a request therefor is made in writing to the Disbursing Agent.

### H.    Distributions to Holders as of the Record Date.

As of the close of business on the Record Date, the Claims register will be closed, and there will be no further changes in the record holder of any Claim. Neither the Plan Administrator nor the Disbursing Agent will have any obligation to recognize any transfer of any Claim occurring after the Record Date (including Administrative Expense Claims accruing on or after the applicable Bar Date). The Plan Administrator and the Disbursing Agent will instead be authorized and entitled to recognize and deal for all purposes under the Plan with only those record holders stated on the Claims register as of the close of business on the Record Date.

### I.    Unclaimed Distributions.

All distributions under the Plan that are unclaimed for a period of at least ninety (90) days after distribution thereof will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Reorganized Debtors and any entitlement of any holder of any Claim to such distributions will be extinguished and forever barred.

### J.    Cancellation and Surrender of Existing Securities and Agreements.

Notwithstanding any other provision of the Plan, as a condition precedent to receiving any distribution under the Plan, each holder of a promissory note, or other instrument or security evidencing a Claim must tender such promissory note or other instrument or security to the Plan Administrator or must execute and deliver an affidavit of loss and furnish an indemnity or bond in substance and amount reasonably satisfactory to the Plan Administrator. Any holder of a

- 34 -

Claim that fails to surrender such instrument or to provide the affidavit and indemnity or bond before the later of six months following the (i) Effective Date or (ii) the date such holder's Claim becomes an Allowed Claim will be deemed to have forfeited all rights and/or Claims and may not receive or participate in any distribution under the Plan.

### K.      Setoffs.

The Plan Administrator may, but will not be required to, set off against any Claim (for purposes of determining the Allowed amount of such Claim on which distribution will be made), any Claims of any nature whatsoever that any of the Debtors may have had prior to the Effective Date may have against the holder of such Claim (including Retained Causes of Action, as provided for in Section 10.09 of the Plan), but neither the failure to do so nor the allowance of any Claim hereunder will constitute a waiver or release by of any such Claim that any of the Debtors may have had prior to the Effective Date against the holder of such Claim.

### L.      Votes Solicited in Good Faith.

Upon confirmation of the Plan, the Debtors will be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.  The Confirmation Order will provide that the Debtors (and each of their Affiliates, agents, directors, officers, members, employees, advisors, and attorneys) have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer, issuance and sale (if applicable) of the securities offered, issued and sold under the Plan and therefore have not been, and on account of such offer, issuance and sale will not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer or issuance of the securities offered and distributed under the Plan.

### M.      Tax Matters Concerning Distributions.

The aggregate consideration distributed to the holders of Allowed Claims under the Plan will be treated as first satisfying an amount equal to the principal amount of each such Allowed Claim and, for those Allowed Claims that include unpaid interest accrued prior to the Petition Date, any remaining consideration will be treated as satisfying such interest.

## IX.      PROCEDURES FOR TREATING DISPUTED CLAIMS

### A.      Objections to Claims.

Any objections to Claims will be filed and served on or before such date as may be fixed by the Bankruptcy Court, after the giving of proper notice in accordance with Bankruptcy Rule 2002 and a hearing.

### B.      No Distributions Pending Allowance.

Notwithstanding any other provision of the Plan, if any Claim or portion thereof is Disputed, no payment or distribution provided in the Plan will be made on account of such Claim unless and until such Claim has become an Allowed Claim through settlement and/or an order of

- 35 -

the Bankruptcy Court.  The Disbursing Agent will only make distributions on account of Claims that have become fully Allowed.  If and when a previously Disputed Claim becomes a fully Allowed Claim, the Disbursing Agent will make a Catch-Up Distribution on account of such claim to the extent warranted on the next Distribution Date.  Nothing in Section 8.02 of the Plan will limit the obligations of the Reorganized Debtors and NewCo to escrow funds pursuant to Section 4.10 of the Plan.

### C.      Tort Claims.

All Tort Claims are Disputed Claims.  No distributions will be made on account of any Tort Claim unless and until such Claim is liquidated and becomes an Allowed Claim.  Any Tort Claim which has not been liquidated prior to the Effective Date and as to which a proof of claim was timely filed in the Chapter 11 Cases, will be determined and liquidated in the administrative or judicial tribunal in which it is pending on the Effective Date or, if no action was pending on the Effective Date, in any administrative or judicial tribunal of appropriate jurisdiction.  Any Tort Claim determined and liquidated (i) pursuant to a judgment obtained in accordance with Section 8.03 of the Plan and applicable nonbankruptcy law which is no longer appealable or subject to review, or (ii) in any alternative dispute resolution or similar proceeding as same may be approved by order of a court of competent jurisdiction, will be paid as follows:  (A) to the extent such liquidated Claim is, in whole or in part, an Insured Claim, the insured portion will be paid by the applicable insurer pursuant to the provisions of Section 8.04 of the Plan and (B) to the extent any portion of such liquidated Claim is not covered by any of the Debtors' insurance policies, such uninsured portion will be deemed an Allowed Claim in Class 6 and treated in accordance with Section 4.06 of the Plan.  Nothing contained in Section 8.03 of the Plan will constitute or be deemed a waiver of any Claim, right, or Cause of Action that any Debtor may have had prior to the Effective Date against any Person in connection with or arising out of any Tort Claim, including, without limitation, any rights under section 157(b) of title 28 of the United States Code.  Notwithstanding any other provision of the Plan, interest will not commence accruing on any Tort Claim until such Claim has been liquidated and Allowed as set forth in Section 8.03 of the Plan.

### D.      Distributions Relating to Allowed Insured Claims.

Distributions under the Plan to each holder of an Allowed Insured Claim will be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan will constitute or be deemed a waiver of any Cause of Action that any Reorganized Debtor may hold against any other Person, including, without limitation, insurers under any of the Debtors' or Reorganized Debtors' insurance policies.

### E.      Resolution of Claims.

On and after the Effective Date, the Plan Administrator will have the authority to litigate, compromise, settle, otherwise resolve, or withdraw any objections to Claims and compromise, settle, or otherwise resolve Disputed Claims without approval of the Bankruptcy Court.

- 36 -

**F.    Estimation.**

Notwithstanding any other provision in the Plan to the contrary, the Plan Administrator may at any time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Plan Administrator has previously objected to such Claim.  The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time, including during proceedings concerning any objection to such Claim.  In the event that the Bankruptcy Court estimates any Disputed Claim, such estimated amount may constitute either (i) the Allowed amount of such Claim, (ii) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan, or (iii) a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on such Claim, Plan Administrator may elect to object to ultimate payment of such Claim.   All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

**G.    No Interest or Penalties.**

No interest or penalties will be paid on account of Disputed Claims, including, without limitation, Disputed Claims that become Allowed Claims.

**X.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**A.    Assumption or Rejection of Executory Contracts and Unexpired Leases.**

All executory contracts and unexpired leases that exist between any Debtor and any Person, including, without limitation, the executory contracts and unexpired leases set forth in Schedule B to the Plan (together, the "Rejected Agreements"), will be deemed rejected by the Debtors as of the Effective Date, except for any executory contract or unexpired lease (together, the "Assumed Agreements") (i) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion or notice for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Effective Date, (iii) that is specifically designated on Schedule A-1 to the Plan as a contract or lease to be assumed as modified by mutual agreement of the Debtors on one hand and the Agent on the other hand (for the avoidance of doubt, any such contract or lease that is not so mutually modified shall be deemed rejected by the Debtors as of the Effective Date), which contracts and/or leases, as so mutually modified, will be filed with the Plan Supplement or (iv) that is specifically designated as a contract or lease to be assumed on Schedule A to the Plan; *provided, however*, that the Debtors may, on or prior to the Effective Date, amend Schedules A, A-1 and B to the Plan to delete any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, as and when directed by Agent in its sole and absolute discretion, in which event such executory contract(s) or unexpired lease(s) will be deemed to be, respectively, Assumed Agreements or Rejected Agreements.  The Debtors will provide notice of any amendments to Schedules A, A-1, and B to the Plan to the parties to the executory contracts and unexpired leases affected thereby.  In the event Schedules A, A-1 and/or B to the Plan have been amended as provided for in Section 9.01(a) of the Plan, the Debtors will file an amended version of such Schedules with the Plan Supplement.  The listing of a document on Schedule A to the Plan will not constitute an admission by the Debtors that such document is an executory

contract or an unexpired lease or that the any Debtor has any liability thereunder. Notwithstanding anything to the contrary in the Plan or on any schedule thereto, Permits will not be deemed rejected by virtue of the Plan notwithstanding the fact that they may be deemed executory contracts

### B.      Approval of Assumption or Rejection of Executory Contracts and Unexpired Leases.

Entry of the Confirmation Order will, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption and assignment to NewCo of the Assumed Agreements, and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the Rejected Agreements

### C.      Inclusiveness.

Unless otherwise specified thereon, each executory contract and unexpired lease listed or to be listed on Schedule A, A-1, or B to the Plan will include modifications, amendments, supplements, restatements, or other agreements made directly or indirectly, as of the Effective Date, by any agreement, instrument, or other document that in any manner affects such executory contract or unexpired lease, without regard to whether such modifications, amendments, supplements, restatements or other such agreements or documents are listed on Schedule A, A-1, or B to the Plan.

### D.      Cure of Defaults.

Except as may otherwise be agreed to by the parties, within sixty (60) days after the Effective Date, the Plan Administrator will pay all Allowed Cure Claims.  All Disputed Cure Claims will be paid by the Plan Administrator as soon as is practicable after they become Allowed Claims.

### E.      Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan.

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to Section 9.05 of the Plan must be filed with the Bankruptcy Court and served upon the Plan Administrator no later than thirty (30) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order, and (iii) notice of an amendment to Schedule B to the Plan.  All such Claims not filed within such time will be forever barred from assertion against the Debtors, Reorganized Debtors, their respective property and their successors and assigns.

## XI.      EFFECT OF CONFIRMATION

### A.      Survival of Corporate Reimbursement Obligations.

Except as expressly provided for in Section 10.01 of the Plan, the obligations of the Debtors and Reorganized Debtors to defend, indemnify, reimburse or limit the liability of their

present and former directors, officers, partners or employees who were directors, officers, members, managers, or employees, respectively, prior to the Effective Date, in their capacity as directors, officers, members, managers or employees, against any Claims or obligations pursuant to the Debtors' Charter Documents, applicable state law or specific agreement, or any combination of the foregoing, will not survive confirmation of the Plan, and will be discharged irrespective of whether indemnification, defense, reimbursement, or limitation is owed in connection with an event occurring before, on or after the Effective Date, and, for the avoidance of doubt, none the foregoing obligations will be deemed to have been assumed by NewCo or included in the Transferred Assets. Notwithstanding the foregoing, the obligations of the Debtors described in the immediately preceding sentence will survive the Effective Date to the extent (i) they are covered by one or more of the Debtors' insurance policies and (ii) the applicable insurer actually pays the Debtors, Reorganized Debtors and/or the GUC Litigation Trustee on account of such obligations, and the right to collect with respect to such claims under such policies (the "Indemnification Insurance Claims") will be included in the Retained Causes of Action. The GUC Litigation Trust will be solely responsible for paying any previous or other costs incurred or accrued under the aforesaid insurance policies at any time subsequent to the Effective Date. For the avoidance of doubt, neither NewCo, the Debtors, nor the Reorganized Debtors will have any obligation to maintain or acquire any insurance coverage to facilitate the availability of Indemnification Insurance Claims.

### B.   Vesting of Assets.

Upon the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all remaining property of the estates of the Debtors (other than the Transferred Assets) will vest in the Reorganized Debtors free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided in the Plan. From and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as provided in the Plan.

### C.   Discharge of Claims.

Except as otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the payments and distributions to be made hereunder will be in exchange for and in complete satisfaction, discharge, and release of all existing debts and Claims of any kind, nature, or description whatsoever, including any interest accrued on such Claims from and after the Petition Date, against or in the Debtors or any of their assets or properties to the fullest extent permitted by section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtors and their assets will be, and will be deemed to be, discharged and terminated, and all holders of Claims and Equity Interests will be precluded and enjoined from asserting against the Debtors, the Estates, the Reorganized Debtors, or any of their respective assets or properties, any other or further Claim based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not such holder has filed a proof of Claim. For the avoidance of doubt, the discharge provided for in Section 10.02 of the Plan will not operate to release or impair the Retained Causes of Action.

- 39 -

### D. Discharge of Debtors.

Upon the Effective Date, except as otherwise expressly provided in the Plan, each holder (as well as any trustees and agents on behalf of each holder) of a Claim or Equity Interest and any Affiliate of such holder will be deemed to have forever waived, released, and discharged the Debtors, the Reorganized Debtors and the Estates, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, rights, including rights of setoff and recoupment, and liabilities that arose prior to the Effective Date. Upon the Effective Date, all such Persons will be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim. For the avoidance of doubt, the discharge provided for in Section 10.03 of the Plan will not operate to release or impair the Retained Causes of Action.

### E. Release of Claims.

#### i. Mutual Releases of Debtors and Lenders.

**As of the Effective Date, (i) each of the Debtors, Davidson and Guarantor, on behalf of themselves, their respective Affiliates, and their respective officers, members, directors, agents, shareholders, employees and Affiliates, and the predecessors, successors and/or assigns of any of the foregoing, on the one hand, and (ii) the Prepetition Lenders, the DIP Lenders, Agent (both as DIP Agent and as Prepetition Agent), the CRO and their respective Affiliates, and their respective officers, members, directors, agents, shareholders, employees and affiliates, and the predecessors, successors and/or assigns of any of the foregoing, on the other hand, and any of the Affiliates, officers, members, directors, agents, shareholders and employees, and the predecessors, successors and/or assigns of any of the foregoing Persons specified in (i) and (ii), will be deemed to have released, and will release, one another from any and all Claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, attorneys' fees and costs), whether known or unknown, suspected or unsuspected, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, then existing or thereafter arising, in law, equity or otherwise (collectively, "Released Claims"), based in whole or in part upon any actions, omissions, occurrences and/or facts occurring or existing on or prior to the Effective Date, including, without limitation, any Released Claims arising from or in any manner related to the Prepetition Credit Agreement or the transactions contemplated thereunder, the DIP Credit Agreement or the transactions contemplated thereunder, the Condominiums, and/or the Property; *provided, however,* that the foregoing will not operate as a waiver or release from any causes of action arising out of the willful misconduct or gross negligence of any such Person as determined by a Final Order entered by a court of competent jurisdiction. For the avoidance of doubt, the releases provided for in Section 10.04(a) of the Plan will not operate to release or limit the enforceability of any Retained Cause of Action to the extent it is prosecuted against any Person other than the Persons specified in subsection (ii) of Section 10.04(a) of the Plan and does not create or impose any liability of or upon such Persons.**

ii.        **Mutual Releases of Lenders.**

**As of the Effective Date, (i) the Prepetition Lenders, on behalf of themselves, their respective Affiliates, and their respective officers, members, directors, agents, shareholders, employees and Affiliates, and the predecessors, successors and/or assigns of any of the foregoing, on the one hand, and (ii) Agent (both as Prepetition Agent and DIP Agent), and Hypo, as a Prepetition Lender, and their respective Affiliates, on the other hand, and any of the Affiliates, officers, members, directors, agents, shareholders and employees, and the predecessors, successors and/or assigns of any of the foregoing Persons specified in (i) and (ii), will be deemed to have released, and shall release, one another from all Released Claims arising from or in any manner related to the Prepetition Credit Agreement or the transactions contemplated thereunder, the DIP Credit Agreement or the transactions contemplated thereunder, the Property, the Condominiums, the Chapter 11 Cases and/or the Debtors including, without limitation, the lawsuit captioned Bank Midwest, N.A. v. Hypo Real Estate Capital Corporation, Index No. 10 Civ. 0232 (WHP), currently pending in the Southern District of New York, which action shall be promptly discontinued with prejudice by the plaintiffs therein.**

iii.        **Releases of Released Parties.**

**Except for any right to enforce the Plan, on and after the Effective Date, each of the Released Parties will be released and discharged from any and all Released Claims related to or in connection with Debtors, the Reorganized Debtors, the Prepetition Credit Agreement or the transactions contemplated thereunder, the DIP Credit Agreement or the transactions contemplated thereunder, the Property, the Condominiums, the Chapter 11 Cases, and/or the Plan, that are based in whole or in part on any act, omission, transaction, event, or other occurrence taking place on or prior to the Effective Date;** *provided, however,* **that the foregoing will not operate as a waiver or release from any causes of action arising out of the willful misconduct or gross negligence of any such Person as determined by a Final Order entered by a court of competent jurisdiction;** *provided, further,* **that nothing in Section 10.04(c) of the Plan will be deemed to release or limit the enforceability of any Retained Cause of Action to the extent it is prosecuted against any Person other than the Released Parties, and does not create or impose any liability of or upon any Released Parties.**

iv.        **Injunction Related to Releases.**

The Confirmation Order will enjoin permanently the commencement or prosecution by any Person, whether directly, derivatively or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities released pursuant to Section 10.04 of the Plan.

**F.      Injunction.**

Except as otherwise provided in the Plan or an order of the Court, on and after the Confirmation Date, all Persons who have held, hold or may hold Claims against or Equity Interests in the Debtors or the Estates will be, with respect to any such Claims or Equity

- 41 -

Interests, permanently enjoined from and after the Confirmation Date from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtors, the Estates, the Reorganized Debtors, the Released Parties, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Persons (collectively, the "Injunction Parties"), or against any property of the Injunction Parties; (b) enforcing, levying, attaching (including, without limitation, any pre-judgment attachment), collecting or otherwise recovering by any manner or means whether directly or indirectly, of any judgment, award, decree or order against the Injunction Parties or against any property of the Injunction Parties; (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Injunction Parties or against any property of the Injunction Parties; (d) asserting any right of setoff, subrogation, or recoupment of any kind, directly or indirectly, against any obligation due the Injunction Parties; and (e) taking any actions in any place and in any manner whatsoever that do not conform to or comply with the provisions of the Plan.

   **G.     Term of Injunctions or Stays.**

   Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Petition Date, will remain in full force and effect until the earlier of the time the Chapter 11 Cases are closed and the time the Chapter 11 Cases are dismissed.

   **H.     Exculpation.**

   None of the Released Parties, the Reorganized Debtors, the Creditors' Committee, or their respective present or former subsidiaries, Affiliates, agents, directors, officers, employees, members, shareholders, managers, agents, attorneys, other advisors and representatives, and each of the successors and assigns of each of the foregoing will have or incur any liability to any holder of a Claim or Equity Interest for any act or omission in connection with, related to, arising out of or in preparation for filing, the Chapter 11 Cases, the preparation or negotiation of the Disclosure Statement and Plan, the solicitation of votes in connection with the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence. Nothing in Section 10.07 of the Plan will limit the liability of the professionals of the foregoing exculpated parties to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility. This provision will not be deemed to act to release any Retained Causes of Action

   **I.     Retained Causes of Action.**

   i.     On and after the Effective Date, the GUC Litigation Trustee will have the full and exclusive right, authority and standing to investigate, prosecute, settle and compromise the Retained Causes of Action, including, without limitation, the Indemnification Insurance Claims. The GUC Litigation Trustee may retain legal counsel and other professionals, in each case in consultation with Agent. All fees and expenses of legal and other professionals retained

by the GUC Litigation Trustee in connection with the Retained Causes of Action or otherwise will be either paid from the GUC Amount or from the proceeds of the Retained Causes of Action pursuant to such contingency or other similar arrangements agreed to by the parties.

      **ii.**      The proceeds of all Retained Causes of Action, net of all attorneys' fees and other litigation costs will be promptly transferred by the GUC Litigation Trustee to NewCo until such time as NewCo will have received an amount equal to the GUC Amount. Thereafter, the GUC Litigation Trustee will (i) deposit all GUC Net Proceeds of the Retained Causes of Action into the GUC Account as soon is practicable, and distribute such funds as provided for in Section 4.06 of the Plan, and (ii) transfer all other Net Proceeds of Retained Causes of Action as soon as is practicable to one or more accounts to be designated by Agent, and distributed to NewCo as and when directed by Agent. Notwithstanding the immediately preceding sentence, if the aggregate amount of all GUC Net Proceeds exceeds the aggregate amount of all Allowed General Unsecured Claims, calculated after all Disputed General Unsecured Claims have been resolved, then the full amount of such excess will be transferred to NewCo.

      **iii.**      Subject to Section 13.08 of the Plan, any funds remaining in the GUC Account following the final resolution of all Retained Causes of Action and the transfer to NewCo of all amounts specified in Section 10.08 (b) of the Plan will be distributed to holders of Allowed General Unsecured Claims by the GUC Litigation Trustee.

      **iv.**      The GUC Litigation Trustee will have the exclusive right to prosecute the Retained Causes of Action, as provided for in Section 10.08(a) of the Plan, and the obligation to transfer the GUC Net Proceeds to the GUC Account and all other Net Proceeds of the Retained Causes of Action the account designated by Agent for the benefit of NewCo. Any dispute as to the respective rights and obligations of the Plan Administrator and the GUC Litigation Trustee that cannot be resolved consensually will be determined by the Bankruptcy Court.

**J.**      **Substantive Consolidation.**

      The Confirmation Order will approve the consolidation of the Debtors solely for the purpose of implementing the Plan, including for purposes of voting, confirmation and distributions to be made under the Plan. Pursuant to such order: (1) all assets and liabilities of the Debtors will be deemed merged; (2) all guarantees by one Debtor of the obligations of any other Debtor will be deemed eliminated so that any Claim against any Debtor and any guarantee thereof executed by any other Debtor and any joint or several liability of any of the Debtors will be deemed to be one obligation of the Debtors; and (3) each and every Claim filed or to be filed in the Chapter 11 Cases of any of the Debtors will be deemed filed against all of the Debtors and will be deemed one Claim against all of the Debtors. Such consolidation (other than for the purpose of implementing the Plan) will not affect: (1) the legal and organizational structures of the Debtors; or (2) distributions from any insurance policies or proceeds of such policies. In addition, such consolidation will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code. If any party in interest challenges the proposed limited substantive consolidation, the Debtors reserve the right to establish at the Confirmation Hearing the ability to confirm the Plan on an entity-by entity basis.

## XII.   CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### A.   Effectiveness.

The Plan will not become effective unless and until the following conditions have been satisfied or waived pursuant to Section 11.03 of the Plan:

      **i.**   The Confirmation Order, in form and substance acceptable to Agent, has been entered and become a Final Order;

      **ii.**   The Reorganization Transaction satisfying the requirements of Section 5.02 of the Plan has been consummated and the conditions specified in Section 5.02 of the Plan will have been satisfied;

      **iii.**   All actions, documents, and agreements necessary or desirable to implement the Plan have been effected or executed, in form and substance acceptable to Agent in its sole discretion;

      **iv.**   The Debtors have received all authorizations, consents, regulatory approvals, rulings, letters, no-action letters, opinions, audited financial statements, and documents that are necessary to implement the Plan and consummate the Reorganization Transaction, and that are required by law, regulation, or order; and

      **v.**   Any other actions Agent determines are necessary or desirable, in its sole discretion in consultation with the Debtors to implement the terms of the have been taken.

### B.   Failure of Conditions.

In the event that one or more of the conditions specified in Section 11.01 of the Plan have not occurred or otherwise been waived pursuant to Section 11.03 of the Plan on or before the thirty first day after the date the Confirmation Order is entered by the Bankruptcy Court, as such date may be extended from time to time by Agent, in its sole and absolute discretion, (i) the Confirmation Order will be vacated, (ii) the Debtors and all holders of Claims and Equity Interests will be restored to the *status quo ante* as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred, and (iii) the Debtors' obligations with respect to Claims and Equity Interests will remain unchanged (subject to a reduction of such Claims for any amounts distributed by the Plan Administrator and/or the Debtors prior to such date) and nothing contained in the Plan will constitute or be deemed a waiver or release of any Claims or Equity Interests by or against the Debtors or any other Person or to prejudice in any manner the rights of the Debtors or any Person in any further proceedings involving the Debtors.

### C.   Waiver of Conditions.

Agent in its sole and absolute discretion, in consultation with the Debtors and to the extent not prohibited by applicable law, may waive one or more of the conditions precedent to effectiveness of the Plan set forth in Section 11.01 of the Plan.

- 44 -

## XIII.      RETENTION OF JURISDICTION

### A.      Exclusive Jurisdiction

Subject to Section 8.03 of the Plan, the Bankruptcy Court will have exclusive jurisdiction of all matters arising out of, and related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

i.        To hear and determine pending applications for the assumption or rejection of executory contracts or unexpired leases and the allowance of cure amounts and Claims resulting therefrom and any disputes with respect to executory contracts or unexpired leases relating to facts and circumstances arising out of or relating to the Chapter 11 Cases;

ii.       To hear and determine any and all adversary proceedings, applications, and contested matters;

iii.      To hear and determine any objection to any Claim;

iv.       To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

v.        To issue such orders in aid of execution and consummation of the Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

vi.       To consider any amendments to, or modifications of, the Plan, to cure any defect or omission, or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

vii.      To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331, and 503(b) of the Bankruptcy Code;

viii.     To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan;

ix.       To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Person with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

x.        To recover all assets of the Debtors and property of the Debtors and the Estates, wherever located;

xi.       To hear and determine matters concerning Taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including the expedited determination of Tax under section 505(b) of the Bankruptcy Code);

- 45 -

xii.     To resolve any Disputed Claims;

xiii.     To determine the scope of any discharge of any Debtor under the Plan or the Bankruptcy Code;

xiv.     To resolve any disputes (i) regarding the payment of fees and reimbursement of expenses of any professional retained by the Plan Administrator or the Reorganized Debtors (if applicable) on and after the Effective Date and (ii) between the Exit Facility Agent and counsel for the Estates regarding the choice of a successor Plan Administrator;

xv.     To resolve any disputes related to the Retained Causes of Action between or among NewCo, the Plan Administrator, the GUC Litigation Trustee and/or the Reorganized Debtors;

xvi.     To hear any other matter not inconsistent with the Bankruptcy Code; and

xvii.     To enter a final decree closing the Chapter 11 Cases.

XIV.    **CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF PLAN CONSUMMATION**

> IRS Circular 230 Disclosure:  To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

A.    **General**

A DESCRIPTION OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN IS PROVIDED BELOW.  THE DESCRIPTION IS BASED ON THE INTERNAL REVENUE CODE OF 1986, AS AMENDED (THE "INTERNAL REVENUE CODE"), TREASURY REGULATIONS, JUDICIAL DECISIONS AND ADMINISTRATIVE DETERMINATIONS, ALL AS IN EFFECT ON THE DATE OF THIS DISCLOSURE STATEMENT.  CHANGES IN ANY OF THESE AUTHORITIES OR IN THEIR INTERPRETATION MAY HAVE RETROACTIVE EFFECT, WHICH MAY CAUSE THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN TO DIFFER MATERIALLY FROM THE CONSEQUENCES DESCRIBED BELOW.  NO RULING HAS BEEN REQUESTED FROM THE IRS, AND NO LEGAL OPINION HAS BEEN REQUESTED FROM COUNSEL, CONCERNING ANY TAX CONSEQUENCE OF THE PLAN, AND NO TAX OPINION IS GIVEN BY THIS DISCLOSURE STATEMENT.

THIS DESCRIPTION DOES NOT COVER ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO HOLDERS OF CLAIMS.  FOR EXAMPLE, THE DESCRIPTION DOES NOT ADDRESS ISSUES OF SPECIAL CONCERN TO CERTAIN TYPES OF TAXPAYERS, SUCH AS DEALERS IN SECURITIES, LIFE INSURANCE COMPANIES, FINANCIAL INSTITUTIONS, TAX-EXEMPT ORGANIZATIONS AND FOREIGN TAXPAYERS.  THIS DESCRIPTION DOES NOT DISCUSS THE POSSIBLE STATE OR LOCAL TAX OR NON-U.S. TAX CONSEQUENCES THAT MIGHT APPLY TO DEBTORS OR TO EXIT FACILITY LENDERS OR TO CURRENT HOLDERS OF EQUITY INTERESTS IN DEBTORS OR TO HOLDERS OF CLAIMS.  THIS DISCUSSION DOES NOT ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES TO DEBTORS OR TO EXIT FACILITY LENDERS OR TO A CURRENT HOLDER OF AN EQUITY INTEREST IN A DEBTOR.  THIS DISCUSSION DOES NOT ADDRESS THE FEDERAL INCOME TAX CONSEQUENCES TO HOLDERS OF UNIMPAIRED CLAIMS, OR SECURED TAX CLAIMS.  THIS DISCUSSION DOES NOT ADDRESS THE APPLICATION OF THE ORIGINAL ISSUE DISCOUNT RULES OF SECTIONS 1271-1275 OF THE CODE TO ANY HOLDERS OF CLAIMS WITH ORIGINAL ISSUE DISCOUNT.

FOR THOSE REASONS, THE DESCRIPTION THAT FOLLOWS IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND PROFESSIONAL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM. HOLDERS OF CLAIMS ARE URGED TO CONSULT WITH THEIR OWN TAX ADVISORS

REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

**B.      Federal Income Tax Consequences to Holders Upon Receipt of Payment of Allowed Claims Pursuant to Plan Generally**

The federal income tax consequences of the implementation of the Plan to the holders of Allowed Claims will depend, among other things, on the consideration to be received by the holder, whether the holder reports income on the accrual or cash method, whether the holder receives distributions under the Plan in more than one taxable year, whether distributions of contingent claims received by the holder are susceptible to valuation in the year received, whether the holder's claim is allowed or disputed on the Effective Date, and whether the holder has taken a bad debt deduction or a worthless security deduction with respect to its claim.

**1.      Recognition of Gain or Loss**

In general, a holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its claim less the holder's tax basis in the claim. The holder's amount realized generally will equal the sum of the cash and the fair market value of any other property received by the holder under the Plan on the Effective Date or a subsequent distribution date, less the amount (if any) treated as interest, as discussed below. Any gain or loss recognized in the exchange may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the holder, the length of time the holder held the claim, and whether the claim was acquired at a market discount. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal such property's fair market value.

**2.      Post-Effective Date Cash Distributions**

If a holder of an Allowed Claim receives a cash distribution after the Effective Date, the imputed interest provisions of the Internal Revenue Code may apply and cause a portion of the distribution to be treated as interest income even if the holder has an overall loss in the transaction. Additionally, if a holder receives distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred. Holders of Allowed Claims should consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their claims.

**3.      Receipt of Interest**

Holders of Allowed Claims will recognize ordinary income to the extent that they receive cash or property that is allocable to accrued but unpaid prepetition interest that the holder has not yet included in its income. If an Allowed Claim includes interest, and if the holder receives less than the amount of the Allowed Claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest. The Plan provides that amounts transferred to holders with respect to Allowed Claims are allocable first to the principal amount of such claims and then to unpaid interest accrued prior to the Petition Date. It is not clear that this allocation

will be respected, but there is language in the legislative history of the Bankruptcy Tax Act of 1980 that suggests (i) that it should be and (ii) that holders are bound by the allocation between principal and interest made in the Plan. Holders of Allowed Claims should consult their own tax advisors regarding this issue. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

### 4. Bad Debt or Worthless Securities Deduction

A holder who receives in respect of an Allowed Claim an amount less than the holder's tax basis in the claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under Section 166(a) of the Internal Revenue Code or a worthless securities deduction under Section 165(g) of the Internal Revenue Code. The rules governing the character, timing and amount of bad debt and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor, the instrument with respect to which a deduction is claimed, and the consideration that is received in exchange for the instrument. Holders of Allowed Claims, therefore, should consult their tax advisors with respect to their ability to take such a deduction.

### C. Certain Federal Income Tax Consequences of the Reorganization Transaction

The Prepetition Lenders will (i) treat NewCo as a partnership for U.S. federal tax purposes, and (ii) make or cause to be made all elections that will be necessary to treat NewCo as a partnership for U.S. federal tax purposes. The Prepetition Lenders may take the position that, for U.S. federal income tax purposes, the Reorganization Transaction was a discharge by the Prepetition Lenders of all of their Prepetition Facility Claims in exchange for the Transferred Assets, followed by a contribution of the Transferred Assets to NewCo in exchange for equity interests in NewCo. Alternatively, Prepetition Lenders may take the position that, for U.S. federal income tax purposes, the Reorganization Transaction was a discharge by the Prepetition Lenders of a portion of their Prepetition Facility Claims, followed by a contribution by the Prepetition Lenders of their remaining Prepetition Facility Claims to NewCo in exchange for equity interests in NewCo, followed by a discharge by NewCo of all Prepetition Facility Claims contributed to it by the Prepetition Lenders in exchange for Transferred Assets. The Prepetition Lenders likely would not take this position if they conclude that, as of the Effective Date, their Prepetition Facility Claims exceed the fair market value of the Transferred Assets. The Internal Revenue Service may take a different position, *e.g.*, that, for U.S. federal income tax purposes, the Reorganization Transaction should be treated as a contribution by the Prepetition Lenders of 100 percent of the Prepetition Facility Claims to NewCo in exchange for equity interests in NewCo, followed by a discharge by NewCo of all Prepetition Facility Claims contributed to it by Prepetition Lenders in exchange for the Transferred Assets.

### D. Treatment of the GUC Litigation Trust and its Beneficial Owners

The Debtors intend that the GUC Litigation Trust be a liquidating trust treated as a "grantor trust" under Section 671 of the Internal Revenue Code. The remainder of this section assumes that this treatment is correct. If the IRS succeeds in requiring a different

characterization of the GUC Litigation Trust, the GUC Litigation Trust could be subject to tax on all of its net income and gains, with the result that the amounts received by holders of Allowed Claims could be reduced.

### 1.      Liquidating Trust

Except as discussed under "Disputed Claims Reserve" below, the GUC Litigation Trust will not be treated as a separate entity for federal income tax purposes. Instead, the holders of beneficial interests in the GUC Litigation Trust will be treated as owning their respective pro rata shares of the GUC Litigation Trust assets, subject to any liabilities of the Debtors assumed by the GUC Litigation Trust and any liabilities of the GUC Litigation Trust itself.

Each recipient of interests in the GUC Litigation Trust on the Effective Date should be treated as transferring its claim to the Debtors in exchange for the holder's pro rata share of the GUC Litigation Trust assets, less any liabilities of the Debtors assumed by the GUC Litigation Trust and any GUC Litigation Trust liabilities (including amounts contributed to the Disputed Claims Reserve), followed by the recipient's transfer of such assets (subject to such liabilities) to the GUC Litigation Trust. The recipients of interests in the GUC Litigation Trust on the Effective Date should recognize gain or loss equal to the difference between the fair market value of such assets (subject to such liabilities) and the recipient's adjusted basis in its claim. The tax basis of the GUC Litigation Trust assets deemed received in the exchange will equal the amount realized by the recipient and the holding period for such assets will begin on the day following the exchange. For the avoidance of doubt, the recipients of interests in the GUC Litigation Trust are not intended to be treated for federal income tax purposes as receiving GUC Litigation Trust assets that are contributed to the disputed claims reserve until such time as the disputed claims reserve makes distributions, in which case (and at which time) the recipients are intended to be treated as receiving the distributions actually received from the disputed claims reserve, if any.

For purposes of the immediately preceding paragraph, the following parties should be treated as recipients of interests in the GUC Litigation Trust on the Effective Date: (A) holders of General Allowed Unsecured Claims on the Effective Date, and (B) NewCo or the Prepetition Lenders, depending on whether NewCo or the Prepetition Lenders are treated as discharging the Prepetition Facility Claims in exchange for interests in the GUC Litigation Trust. If Prepetition Lenders are treated as recipients of interests in the GUC Litigation Trust on the Effective Date for purposes of the immediately preceding paragraph, they should be treated as contributing their interests in the GUC Litigation Trust to NewCo immediately after receiving them.

NewCo and each holder of an Allowed General Unsecured Claim should be required to include in income their allocable share of any income, gain, loss, deduction or credit recognized by the GUC Litigation Trust, including interest or dividend income earned on bank accounts and other investments. If the GUC Litigation Trust sells or otherwise disposes of a GUC Litigation Trust asset in a transaction in which gain or loss is recognized, NewCo and each holder of an Allowed General Unsecured Claim will be required to include in income gain or loss equal to the difference between (i) their pro rata share of the cash or property received in exchange for the asset sold or otherwise disposed of, and (ii) their adjusted basis in the holder's pro rata share of the asset. The character and amount of any gain or loss will be determined by reference to the

- 50 -

character of the asset sold or otherwise disposed of. NewCo and holders of Allowed General Unsecured Claims will be required to report any income or gain recognized on the sale or other disposition of a GUC Litigation Trust asset whether or not the GUC Litigation Trust distributes the sales proceeds currently and may, as a result, incur a tax liability before the holder receives a distribution from the GUC Litigation Trust.

### 2. Disputed Claims Reserve

The disputed claims reserve is intended to be treated as a discrete trust taxed under Sections 641 *et seq.* of the Internal Revenue Code. Under these provisions, income and gain recognized with respect to the GUC Litigation Trust assets in the disputed claims reserve should be subject to an entity-level tax to the extent the income or gain is not distributed to holders of Allowed Claims within the same taxable year. The Internal Revenue Service may take a different position, *e.g.*, that, for U.S. federal income tax purposes, the disputed claims reserve must be treated as a disputed ownership fund under Treasury regulations section 1.468B-9.

### E. Information Reporting and Withholding

Under the Internal Revenue Code's backup withholding rules, the holder of an Allowed Claim may be subject to backup withholding with respect to distributions or payments made pursuant to the Plan unless the holder comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact, or provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax, but merely an advance payment that may be refunded to the extent it results in an overpayment of tax. Holders of Allowed Claims may be required to establish exemption from backup withholding or to make arrangements with respect to the payment of backup withholding.

## XV.   ADDITIONAL INFORMATION

The statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. The Debtors will file all exhibits to the Plan with the Bankruptcy Court.

## XVI.   RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that the Confirmation and consummation of the Plan is preferable to all other alternatives. Consequently, the Debtors urge all holders of Claims in Classes 4 and 6 to vote to accept the Plan and to evidence their acceptance by duly completing and returning their Ballots so that they will be received on or before the Voting Deadline.

[Signature Page Immediately Follows]

10732\29\1421175.4

Dated:  July 9, 2010

Respectfully submitted,

**DEBTORS:**

**7677 EAST BERRY AVENUE ASSOCIATES, L.P.**

By:    EDC Denver I, LLC, a Delaware
         limited liability company,
         its General Partner

By:_____
      Name:  Zachary Davidson
      Title:   Manager

      By:_____
      Name:  Andrew Miller
      Title:   Chief Restructuring Officer

**EDC DENVER I, LLC**

By:_____
Name:  Zachary Davidson
Title:  Manager

**EVEREST HOLDINGS, LLC**

By:_____
Name:  Zachary Davidson
Title:  Manager

- 52 -

Dated:  July 9, 2010

Respectfully submitted,

**DEBTORS:**

**7677 EAST BERRY AVENUE ASSOCIATES, L.P.**

By:    EDC Denver I, LLC, a Delaware
       limited liability company,
       its General Partner

By:_____
      Name:  Zachary Davidson
      Title:   Manager

      By:_____
      Name:  Andrew Miller
      Title:   Chief Restructuring Officer

**EDC DENVER I, LLC**

By:_____
Name:  Zachary Davidson
Title:   Manager

**EVEREST HOLDINGS, LLC**

By:_____
Name:  Zachary Davidson
Title:   Manager

- 52 -

Counsel:

BROWNSTEIN HYATT FARBER SCHRECK, LLP


By: ___*s/Daniel J. Garfield*_____
Michael J. Pankow (CO Bar No. 21212)
Daniel J. Garfield (CO Bar No. 26054)
410 Seventeenth Street
Suite 2200
Denver, CO 80202-4432
Telephone:  (303) 223-1100
Facsimile:  (303) 223-1111

*Counsel for Debtors and Debtors in Possession*

10732\29\1421175.4

**EXHIBIT I**

**DEBTORS' JOINT PLAN OF REORGANIZATION
UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

[See Attached]

# EXHIBIT II

# SOLICITATION ORDER

[See Attached]

**EXHIBIT III**

**CHAPTER 7 LIQUIDATION ANALYSIS**

[See Attached]